1  GREGORY C. LOARIE (CA Bar No. 215859)
   EARTHJUSTICE
2  50 California Street, Suite 500
   San Francisco, CA 94111
3  T: (415) 217-2000 • F: (415) 217-2040
4  E: gloarie@earthjustice.org

5  ELIZABETH B. FORSYTH (CA Bar No. 288311)
   EARTHJUSTICE
6  810 3rd Avenue #610
   Seattle, WA 98104
7  T: (206) 531-0841 • F: (206) 343-1526
8  E: eforsyth@earthjustice.org

9  *Counsel for Plaintiffs*

10 (*Additional Counsel of Record*
11 *Listed in Signature Block*)

12
13            IN UNITED STATES DISTRICT COURT FOR THE
                 CENTRAL DISTRICT OF CALIFORNIA
14                      WESTERN DIVISION

15 CENTER FOR BIOLOGICAL DIVERSITY,   )  No.:
   DEFENDERS OF WILDLIFE, and SIERRA  )
16 CLUB,                              )
                                      )  **COMPLAINT FOR**
17           Plaintiffs,              )  **DECLARATORY AND**
                                      )  **INJUNCTIVE RELIEF**
18       vs.                          )
                                      )
19                                    )
   U.S. BUREAU OF LAND MGMT.; DEBRA   )
20 HAALAND, Secretary of Interior; NADA )
   CULVER, Senior Advisor to the Secretary of )
21 the Department of the Interior; KAREN )
   MOURITSEN, California Director, Bureau of )
22 Land Mgmt.; ANDREW ARCHULETA,      )
   California Desert District Manager, Bureau of )
23 Land Mgmt.; MICHAEL AHRENS, Needles )
   Field Office Manager, Bureau of Land Mgmt., )
24                                    )
25           Defendants.              )
                                      )
26 ─────────────────────────────────  )

27
28

─────────────────────────────────────
                    1

## INTRODUCTION

1.　　This case challenges a December 21, 2020 decision by defendants (collectively, BLM) to issue a private company, Cadiz, rights-of-way to convey water through a mothballed oil and gas pipeline that crosses Mojave Trails National Monument and other protected public land in southeastern California.  BLM's decision allows Cadiz to implement the so-called "Cadiz Valley Water Conservation, Recovery and Storage Project" (or "Cadiz Water Project"), a longstanding scheme to sell groundwater extracted from ancient aquifers underlying the Mojave Desert.

2.　　BLM's decision will have a devastating impact on the fragile desert environment.  Use of the oil and gas pipeline for water will make it possible for Cadiz to extract far more groundwater from the desert aquifers in and around Mojave Trails National Monument than is replenished naturally, causing overdraft in the affected groundwater basins.  The resulting draw-down of the water table will cause many freshwater springs of critical importance to desert plants and animals to go dry.  The retreating aquifer will also desiccate desert "playa" lakebeds, resulting in toxic air pollution from windswept sediments akin to what has plagued the Owens Valley to the north ever since large-scale water diversions to Los Angeles dried Owens Lake a century ago.

3.　　On December 21, 2020, in the eleventh hour of the departing administration, BLM issued the challenged rights-of-way with no environmental review, in violation of the National Environmental Policy Act (NEPA).  BLM moreover failed to comply the Mojave Trails National Monument Proclamation's requirements that rights-of-way across the Monument be consistent with the care and management of monument objects and ensure availability of water resources.  Finally, BLM violated the Federal Land Policy and Management Act's (FLPMA's) requirements to review whether the rights-of-way would create or exacerbate groundwater overdraft and to specify terms and conditions in the rights-of-way that would protect the environment.

Complaint for Declaratory & Injunctive Relief

4.     Plaintiffs Center for Biological Diversity, Defenders of Wildlife, and Sierra Club ask this Court to set aside BLM's illegal issuance of the rights-of-way and enjoin BLM from authorizing or otherwise allowing Cadiz to undertake any activities within the rights-of-way until BLM complies with federal law.

**JURISDICTION AND VENUE**

5.     This action arises under NEPA, 42 U.S.C. §§ 4321–4347, FLPMA, 43 U.S.C. §§ 1701–1787, the Proclamation Establishing the Mojave Trails National Monument, Pres. Proc. No. 9395, 81 FR 8371 (Feb. 12, 2016), and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.  The Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

6.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant).  An actual justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1), because a substantial part of the public land that is the subject of this action lies in this District.

8.     Assignment to the Western Division of this Court is proper under General Order No. 16-05 I.B.1.a(1)(b).

**PARTIES**

9.     Plaintiff Center for Biological Diversity ("the Center") is a national non-profit conservation organization with over 84,000 members dedicated to the protection of biodiversity and ecosystems throughout the world.  The Center works through science, law, and creative media to secure a future for all species, great and small, hovering on the brink of extinction, with a focus on protecting the lands, waters and climate that species need to survive.  The Center has offices in California and over 17,500 members across the state, and it is actively involved in species and habitat protection in the California desert, including on the federal land at issue in this case.

10.     Plaintiff Defenders of Wildlife ("Defenders") is a nonprofit corporation with members and supporters across the nation, including many in California. Defenders is dedicated to the protection of all native wild animals and plants in their natural communities. The organization focuses its programs on what scientists consider two of the most serious environmental threats to the planet: the accelerating rate of extinction of species and the associated loss of biological diversity, and habitat alteration and destruction. These programs encourage protection of entire ecosystems and interconnected habitats, including the Mojave Desert, while protecting wildlife that serve as indicator species for ecosystem health.

11.     Plaintiff Sierra Club is a national nonprofit organization with sixty-three chapters and more than 830,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  Led by the Sierra Club's San Gorgonio Chapter, the Sierra Club has worked to conserve and restore the Mojave Desert for decades.

12.     Plaintiffs have members who live, work, and recreate in the Mojave Desert region in the vicinity of the Cadiz Water Project.  Plaintiffs' members and supporters enjoy, on a continuing basis, public lands within Mojave Trails National Monument and other public lands that will be affected by the Cadiz Water Project.  In a land where water is scarce and precious, Plaintiffs' members have visited freshwater springs that will be impacted by the Cadiz Water Project, including Bonanza Springs, to observe rare plants and animals and find solace and renewal, and they intend to continue to do so in the future.  Plaintiffs' members derive professional, scientific, aesthetic, recreational, and educational enjoyment from the natural ecosystems that these desert springs and other riparian areas support.

13.     Plaintiffs have been, are being, and will continue to be adversely affected and irreparably injured by BLM's decision to issue Cadiz rights-of-way to convey

water through the oil and gas pipeline at issue.  BLM's decision allows Cadiz to carry out the Cadiz Water Project.  The interests of Plaintiffs' members described above will be injured not only by the noise, pollution, and adverse impacts to plants and wildlife associated with construction, operation, and maintenance of the Cadiz Water Project, including the Project's pipelines and other infrastructure, but also by the draw-down of the aquifers that will result from operation of the Project.  The drying of desert springs and riparian areas, as well as the air pollution caused by excessive drying of desert lakebeds, will cause Plaintiffs' and their members to suffer actual injury-in-fact that is both concrete and particularized.

14.     Plaintiffs also have members who live in urban areas that could receive water from the Cadiz Water Project and are justifiably concerned about the health risks associated with using and consuming water from the Cadiz Water Project, which will contain hexavalent chromium and other heavy metals.  The BLM decisions at issue harm Plaintiffs and their members, because they allow Cadiz to profit by privatizing and selling public water resources that are unsafe for urban uses.

15.     Plaintiffs are non-profit advocacy organizations whose organizational missions have been, are being, and will continue to be frustrated by BLM's illegal decision to issue Cadiz rights-of-way across Mojave Trails National Monument and other protected public land for the Cadiz Water Project.  BLM's illegal decision has caused Plaintiffs to divert their organizational resources to ensure that the Cadiz Water Project does not proceed.  Plaintiffs' injuries described above are caused by the BLM decision challenged herein, because BLM's decision allows Cadiz to undertake harmful activities that would otherwise be illegal or impracticable.  Plaintiffs' injuries would be redressed by the relief sought herein.  Plaintiffs have no adequate remedy at law.

16.     Defendant Bureau of Land Management is the administrative agency within the Department of Interior responsible for managing the public land

Complaint for Declaratory & Injunctive Relief

surrounding much of the Cadiz Water Project and underlying much of the rights-of-way at issue.

17.    Defendant Debra Haaland is Secretary of the U.S. Department of Interior and sued in her official capacity as such.

18.    Defendant Nada Culver is Senior Advisor to the Secretary of the Department of the Interior, exercising the delegated authority of the BLM Director, and sued in her official capacity as such.

19.    Defendant Karen Mouritsen BLM's California State Director and sued in her official capacity as such.

20.    Defendant Andrew Archuleta is the District Manager for BLM's California Desert District and sued in his official capacity as such.

21.    Defendant Michael Ahrens is the Field Manager for BLM's Needles Field Office and sued in his official capacity as such.

## LEGAL BACKGROUND

**The Federal Land Policy and Management Act**

22.    Congress enacted the Federal Land Policy and Management Act in 1973 to ensure that federal public land administered by BLM is "managed in a manner that will protect the quality of scientific, scenic, historic, ecological, environmental, air and atmospheric, water resource, and archeological values." 43 U.S.C. § 1701(a)(8). FLPMA requires BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands." *Id*. § 1732(b).

23.    FLPMA finds the deserts of southern California are an especially rich and unique environment containing "historical, scenic, archeological, environmental, biological, cultural, scientific, educational, recreational, and economic resources." 43 U.S.C. § 1781(a)(1). Though vast, the statute recognizes California's deserts are "extremely fragile, easily scarred, and slowly healed." *Id.* § 1781(a)(2)*.* FLPMA finds, "the California desert environment and its resources, including certain rare and endangered species of wildlife, plants, and fishes, and numerous archeological and

historic sites, are seriously threatened by air pollution . . . and pressures of increased use." *Id*. § 1781(a)(3).

24.   To protect southern California's deserts for future generations, FLPMA designated 25 million acres of federal public land as the California Desert Conservation Area (CDCA). 43 U.S.C. § 1781(c).  The CDCA was designated "to provide for the immediate and future protection and administration of the public lands in the California desert within the framework of a program of multiple use and sustained yield, and the maintenance of environmental quality." *Id*. § 1781(b). FLPMA directs the Secretary of the Interior to develop a "comprehensive, long-range plan for the management, use, development, and protection of the public lands within the [CDCA]." *Id*. § 1781(d).  Exercising this authority, BLM has adopted the California Desert Conservation Area Management Plan of 1980 (CDCA Plan), as amended by both the Northern and Eastern Colorado Desert Coordinated Management Plan, and the Desert Renewable Energy Conservation Plan (DRECP).  BLM regulations require "[a]ll future resource management authorizations and actions" to "conform" with these plans.  43 C.F.R. § 1610.5-3(a) (2017).

25.   FLPMA sets forth a process by which the Secretary of Interior, acting through BLM, may "grant, issue, or renew rights-of-way over, upon, under, or through" federal land administered by BLM for, among other things, "pipelines . . . for the . . . transportation or distribution of water." 43 U.S.C. § 1761(a)(1).

26.   Prior to issuing a right-of-way for a water pipeline under FLPMA, the applicant must submit substantial analysis, and the Secretary of Interior, acting through BLM, must make a number of findings.  For example, "prior to granting or issuing a right-of-way . . . for a new project which may have a significant impact on the environment," BLM "shall require the applicant to submit a plan for construction, operation, and rehabilitation for such right-of-way" that complies with BLM's terms and conditions.  43 U.S.C. § 1764(d).  BLM's terms and conditions must, among other things, "minimize damage to scenic and esthetic values and fish and wildlife habitat

and otherwise protect the environment"; and "protect Federal property and economic interests."  43 U.S.C. § 1765.

**The National Environmental Policy Act**

27.    NEPA declares "it is the continuing policy of the Federal Government . . . to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  42 U.S.C. § 4331(a).

28.    To effectuate this policy, NEPA requires federal agencies to prepare an "environmental impact statement" (EIS) for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An EIS must set forth:

> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.*

29.    NEPA created within the Executive Office of the President the Council on Environmental Quality (CEQ) "to formulate and recommend national policies to promote the improvement of the quality of the environment."  42 U.S.C. § 4342.  CEQ promulgated regulations to assist federal agencies in implementing NEPA in 1978.  *See* 40 C.F.R. §§ 1500–1508 (1978).  Although CEQ updated these regulations in 2020, the 1978 CEQ regulations govern BLM's issuance of the rights-of-way in this case, because the NEPA review process began prior to September 14, 2020.  *See* Update to the Regulations Implementing the Procedural Provisions of the National

Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020); 40 CFR 1506.13 (2020).

30. Under CEQ's regulations, if a proposed agency action is not likely to have significant effects or when the significance of the effects is unknown, the agency must prepare an "environmental assessment." 40 C.F.R. § 1508.9 (1978). The environmental assessment must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact;" and "include brief discussions of the need for the proposal, of alternatives, [and] of the environmental impacts of the proposed action and alternatives[.]" *Id.*

31. As part of its environmental review under NEPA, an agency is required to evaluate the indirect effects of the proposed action. 40 C.F.R. §§ 1502.16(b) (1978), 1508.8(b), 1508.25(c). "Indirect effects" are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). The agency's NEPA analysis also must assess the cumulative impacts of the action "result[ing] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* §§ 1508.7, 1508.27(b)(7).

32. Pursuant to the CEQ regulations, each federal agency is also required to identify categories of actions which do not individually or cumulatively have a significant effect on the human environment. 40 C.F.R. §§ 1507.3(b)(2)(ii) (1978), 1508.4.

33. The Department of Interior (Department) has promulgated regulations establishing "procedures for the Department, and its constituent bureaus, to use for compliance" with NEPA and CEQ's implementing regulations. 43 C.F.R. § 46.10 (2008). The Department's regulations identify actions that the Department concludes normally do not have a significant effect on the human environment and are "categorically excluded" from NEPA. *Id.* § 46.210.

34.     The Department has established additional NEPA policy in part 516 of its "Departmental Manual" (DM).  Chapter 11 of Departmental Manual part 516 specifies the additional NEPA procedures applicable to BLM.  Chapter 11.9 lists additional BLM "Actions Eligible for Categorical Exclusion (CX)" from NEPA.

35.     If an agency determines that a categorical exclusion identified in its agency NEPA procedures covers a proposed action, CEQ's regulations require agencies identify any "extraordinary circumstances in which a normally excluded action may have a significant environmental effect," 40 C.F.R. § 1508.4 (1978), in which case the agency must prepare an EIS or an EA with a "finding of no significant impact."

36.     The Department's NEPA regulations provide that "extraordinary circumstances . . . exist for individual actions within categorical exclusions that may meet" the following criteria:

(a) Have significant impacts on public health or safety.

(b) Have significant impacts on such natural resources and unique geographic characteristics as historic or cultural resources; park, recreation or refuge lands; wilderness areas; wild or scenic rivers; national natural landmarks; sole or principal drinking water aquifers; prime farmlands; wetlands; floodplains; national monuments; migratory birds; and other ecologically significant or critical areas.

(c) Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources.

(d) Have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.

(e) Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

(f) Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.

(g) Have significant impacts on properties listed, or eligible for listing, on the National Register of Historic Places as determined by the bureau.

Complaint for Declaratory & Injunctive Relief

(h)  Have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species or have significant impacts on designated Critical Habitat for these species.

(i) Violate a Federal law, or a State, local, or tribal law or requirement imposed for the protection of the environment.

(j) Have a disproportionately high and adverse effect on low income or minority populations.

(k) Limit access to and ceremonial use of Indian sacred sites on Federal lands by Indian religious practitioners or significantly adversely affect the physical integrity of such sacred sites.

(l) Contribute to the introduction, continued existence, or spread of noxious weeds or non-native invasive species known to occur in the area or actions that may promote the introduction, growth, or expansion of the range of such species.

43 C.F.R. § 46.215 (2008) (citations omitted).

37.    The Department's NEPA regulations confirm, "[a]ny action that is normally categorically excluded must be evaluated to determine whether it meets any of the extraordinary circumstances in section 46.215; if it does, further analysis and environmental documents must be prepared for the action."  *Id.* § 46.205(c)(1).  BLM must "work within existing administrative frameworks, including any existing programmatic agreements, when deciding how to apply any of the section 46.215 extraordinary circumstances."  *Id.* § 46.205(c)(2).

## FACTUAL BACKGROUND

**Mojave Trails National Monument**

38.    President Obama established Mojave Trails National Monument by presidential proclamation on February 12, 2016.  *See* Pres. Proc. No. 9395, 81 Fed. Reg. 8,371 (Feb. 18, 2016).  Stretching from Joshua Tree National Park north to Mojave National Preserve, the Monument encompasses 1.6 million acres of federal land administered by BLM within the CDCA.  A BLM map of the Monument is reproduced below.

39.    The presidential proclamation describes the Mojave Trails area as "a stunning mosaic of rugged mountain ranges, ancient lava flows, and spectacular sand dunes." 81 Fed. Reg. at 8,371.  The proclamation finds the monument is "an invaluable treasure and will continue to serve as an irreplaceable national resource for geologists, ecologists, archaeologists, and historians for generations to come." *Id.*  It concludes "protection of the Mojave Trails area will preserve its cultural, prehistoric, and historic legacy and maintain its diverse array of natural and scientific resources, ensuring that the prehistoric, historic, and scientific values of this area remain for the benefit of all Americans." *Id*. at 8,374.

40.    A complex network of ancient underground aquifers supports a number of ecologically significant springs, seeps and other riparian areas in and near Mojave Trails National Monument.  The proclamation establishing Mojave Trails National Monument specifically identifies "the area's scarce springs and riparian areas such as

1   Afton Canyon, Chuckwalla Spring, Hummingbird Spring, Barrel Spring, and Fenner

2   Spring" as ecological objects warranting protection.  81 Fed. Reg. at 8,372.

3   **The Cadiz Water Project**

4       41.   Cadiz, Inc. and its subsidiary Cadiz Real Estate, LLC (collectively,

5   Cadiz) are a for-profit corporations that have acquired over 34,000 acres of private

6   land in the Mojave Desert, most of which is located within the large rectangular

7   "donut hole" at the center of Mojave Trails National Monument.  Cadiz's property

8   spans portions of the Fenner, Cadiz, and Bristol Valley watersheds, and it sits above

9   the same underground aquifers that feed springs, seeps and riparian areas within the

10  Monument, Mojave National Preserve, Joshua Tree National Park, and other public

11  lands.  A map depicting the Cadiz's property (outlined in orange) in relation to the

12  three watersheds is reproduced below.



Complaint for Declaratory & Injunctive Relief

42.     Cadiz seeks to construct and operate the "Cadiz Valley Water Conservation, Recovery and Storage Project" or "Cadiz Water Project."  The Cadiz Water Project proposes to extract an average of 50,000 acre feet (an amount equivalent to 16.3 billion gallons) of groundwater every year for 50 years from the aquifers underlying Cadiz' property.  Cadiz seeks to profit by selling the extracted groundwater to municipal water districts and other users.

43.     The Cadiz Water Project will extract far more groundwater from the underlying aquifers than is replenished naturally each year, causing overdraft. Overall, the Cadiz Water Project would lower groundwater levels by 80 feet in the aquifer system through unsustainable pumping, and it could take 390 years after the cessation of pumping for the aquifers to return to their current equilibrium.

44.     The Cadiz Water Project will draw down the underlying aquifers and dewater springs, seeps, and other riparian areas in Mojave Trails National Monument and other public lands.  The retreating aquifer will also desiccate desert "playa" lakebeds like Bristol and Cadiz Dry Lakes, resulting in toxic air pollution from windswept sediments akin to what has plagued the Owens Valley to the north ever since large-scale water diversions to Los Angeles dried Owens Lake a century ago.

45.     The desert aquifers that the Cadiz Water Project intends to draw down contain hexavalent chromium and other naturally occurring heavy metals.  Experts have warned that that water produced from the Cadiz Water Project will contain hexavalent chromium at levels that far exceed state and federal safety guidelines.

46.     For the Cadiz Water Project to proceed, Cadiz must secure a right-of-way across Mojave Trails National Monument and other BLM-managed public lands that surround its property for a water pipeline capable of conveying water from the wellfield to an existing aqueduct and or other water conveyance offsite.  A water pipeline across BLM-managed public lands with sufficient capacity is a critical component of the Cadiz Water Project, without which the Project is not economically viable and cannot proceed.

Complaint for Declaratory & Injunctive Relief

47.     In September 2008, Cadiz leased a portion of a railroad right-of-way held by the Arizona & California Railroad (ARZC) that extends from Cadiz's property southeast through Mojave Trails National Monument to the town of Rice.  In 2012, Cadiz proposed to construct a seven-foot-wide, 43-mile-long water pipeline within the ARZC right-of-way linking the Cadiz Water Project's wellfield to the Colorado River Aqueduct.  In June 2019, Cadiz re-aligned a portion of its proposed southern pipeline route to deviate from the ARZC right-of-way and thereby avoid a 200-foot-wide strip of land in Section 36, Township 5 North, Range 14 East that is owned by the State of California and administered by the California State Lands Commission.  In 2020, Cadiz applied to BLM for a new, 41-foot right-of-way under FLPMA to accommodate the proposed realignment.  Cadiz's application to BLM for this 41-foot right-of-way is pending.  Cadiz does not currently hold the necessary rights-of-way to construct a southern pipeline linking its property to the Colorado River Aqueduct.

48.     In 2011, Cadiz negotiated the purchase of an oil and gas pipeline owned by the El Paso Natural Gas Company that stretches from Cadiz's property northwest to Barstow and all the way to Interstate 5 near the Los Angeles Grapevine, crossing the California Aqueduct, the Los Angeles Aqueduct, and the Mojave River Pipeline. Cadiz proposes to convert this oil and gas pipeline, which has been unused since 2004, into a water pipeline capable of conveying up to 30,000 acre-feet from the Cadiz Water Project per year.  Cadiz estimates it will cost approximately $100 million to convert the pipeline to make it operational for delivery of groundwater.

49.     The oil and gas pipeline crosses approximately 53.5 miles of BLM lands located in San Bernardino and Kern Counties, California.  The portion of the pipeline that crosses BLM lands is located within a right-of-way granted to El Paso Natural Gas Company under the Mineral Leasing Act of 1920, 30 U.S.C. § 185.  A map depicting in red the portion of the pipeline that crosses BLM land is reproduced

Complaint for Declaratory & Injunctive Relief

below.



50.     On July 30, 2020, Cadiz applied to BLM (1) to reassign El Paso Natural Gas's Mineral Leasing Act right-of-way to Cadiz, and (2) to convert the Mineral Leasing Act right-of-way to a FLPMA right-of-way.  Cadiz's application confirmed the requested rights-of-way would allow the Cadiz Water Project to proceed.  The application described the need for the proposed "project" broadly as to "increase flexibility and resilency of the water supply" through "enhanced conveyance capacity[.]"  The application explained that the "probable effects" of the "project" would include "open[ing] up additional, diversified, [water] supply options" for water users.

51.     On December 11, 2020, BLM concluded the conversion of the Mineral Leasing Act right-of-way to a FLPMA right-of-way was categorically excluded from NEPA review under exclusion 11.9(E)(12) of the Department of the Interior's Departmental Manual Part 516.

52.     Exclusion 11.9(E)(12) provides for a categorical exclusion from NEPA, unless one or more extraordinary circumstances apply, for "[g]rants of right-of-way wholly within the boundaries of other compatibly developed rights-of-way."  516 DM 11.9(E)(12).  BLM reasoned that the categorical exclusion applied because "[t]he water pipeline that would be authorized under FLPMA is the same existing facilities as the existing El Paso Natural Gas Pipeline.  No new construction or modification is proposed."  BLM did not explain how a pipeline that could not, under the Mineral Leasing Act, be used to transport water, was compatible with grant of a right-of-way allowing the use of the pipeline to carry water.  Nor did it explain its reasoning for its assumption that no construction or modification of the pipeline was required to convert it from gas to water.

53.     BLM determined that no extraordinary circumstances applied which would make the project ineligible for a categorical exclusion.  BLM reasoned that there would be no significant environmental impacts because "[t]he FLPMA [right-of-way] would utilize existing infrastructure and right-of-way footprint and would not include any new construction or ground disturbing activities."  BLM similarly determined that the right-of-way would have no impact on the Mojave Trails National Monument because "[w]hile portions of the project area are within the Mojave Trails National Monument, the FLPMA [right-of-way] would not include any new construction or ground disturbing activities on public lands."  In its findings, BLM did not mention that the purpose of the pipeline was to transport water pumped from the Cadiz Water Project, and it did not consider the effect that pumping would have on the desert environment.

54.     BLM did not address whether the reassignment of El Paso Natural Gas's Mineral Leasing Act right-of-way to Cadiz is subject to NEPA review.

55.     By letter dated December 16, 2020, Plaintiffs Defenders and the Center objected.  They explained that conversion and use of the oil and gas pipeline for water would have significant effects on the environment.  They also highlighted that the new

right-of-way "would allow extraction of vast amounts of water from the desert ecosystem impacting many resources." They explained that several extraordinary circumstances apply that trigger the need for BLM to analyze the project under NEPA, including that the Cadiz Water Project would be a direct effect of issuing the right-of-way, and that pumping from the Cadiz Water Project would impact "a cultural landscape with sacred sites, wetland habitat and the numerous species that rely on it." They also pointed out that the impacts of the Cadiz Water Project would be highly controversial; have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks; have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species due to impacts to the threatened desert tortoise; and could violate S.B. 307, the State Water Resources Control Board's dredge and fill procedures, the California Endangered Species Act, and California Fish and Game Code Section 1600.

56.     BLM did not respond to the Plaintiffs' letter or conduct further analysis under NEPA. On December 21, 2020, BLM provided Cadiz "fully executed Mineral Leasing Act (MLA) right-of-way (ROW) grant CACA-059168," assigning El Paso Natural Gas's Mineral Leasing Act right-of-way to Cadiz, along with "Federal Land Policy and Management Act (FLPMA) ROW grant CACA-059050," converting the Mineral Leasing Act right-of-way to a FLPMA right-of-way.

## FIRST CLAIM FOR RELIEF
### (Violations of NEPA)

57.     Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding paragraphs.

58.     BLM's compliance with NEPA is subject to judicial review under the APA. The APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

59.     BLM's December 21, 2020 issuance of Mineral Leasing Act right-of-way CACA-059168 and Federal Land Policy and Management Act right-of-way CACA-059050 are "final agency actions" subject to judicial review under the Administrative Procedure Act (APA).  5 U.S.C. § 704.

60.     BLM's issuance of Mineral Leasing Act right-of-way CACA-059168 and Federal Land Policy and Management Act right-of-way CACA-059050 is a major Federal action significantly affecting the quality of the human environment, within the meaning of NEPA.  BLM violated NEPA by failing to prepare an EIS in connection with its decision to issue these rights-of-way.

61.     BLM's determination that right-of-way CACA-059050 is categorically excluded from NEPA review is arbitrary, capricious, an abuse of discretion, and not in accordance with law.  BLM may only convert existing rights-of-way without NEPA review "where no new facilities or other changes are needed," 516 DM 11.9(E)(11), and BLM may only exclude grants of right-of-way from NEPA review when they are within the boundaries of other "compatibly developed" rights-of-way, 516 DM 11.9(E)(12).  Right-of-way CACA-059050 is a conversion of a Mineral Leasing Act right-of-way to a FLPMA right-of-way which allows Cadiz to convert a pipeline transporting natural gas to transporting water.  New facilities or other changes are needed to make this change, and the Mineral Leasing Act natural gas pipeline right-of-way is not "compatibly developed" with a FLPMA pipeline right-of-way allowing transport of water.  BLM had no rational basis to rely on a categorical exclusion from NEPA to avoid environmental review of the right-of-way conversion.

62.     BLM's determination that no extraordinary circumstances apply precluding the use of a categorical exclusion from NEPA for right-of-way CACA-059050 is arbitrary, capricious, an abuse of discretion, and not in accordance with law. There will be significant construction impacts associated with converting the oil and gas pipeline to make it operational for delivery of water.  In addition, the right-of-way is a part of the Cadiz Water Project, and the Cadiz Water Project's effects are effects

Complaint for Declaratory & Injunctive Relief

of the right-of-way.  The impacts of the Cadiz Water Project will be significant, highly controversial, have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks; have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects; have significant impacts on species listed, or proposed to be listed, on the List of Endangered or Threatened Species list; and would violate State laws imposed for the protection of the environment.  Extraordinary circumstances therefore apply, precluding BLM's use of a categorical exclusion to avoid NEPA review. 43 C.F.R. § 46.215(b), (c), (d), (f), (h), (i).

63.   BLM's failure to conduct any NEPA analysis on its assignment of Mineral Leasing Act right-of-way CACA-059168 to Cadiz is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  When the Bureau re-assigns an existing right-of-way, it must conduct NEPA review unless "no additional rights are conveyed beyond those granted by the original authorizations."  516 DM 11.9(E)(9).  Because BLM conveyed additional rights through its issuance of Federal Land Policy and Management Act right-of-way CACA-059050 to allow Cadiz to transport water through the pipeline, it was required to conduct NEPA review on its assignment of Mineral Leasing Act right-of-way CACA-05916.

### SECOND CLAIM FOR RELIEF
### (Violations of FLPMA)

64.   Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding paragraphs.

65.   BLM's compliance with FLPMA is subject to judicial review under the APA.

66.   BLM's issuance of Mineral Leasing Act right-of-way CACA-059168 and Federal Land Policy and Management Act right-of-way CACA-059050 is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with FLPMA.

Complaint for Declaratory & Injunctive Relief

67.     First, FLPMA requires BLM to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). For areas within the CDCA, FLPMA also requires BLM to ensure "immediate and future protection and administration of the public lands in the California desert" and "the maintenance of environmental quality." 43 U.S.C. § 1781(b). BLM's issuance of Mineral Leasing Act right-of-way CACA-059168 and Federal Land Policy and Management Act right-of-way CACA-059050 will cause unnecessary and undue degradation of Mojave Trails National Monument and other public land administered by BLM. BLM's failure to prevent this unnecessary and undue degradation or to ensure protection of these public lands and the maintenance of environmental quality violates FLPMA.

68.     Second, FLPMA provides "prior to granting or issuing a right-of-way . . . for a new project which may have a significant impact on the environment," BLM "shall require the applicant to submit a plan for construction, operation, and rehabilitation for such right-of-way" that complies with BLM's terms and conditions. 43 U.S.C. § 1764(d). The Cadiz Water Project will have a significant impact on the environment. BLM violated FLPMA by failing to specify terms and conditions that "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment" and "protect Federal property and economic interests." 43 U.S.C. § 1765.

69.     Third, BLM's decisions must conform to the California Desert Conservation Area Plan, as amended by the Desert Renewable Energy Conservation Plan (DRECP). The DRECP requires that "for any activity that proposes to utilize groundwater resources," "[a] Water (Groundwater) Supply Assessment shall be prepared in conjunction with the activity's NEPA analysis and prior to an approval or authorization." The DRECP explains that "[t]he purpose of the Water Supply Assessment is to determine whether over-use or over-draft conditions exist within the project basin(s), and whether the project creates or exacerbates these conditions."

BLM's issuance of Mineral Leasing Act right-of-way CACA-059168 and Federal Land Policy and Management Act right-of-way CACA-059050, without conducting a Groundwater Supply Assessment, violated the DRECP and FLPMA.

### THIRD CLAIM FOR RELIEF

### (Violation of the Proclamation Establishing Mojave Trails National Monument)

70.     Plaintiffs re-allege, as if fully set forth herein, the allegations contained in the preceding paragraphs.

71.     BLM's compliance with the proclamation establishing the Mojave Trails National Monument is subject to judicial review under the APA.

72.     The Mojave Trails National Monument Proclamation requires that BLM may only allow assignments of and modifications to pipelines located within the Mojave Trails National Monument if they are "consistent with the care and management" of the Monument objects.  81 Fed. Reg. at 8,375.  The Proclamation similarly provides that existing pipelines within the Monument "may be expanded . . . only to the extent consistent with the care and management" of Monument objects. *Id*.

73.     The Mojave Trails National Monument Proclamation also directs the Secretary of Interior to "work with appropriate State officials to ensure the availability of water resources, including groundwater resources, needed for monument purposes." 81 Fed. Reg. at 8,375.

74.     BLM's issuance of Mineral Leasing Act right-of-way CACA-059168 and Federal Land Policy and Management Act right-of-way CACA-059050 is inconsistent with the care and management of monument objects and violates the Proclamation's requirement to ensure availability of water resources, because the rights-of-way will allow Cadiz to pump unsustainable amounts of groundwater that otherwise support monument objects including springs, seeps, and riparian areas, and the plants and wildlife that depend on them, in the Mojave Trails National Monument.  BLM's

Complaint for Declaratory & Injunctive Relief

issuance of these rights-of-way therefore violated the proclamation establishing the Mojave Trails National Monument and was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Issue a declaratory judgment that BLM violated the law as described in this complaint;

B.     Vacate and set aside Mineral Leasing Act right-of-way CACA-059168 and Federal Land Policy and Management Act right-of-way CACA-059050;

C.     Enjoin BLM from authorizing or otherwise allowing Cadiz to undertake any activities within the rights-of-way at issue;

D.     Award Plaintiffs their costs of litigation, including reasonable attorneys' fees and costs;

E.     Grant Plaintiffs such additional relief as the Court may deem proper; and

F.     Retain continuing jurisdiction of this matter until BLM fully remedies the violations of law complained of herein.

Respectfully submitted,

Dated: March 23, 2021           /s/ Gregory C. Loarie
                                GREGORY C. LOARIE (CA Bar No. 215859)
                                EARTHJUSTICE
                                50 California Street, Suite 500
                                San Francisco, CA 94111
                                T: (415) 217-2000 • F: (415) 217-2040
                                E: gloarie@earthjustice.org

                                ELIZABETH B. FORSYTH (CA Bar No. 288311)*
                                EARTHJUSTICE
                                810 3rd Ave #610
                                Seattle, WA 98104
                                T: (206) 531-0841 • F: (206) 343-1526
                                E: eforsyth@earthjustice.org
                                *admitted in California; not admitted in Washington

                                *Counsel for All Plaintiffs*

Complaint for Declaratory & Injunctive Relief

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LISA T. BELENKY (CA Bar No. 203225)
ARUNA M. PRABHALA (CA Bar No. 278865)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway Street, Suite 800
Oakland, CA 94612
T: (510) 844-7100 • F: (510) 844-7150
E: lbelenky@biologicaldiversity.org
   aprabhala@biologicaldiversity.org

*Counsel for Plaintiff Center for Biological Diversity*

Complaint for Declaratory & Injunctive Relief