TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division
LUTHER L. HAJEK
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO  80202
Tel.:  (303) 844-1376
Fax:  (303) 844-1350
E-mail:  luke.hajek@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>              Plaintiffs,<br><br>v.<br><br>U.S. BUREAU OF LAND MANAGEMENT, *et. al.*,<br><br>              Defendants,<br><br>and<br><br>CADIZ, INC., *et al.*,<br><br>              Defendant-Intervenors | Case No. 2:21-cv-02507-GW-AS<br><br>**DEFENDANTS' NOTICE OF MOTION FOR VOLUNTARY REMAND AND MEMORANDUM IN SUPPORT**<br><br>Hearing Date:  March 24, 2021<br>Time:  8:30 am<br>Courtroom:  9D<br>Judge: Honorable George H. Wu |

*Defs.' Notice of Motion for Voluntary Remand and Memorandum in Support*

## NOTICE OF MOTION AND MOTION FOR VOLUNTARY REMAND

PLEASE TAKE NOTICE that, on March 24, 2022, or as soon thereafter as it may be taken under submission or heard, Defendants the U.S. Bureau of Land Management ("BLM") *et al.* will, and hereby do, move this Court for a voluntary remand of the actions challenged in this case. Specifically, Defendants request that the Court grant a remand of BLM's decision to issue a right-of-way to Cadiz Real Estate, LLC ("Cadiz") allowing it to operate a pipeline to transport water between Cadiz and Barstow, California. In making that decision, BLM did not adequately analyze the potential environmental impacts of granting the right-of-way under the National Environmental Policy Act ("NEPA") and did not sufficiently evaluate potential impacts to historic properties under the National Historic Preservation Act ("NHPA"). Therefore, and for the reasons set forth in the accompanying memorandum in support, Defendants request that the Court remand BLM's decision to the agency and vacate it.

Pursuant to Local Rule 7-3, Defendants' counsel has conferred with counsel for the parties. Defendant-Intervenors Cadiz *et al.* oppose this motion. Plaintiffs Center for Biological Diversity *et al.* and Plaintiffs Native American Land Conservancy *et al.*, subject to review of the filed brief, do not oppose this motion.

DATED: December 3, 2021      Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

*/s/ Luther L. Hajek*
Luther L. Hajek
Trial Attorney (CO Bar No. 44303)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

22

23

24

25

26

27

28

U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Tel | (303) 844-1376
Fax | (303) 844-1350
Email:  Luke.Hajek@usdoj.gov

*Attorneys for Defendants*

# MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

INTRODUCTION ........................................................................... 1

BACKGROUND ............................................................................. 1

    I.    Factual Background....................................................... 1

    II.   Legal Background ......................................................... 7

         A.    The Federal Land Policy and Management Act ................ 7

         B.    Mineral Leasing Act................................................. 7

         C.    National Environmental Policy Act.................................. 8

         D.    National Historic Preservation Act ..................................... 9

APPLICABLE LEGAL STANDARD ........................................... 11

ARGUMENT ............................................................................. 12

    I.    A Remand of BLM's Right-of-Way Decision Is Appropriate... 12

         A.    BLM Did Not Comply With NEPA Prior to the Approval of Right-of-Way Grants to Cadiz...................................... 12

         B.    BLM Did Not Comply With Section 106 of the NHPA Prior to the Approval of Right-of-Way Grants to Cadiz . 16

         C.    BLM Lacked Sufficient Information to Determine Whether Cadiz's Use of the Rights-of-Way Complied With FLPMA ........................................................ 20

    II.   The Court Should Vacate BLM's Decision Granting Rights-of-Way to Cadiz.......................................................... 21

CONCLUSION ............................................................................. 23

# TABLE OF AUTHORITIES

**Cases**

*Alaska Ctr. for Envt. v. U.S. Forest Serv.*,
    189 F.3d 851 (9th Cir. 1999) ................................................................. 13, 14

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C.Cir.1993) ...................................................................12

*Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency*,
    688 F.3d 989 (9th Cir. 2012) ........................................................ 11, 12, 21

*California v. Norton*,
    311 F.3d 1162 (9th Cir. 2002) .................................................................15

*Coast Rivers All. v. U.S. Dep't of the Interior*,
    No. 1:16-cv-307-LJO-MJS, 2016 WL 8673038 (E.D. Cal. Dec. 16, 2016) ........11

*Crutchfield v. U.S. Army Corps of Eng'rs*,
    154 F. Supp. 2d 878 (E.D. Va. 2001) .........................................................19

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    No. 2:14-cv-00226-APG-VCF, 2017 WL 3667700 (D. Nev. Aug. 23, 2017) ....15

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    No. CV 17-8587-GW(ASx), 2019 WL 2635587 (June 20, 2019) .......................2

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ................................................................................21

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir.1995) ....................................................................12

*Jones v. Gordon*,
    793 F.2d 821 (9th Cir. 1986) ...................................................................15

*Klamath–Siskiyou Wildlands Ctr. v. Nat'l Oceanic and Atmospheric Admin.*,
    109 F. Supp. 3d 1238 (N.D. Cal. 2015) ................................................ 21, 22

*Lute v. Singer Co.*,
    678 F.2d 844 (9th Cir.1982) ....................................................................11

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
    177 F.3d 800 (9th Cir. 1999) ................................................................. 9, 10

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*,
   275 F. Supp. 2d 1136 (C.D. Cal. 2002)................................................................11

*Nat'l Family Farm Coal. v. U.S. Envtl. Prot. Agency*,
   960 F.3d 1120 (9th Cir. 2020)....................................................................... 21, 22

*Native Ecosystems Council v. Dombeck*,
   304 F.3d 886 (9th Cir. 2002)..............................................................................19

*Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*,
   56 F.3d 1060 (9th Cir. 1995)...............................................................................19

*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*,
   806 F.3d 520 (9th Cir. 2015)...............................................................................23

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ..............................................................................................8

*Rusty Coal Blackwater v. Sec. of the Interior*,
   No. 3:14-cv-244-LRH-VPC, 2015 WL 506475 (D. Nev. Feb. 5, 2015) ...... 11, 16

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014)...............................................................................21

*Save Our Heritage v. Federal Aviation Administration*,
   269 F.3d 49 (1st Cir. 2001) .................................................................................18

*Sisseton-Wahpeton Oyate of the Lake Traverse Reservation v. U.S. Army Corps of Eng'rs*,
   No. 3:11-CV-03026-RAL, 2016 WL 5478428 (D.S.D. Sept. 29, 2016) .............18

*SKF USA Inc. v. United States*,
   254 F.3d 1022 (Fed. Cir. 2001) ..........................................................................11

*Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*,
   496 F. App'x. 712 (9th Cir. 2012).................................................................. 10, 11

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the Interior*,
   608 F.3d 592 (9th Cir. 2010)........................................................................ 17, 18

*Trujillo v. Gen. Elec. Co.*,
   621 F.2d 1084 (10th Cir.1980)............................................................................11

**Statutes**

30 U.S.C. § 185(a) ....................................................................................................7

42 U.S.C. § 4332(2)(C)..............................................................................................8

*Defs.' Memorandum in Support of Motion for Voluntary Remand*          iii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
22
23
24
25
26
27
28

43 U.S.C. § 1701(a)(7)........................................................................................7

54 U.S.C. § 300320.............................................................................. 10, 17, 19

54 U.S.C. § 304101............................................................................................9

54 U.S.C. § 306108...................................................................................... 9, 17

**Regulations**

36 C.F.R. § 800.16(d).......................................................................................10

36 C.F.R. § 800.16(*l*)(1)...................................................................................10

36 C.F.R. § 800.3(a).........................................................................................17

36 C.F.R. § 800.3(a)(1)............................................................................. 16, 18

36 C.F.R. § 800.4(a)(1).....................................................................................10

36 C.F.R. § 800.4(d)(2).....................................................................................10

36 C.F.R. §§ 800.4-800.6..................................................................................17

40 C.F.R. § 1501.3.............................................................................................8

40 C.F.R. § 1501.4...........................................................................................13

43 C.F.R. § 2885.12(a).......................................................................................7

43 C.F.R. § 46.205(c)........................................................................................13

43 C.F.R. § 46.210.............................................................................................9

43 C.F.R. § 46.215(f).................................................................................. 13, 15

43 C.F.R. §§ 2804.25(c)....................................................................................16


**Other Authorities**

51 Fed. Reg. 15,618 (Apr. 25, 1986)..................................................................8

65 Fed. Reg. 77,69 (Dec. 12, 2000).................................................................19

85 Fed. Reg. 43,304 (July 16, 2020)..................................................................8

**INTRODUCTION**

Defendants request that the Court remand the U.S. Bureau of Land Management's ("BLM") issuance of right-of-way grants to Cadiz Real Estate, LLC ("Cadiz") to allow it to operate a pipeline to transport water between Cadiz and Wheeler Ridge, California.  The potential impacts of granting such a right-of-way were not properly evaluated in accordance with the National Environmental Policy Act ("NEPA") and the National Historic Preservation Act ("NHPA").  Due to the lack of analysis, the agency does not know the source of the water that will be transported through the pipeline and therefore could not have analyzed the potential impacts on the environment or historic properties of drawing down the water at its source.  Cadiz did not provide specific information about its plans, and the agency, nevertheless, proceeded to grant a right-of-way without knowing either the specifics of Cadiz's plans or evaluating the potential impacts of Cadiz's operations.  The resulting decision violated NEPA and the NHPA.  Defendants further request that BLM's decision and the underlying right-of-way grants be vacated due to the seriousness of the agency's legal errors.

**BACKGROUND**

**I.    Factual Background**

For more than twenty years, Cadiz has pursued a project to extract water from an aquifer underlying its land in southeastern California and transport it to urban areas in and around Los Angeles.  Cadiz's property is located in the vicinity of Mojave National Preserve and surrounded by Mojave Trails National Monument.  Cadiz2020-02384.  In order to transport the water to urban water districts, Cadiz must cross federal lands.  Two avenues are available: a southern route connecting the Cadiz Project to the Colorado River Aqueduct near Rice, California, or a northern route extending westward to the California Aqueduct near Wheeler Ridge, California.  Cadiz2020-02449-50.

In order to pursue the southern route, Cadiz leased a portion of a railroad right-of-way from the Arizona California Railroad, which had been granted under the General Railroad Right-of-Way Act of 1875 ("1875 Act"). *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. CV 17-8587-GW(ASx), 2019 WL 2635587, at *1 (June 20, 2019). Cadiz asserted that, because the right-of-way for the railroad right-of-way was granted under the 1875 Act and its use of the line would further a railroad purpose, it did not need to seek permission from BLM to use the right-of-way for a water pipeline. *Id.* at *3. BLM agreed in 2017, and determined that Cadiz had shown that its proposed water pipeline would serve a railroad purpose. *Id.* at *6-7. BLM's determination was challenged, and in June 2019, this Court held that the determination was arbitrary and capricious and remanded the matter to the agency. *Id.* at *31-32. In February 2020, BLM reaffirmed its determination that Cadiz's water pipeline would serve a railroad purpose, but Cadiz has not built a pipeline along that route and that determination is not at issue here.[1]

Cadiz also pursued a potential northern route for the transport of water, which is at issue here. In May 2020, Cadiz approached BLM about the potential conversion of an existing right of way grant for a natural gas pipeline to use for water transport. Cadiz2020-02444. That pipeline, the rights to which Cadiz purchased from the El Paso Natural Gas Company ("EPNG"), runs from Cadiz, California to Wheeler Ridge, California. *Id.*; *see also* Cadiz2020-02450. Cadiz informed BLM that it planned to use the existing pipeline, which previously had been used to transport natural gas, to transport water. Cadiz2020-02444. According to Cadiz, the pipeline "has the capacity to transport approximately

---

[1] It is Defendants' understanding that a legal dispute with the State of California has prevented Cadiz from moving forward along the southern route.

*Defs.' Memorandum in Support of Motion for Voluntary Remand*     2

30,000 [acre-feet per year ("AFY")] between Palmdale and Barstow and 25,000 AFY between Barstow and Cadiz." *Id.* Cadiz further explained that the "[u]se of the pipeline for water transport would facilitate groundwater storage in adjacent basins," and would diversify the "sources of water for communities that presently lack access to reliable water sources, including state-designated disadvantaged communities." *Id.* Cadiz also submitted maps showing the existing EPNG line and the potential route of the water pipeline in relation to existing aqueducts. Cadiz20202449-50.[2]

In June 2020, BLM sent Cadiz some initial questions about their planned project. Cadiz2020-02429. Cadiz responded on July 20, 2020, but provided few details about its plans to transport water through the pipeline. Cadiz2020-02417. It stated that its proposed plan was "a separate project that is not part of the Cadiz Water Project that has been planned to deliver water from Cadiz's holdings to the Colorado River Aqueduct for delivery to communities in Southern California." *Id.* Instead, it asserted that its plans with respect to the EPNG line involved transporting water from Cadiz to Wheeler Ridge, but stated that the "project [was] in the early stages." *Id.* Further, Cadiz explained that, if it obtained approval from BLM to use the pipeline for transporting water, it would seek to enter into contracts with water providers and water users for the transport of water. *Id.* Cadiz did not explain where the water would come from.

---

[2] In a 2018 filing with the Securities and Exchange Commission, Cadiz stated that it currently owned a 96-mile abandoned oil and gas line extending from Cadiz to Barstow, California, and that it planned to acquire an additional 124-mile segment from Barstow to Wheeler Ridge, California, which would allow Cadiz to "transport between 18,000 and 30,000 acre-feet of water per year between the Water Project area and the Central and Northern California water transportation networks." Cadiz2020-01474.

*Defs.' Memorandum in Support of Motion for Voluntary Remand*          3

On July 30, 2020, Cadiz submitted an application to BLM for a right-of-way. Cadiz2020-02382. Cadiz sought approval of the assignment of a right-of-way granted to EPNG for a right-of-way spanning a 216-mile route from Cadiz to Wheeler Ridge and amendment of the right-of-way grant to allow Cadiz to use the pipeline for water transport. *Id.* The application stated that Cadiz "owns 45,000 acres of land and water rights in eastern San Berna[r]dino County, California." *Id.* The application further stated that the conversion of the oil and gas pipeline to a water pipeline would provide an alternative source of water to water providers and particularly rural areas and disadvantage communities. Cadiz2020-02383. It also provided a map of the "Cadiz Northern Pipeline," which showed a route extending from Cadiz to Wheeler Ridge. Cadiz2020-02384. Attached to the application was a "Plan of Development," which stated, "Water will be transported through the pipeline to serve water conveyance needs of various municipal, agricultural, and industrial interests along the route of the pipeline." Cadiz2020-02396. No other details about Cadiz's plans to use the pipeline for water transport were provided.

On September 23, 2020, Cadiz sent an e-mail to BLM regarding the assignment of the EPNG right-of-way. Cadiz2020-02259. In the e-mail, Cadiz advised BLM that the closing on the agreement regarding the EPNG pipeline and right-of-way was "predicated on BLM's approval of the assignment of the ROW to Cadiz." *Id.* In a subsequent e-mail on October 12, 2020, Cadiz offered input on potential options for processing its right-of-way application: under one option BLM would process the application all at once and amend the existing right-of-way, and in the other, BLM would take two separate actions—reassigning the existing right-of-way for the natural gas pipeline and granting a new right-of-way under the Federal Land Policy and Management Act ("FLPMA") for a water pipeline. Cadiz2020-02184-86. Cadiz emphasized the need to process the application quickly. Cadiz2020-02185. After subsequent meetings with Cadiz,

BLM committed to completing a decision regarding the right-of-way by the end of December 2020.  Cadiz2020-02112.

BLM chose to process the application in two steps: the reassignment of the existing Mineral Leasing Act ("MLA") right-of-way for oil and gas transport and the grant of a new FLPMA right-of-way for water transport.  On December 11, 2020, BLM prepared two categorical exclusions ("CX"), one for each step.  *See* Cadiz2020-00583, Cadiz2020-00650.  For the MLA right-of-way, BLM relied on a CX specified in the U.S. Department of the Interior's manual, 516 DM 11.9 E.(9), which applies to renewals of rights-of-way "where no additional rights are conveyed beyond those granted by the original authorizations."  Cadiz2020-00584. For the FLPMA right-of-way, BLM relied on the CX in 516 DM 11.9 E.(12), which applies to "[g]rants of right-of-way wholly within the boundaries of other compatibly developed rights-of-way."  Cadiz2020-00650.  For each CX, BLM concluded that there were no extraordinary circumstances associated with the actions that would require the preparation of an environmental analysis. Cadiz2020-00587; Cadiz2020-00654.

As for NHPA compliance, BLM determined that both right-of-way grants fell within Exemption B8 of the California Protocol Agreement ("PA"),[3] meaning that a separate review of potential adverse effects on historic properties pursuant to section 106 of the NHPA was not required.  Cadiz2020-01260-61 (MLA right-of-way); Cadiz2020-00950-51 (FLPMA right-of-way).  On December 10, 2020, the

---

[3] The California PA serves as the alternative process by which the BLM in California satisfies its responsibilities under section 106 of the NHPA, consistent with the National Programmatic Agreement between the BLM, Advisory Council on Historic Preservation ("ACHP") and the National Conference of State Historic Preservation Officers.  Cadiz2020-00950 n.1.  The California PA is attached as Ex. 1.

*Defs.' Memorandum in Support of Motion for Voluntary Remand*          5

Native American Land Conservancy and the National Parks Conservation Association (collectively, "NALC"), both of whom are now Plaintiffs, submitted a formal objection to the BLM's use of Exemption B8 in accordance with section 8.1(P) of the California PA, which triggered a consultation process with the California State Historic Preservation Officer ("SHPO").  Cadiz2020-00344; *see also* California PA at 16-17.  NALC asserted that Exemption B8 was inapplicable because BLM did not consider potential impacts to historic properties associated with Cadiz's water extraction project as directly associated with the right-of-way authorization.  Cadiz2020-00345.  On December 15, 2020, the California SHPO also sent BLM an e-mail in response to NALC's objections.  Cadiz2020-00182.

On December 21, 2020, BLM responded to the California SHPO's concerns and NALC's objection, explaining that it was no longer relying on Exemption B8 and was instead relying on the applicable regulations at 36 C.F.R. pt. 800, consistent with Stipulation 5.1(A) of the California PA.  Cadiz2020-00195 (letter to SHPO); Cadiz2020-00193 (letter to NALC).  BLM concluded that the right-of-way had "independent utility," *i.e.*, was not related to any other authorization for the use of public or private land and, specifically, was "not linked to the use of the groundwater under private lands held by Cadiz."  *Id.*

On December 21, 2020, BLM also issued a decision transferring a portion of the EPNG MLA right-of-way to Cadiz and simultaneously granting a new, coextensive FLPMA right-of-way to Cadiz.  Cadiz2020-00001-37.  The rights-of-way cover approximately 58 and 53 miles of discontinuous federal land, respectively, between Cadiz and Wheeler Ridge, California.  Cadiz2020-00021 (MLA grant); Cadiz2020-00005 (FLPMA grant); *see also* Cadiz2020-02449 (indicating the approximate location of the rights-of-way); Cadiz2020-01140-64 (plats of the land crossed by the rights-of-way).

## II.    Legal Background

### A.    The Federal Land Policy and Management Act

Pursuant to FLPMA, BLM is charged with managing federal public lands for a variety of uses while protecting environmental, ecological, and recreational values.  *See* 43 U.S.C. § 1701(a)(7).  Under Title V of FLPMA, BLM may grant rights-of-way across public land for various uses, including pipelines for the transportation of water.  *Id.* § 1761(a)(1).  An entity seeking a right-of-way must submit an application disclosing the intended use of the right-of-way, plans, and any other information deemed necessary by the Secretary.  *Id.* § 1761(b)(1).  If approved, a right-of-way grant should include terms and conditions ensuring that that applicant minimizes potential environmental impacts and complies with relevant federal and state air and water quality standards, among other things.  *Id.* § 1765.

### B.    Mineral Leasing Act

Under the Mineral Leasing Act, BLM may grant rights-of-way across federal lands for pipelines to transport oil or gas.  30 U.S.C. § 185(a); 43 C.F.R. pt. 2880.  BLM may grant the right-of-way so long as the applicant possesses the requisite qualifications and BLM determines that the right-of-way is consistent with the purposes of the affected federal land.  30 U.S.C. §§ 185(a), (b)(1).  A grant conveys to the grantee only those rights expressly contained in the grant and includes, among other things, the right to "[u]se the described lands to construct, operate, maintain, and terminate facilities within the right-of-way or TCP [temporary use permit] area for authorized purposes under the terms and conditions of the grant or TUP," and "[a]ssign the grant or TUP to another, provided that [the grantee] obtain the BLM's prior written approval, unless [the grantee's] grant or TUP states that such approval is unnecessary."  43 C.F.R. § 2885.12(a), (e).  A proposed assignee of a grant "must file an application and satisfy the same

*Defs.' Memorandum in Support of Motion for Voluntary Remand*          7

procedures and standards as for a new grant or TUP." *Id.* § 2887.11(b).  Until approved in writing, BLM will not recognize an assignment.  *Id.* § 2887.11(e).

## C.    National Environmental Policy Act

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision."  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  To meet the procedural goals of the statute, NEPA requires that an agency prepare a comprehensive EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

An EIS, however, is not required in every instance.  In accordance with the Council on Environmental Quality's ("CEQ") regulations implementing NEPA, an agency should first determine the appropriate level of environmental review.  *See* 40 C.F.R. § 1501.3.[4]  If an action typically would not have significant environmental effects, then it may be categorically excluded from the requirement to prepare an EIS.  *Id.* § 1501.3(a)(1).  Each agency shall promulgate its own regulations regarding the types of actions subject to categorical exclusions ("CX").  *Id.* § 1501.4(a).  If a proposed action falls within a CX identified by the agency's regulations, then the agency must evaluate whether extraordinary circumstances

---

[4] CEQ promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, 51 Fed. Reg. 15,618 (Apr. 25, 1986).  In 2020, CEQ published a final rule substantially revising the 1978 regulations.  85 Fed. Reg. 43,304 (July 16, 2020).  The NEPA review challenged in this case was conducted pursuant to the 2020 regulations, and therefore the citations to CEQ's regulations in this brief refer to those regulations.

are present.  *Id.* § 1501.4(b)(1).  If extraordinary circumstances are present, then the agency may not rely on a CX and instead must prepare an environmental assessment ("EA") or an EIS.  *Id.* § 1501.4(b)(2).

The Department of the Interior's NEPA regulations designate categories of actions subject to categorical exclusions.  43 C.F.R. § 46.210.  Interior's regulations provide for a review of extraordinary circumstances.  *Id.* § 46.215. Categorical exclusions applicable to BLM are set forth in Interior's Departmental Manual ("DM") at 516 DM 11.9.[5]

### D.    National Historic Preservation Act

Section 106 of the NHPA requires federal agencies to consider the potential effects of federal "undertakings" on historic properties.  54 U.S.C. § 306108. Section 106 requires BLM to "take into account the effect of the undertaking on any historic property."  *Id.*  Section 106 of the NHPA "is a stop, look, and listen provision that requires each federal agency to consider the effects of its programs." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999). The ACHP administers the NHPA, *see* 54 U.S.C. § 304101, and has promulgated regulations to govern federal agency compliance with section 106, codified at 36 C.F.R. Part 800.

The ACHP's regulations direct agencies to determine whether a project qualifies as an "undertaking" and is a "type of activity that has the potential to cause effects on historic properties."  *Id*. § 800.3(a).[6]  The NHPA broadly defines

---

[5] The relevant manual section is attached as Ex. 2.

[6] The regulations define historic properties as "any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior" and includes "properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization that meet the National Register

"undertaking" to include "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including – (1) those carried out by or on behalf of the agency; . . . (3) those requiring a Federal permit, license, or approval . . . ." 54 U.S.C. § 300320.  If an undertaking is the type of activity with the potential to cause effects on historic properties, then the agency must consult with the SHPO and other consulting parties, including "[d]etermin[ing] and document[ing] the area of potential effects." 36 C.F.R. § 800.4(a)(1); *see also id*. § 800.16(d).  The agency also must "consult with any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties that may be affected by an undertaking," *id.* § 800.2(c)(2)(ii), and must provide such tribes or organizations a reasonable opportunity to identify historic properties and provide input regarding potential adverse effects on such properties. *Id.* § 800.2(c)(2)(ii)(A).

An agency must "make a reasonable and good faith effort" to identify historic properties within the undertaking's area of potential effects.[7] *Id.* § 800.4(b)(1); *see also Summit Lake Paiute Tribe of Nev. v. U.S. Bureau of Land Mgmt.*, 496 F. App'x. 712 (9th Cir. 2012).  If the agency finds that historic properties may be affected, it must further consult with all consulting parties. 36 C.F.R. § 800.4(d)(2).  The agency then applies the regulatory criteria to determine if there is an adverse effect, *id.* § 800.5(a), and if so, engages in further consultation regarding the resolution of any such adverse effects, *id.* § 800.6.  In certain circumstances, an agency may negotiate a programmatic agreement with

---

criteria." 36 C.F.R. § 800.16(*l*)(1).

[7] The regulations define an area of potential effects to mean "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist." 36 C.F.R. § 800.16(d).

the ACHP for compliance with section 106.  *Id.* § 800.14(b).  Where a programmatic agreement exists for an agency program, compliance with the agreement serves as compliance with the statute.  *Id.* § 800.14(b)(2)(iii).

## APPLICABLE LEGAL STANDARD

Courts have long recognized the propriety of voluntarily remanding a challenged agency action without judicial consideration of the merits.  "A federal agency may request remand in order to reconsider its initial action."  *Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012) (citing *SKF USA Inc. v. United States,* 254 F.3d 1022, 1029 (Fed. Cir. 2001)).  "Voluntary remand is consistent with the principle that "[a]dministrative agencies have an inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider."  *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 275 F. Supp. 2d 1136, 1141 (C.D. Cal. 2002) (quoting *Trujillo v. Gen. Elec. Co.,* 621 F.2d 1084, 1086 (10th Cir.1980)); *see also Lute v. Singer Co.,* 678 F.2d 844, 846 (9th Cir.1982).

In determining whether to grant a voluntary remand, courts within the Ninth Circuit have looked to the Federal Circuit's decision in *SKF USA* for guidance. *See*, *e.g.*, *Cal. Cmtys. Against Toxics*, 688 F.3d at 992; *N. Coast Rivers All. v. U.S. Dep't of the Interior*, No. 1:16-cv-307-LJO-MJS, 2016 WL 8673038, at *3 (E.D. Cal. Dec. 16, 2016).  In *SKF USA*, the court indicated that, when an agency action is challenged, "the agency may request a remand, without confessing error, to reconsider its previous position" or "the agency may request a remand because it believes that its original decision was incorrect on the merits and it wishes to change the result."  *N. Coast Rivers All.*, 2016 WL 8673038, at *3 (quoting *SKF USA*, 254 F.3d at 1027-28).  "Generally, courts only refuse voluntarily requested remand when the agency's request is frivolous or made in bad faith."  *Cal. Cmtys. Against Toxics*, 688 F.3d at 992; *see also Rusty Coal Blackwater v. Sec. of the*

*Defs.' Memorandum in Support of Motion for Voluntary Remand*            11

*Interior*, No. 3:14-cv-244-LRH-VPC, 2015 WL 506475, at *2 (D. Nev. Feb. 5, 2015).

If a court grants a voluntary remand, it should then decide whether the agency's action should be vacated during the remand. "[W]hen equity demands, the [agency's action] can be left in place while the agency follows the necessary procedures" to correct its action." *Cal. Communities Against Toxics*, 688 F.3d at 992 (quoting *Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1405 (9th Cir.1995)). "Whether agency action should be vacated depends on how serious the agency's errors are "'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Communities Against Toxics*, 688 F.3d at 992 (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146, 150–51 (D.C.Cir.1993) (internal quotation marks omitted)).

## ARGUMENT

## I.    A Remand of BLM's Right-of-Way Decision Is Appropriate

The Court should remand BLM's decision to grant rights-of-way to Cadiz for purposes of transporting water across federal land. BLM rushed the approval process and, in doing so, short-circuited necessary reviews and violated the procedural requirements of the NEPA and the NHPA. And because the agency did not conduct the required reviews, it lacked sufficient information to decide whether allowing the rights-of-way would violate the provisions of applicable land use plans and therefore violate FLPMA. Accordingly, BLM's decision should be remanded.

### A.    BLM Did Not Comply With NEPA Prior to the Approval of Right-of-Way Grants to Cadiz

BLM did not comply with NEPA because it relied on CXs without adequately evaluating whether extraordinary circumstances existed. BLM had sufficient information to know that Cadiz intended to transport water through the

pipeline in the right-of-way, but BLM did not evaluate the withdrawal of the water from its source and associated environmental impacts.  Therefore, BLM violated NEPA.

An agency may rely on a CX for NEPA compliance only if it conducts an extraordinary circumstances review to determine whether the proposed action may have significant impacts on the environment.  40 C.F.R. § 1501.4; 43 C.F.R. § 46.205(c); *see also Alaska Ctr. for Envt. v. U.S. Forest Serv.*, 189 F.3d 851, 858 (9th Cir. 1999).  The Department of the Interior's NEPA regulations governing extraordinary circumstances require BLM to consider a range of factors, including whether the proposed action has "a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects." 43 C.F.R. § 46.215(f).

Here, in both CXs, BLM went through each of the factors in its regulations and determined that no extraordinary circumstances existed for any of them. Cadiz2020-00584-86; Cadiz2020-00650-53.  In doing so, BLM relied primarily on the notion that the rights-of-way would not involve new surface disturbance at present.  *See, e.g.*, Cadiz2020-00651 (stating that the proposed action "would not include any new construction or ground disturbing activities").  That assumption allowed BLM to find, for example, that there would be no significant impacts on natural resources, drinking water aquifers, prime farmlands, historic or cultural resources, or threatened or endangered species, and that there would be no highly uncertain or controversial significant impacts.  Cadiz2020-006751-53.

BLM lacked sufficient information to make those determinations regarding extraordinary circumstances, and the information that it had belied its conclusions. At the outset of the approval process, Cadiz informed BLM that it planned "to convey water along the pipeline route for any of a variety of municipal, agricultural or industrial uses."  Cadiz2020-02444.  And Cadiz informed BLM that

it had obtained the pipeline from EPNG, running from Cadiz to Wheeler Ridge, California, for the purpose of transporting up to 30,000 AFY of water. *Id.* Further, in the plan of development submitted with its application, Cadiz acknowledged that, although no development was planned at the time, later development would occur. Cadiz2020-02396. But instead of explaining what sort of development might be planned in the future, Cadiz stated that, if "an agreement to convey water is reached, the impacts of conveyance, if any, will be assessed at that time." Cadiz2020-02397. In other words, Cadiz sought to secure a right-of-way first and have the environmental impacts analyzed later.

The record show analytical gaps in BLM's decision-making. The CX for the FLPMA right-of-way stated that, if alterations to the pipeline were planned later, BLM could consider a proposal for such alterations and analyze potential environmental impacts at the time. Cadiz2020-00651-52. But this overlooked that, by issuing the right-of-way grant to Cadiz, BLM would grant Cadiz the "right to construct, operate, maintain, and terminate a Water Pipeline." Cadiz2020-00005. While BLM may need to approve further construction, Cadiz would already be authorized to use the pipeline to transport water.

Despite granting Cadiz such a right, BLM never considered the impacts of Cadiz transporting water through the pipeline. BLM was aware that Cadiz has sought to develop a means to transport water from its holdings to water authorities in Southern California and that the application identified a right-of-way from Cadiz to Wheeler Ridge, which is in the proximity of the California Aqueduct and the Los Angeles Aqueduct. Cadiz2020-02384; *see also* Cadiz2020-02449-50. But in its analysis, BLM did not identify the source of the water that would be transported or evaluate the potential environmental impacts of withdrawing water from such sources. Thus, for example, the BLM did not analyze whether there would be any impacts to the Mojave Trails National Monument, Mojave National Park, or

*Defs.' Memorandum in Support of Motion for Voluntary Remand*   14

Joshua Tree National Park because the BLM lacked sufficient information to ascertain whether there could be impacts.

Despite lacking information regarding the source of the water, BLM concluded that its grant of the rights-of-way to Cadiz would have no significant impacts on "drinking water aquifers, prime farmlands, wetlands, or floodplains in the project area" or "the Mojave Trails National Monument."  Cadiz2020-00651. By limiting its inquiry to the project footprint, BLM violated the Department of the Interior's NEPA regulations requiring it to evaluate whether the proposed action has "a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects."  43 C.F.R. § 46.215(f).  Further, because the agency never actually looked at the potential impacts associated with other actions having a direct relationship to the proposed right-of-way, its reliance on a CX was improper.  *See Jones v. Gordon*, 793 F.2d 821, 828 (9th Cir. 1986) ("An agency cannot avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment.") (internal quotation marks, ellipsis, and citation omitted); *see also California v. Norton*, 311 F.3d 1162, 1176-77 (9th Cir. 2002) (finding that a CX could not be applied where the record showed the potential for highly controversial environmental impacts).

Because it was a reasonably foreseeable effect of granting the right of way, in these circumstances, BLM should have evaluated the potential impacts of drawing down water, which may have resulted in the preparation of an EA or EIS. BLM has conducted such an analysis in other instances.  For a proposed groundwater project in Nevada, for example, BLM prepared an EIS before deciding whether to grant a right-of-way for a water pipeline and associated pumping facilities.  *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.* No. 2:14-cv-00226-APG-VCF, 2017 WL 3667700, at *1-4 (D. Nev. Aug. 23,

*Defs.' Memorandum in Support of Motion for Voluntary Remand*          15

2017).  A significant issue in the case was whether BLM had adequately analyzed the long term impacts of pumping the groundwater that would flow through the proposed pipeline.  *Id.* at *7-8.  While the Nevada groundwater project was massive, and Defendants are not suggesting that Cadiz's plans to transport water through the right-of-way at issue here are on the same scale, BLM was nonetheless required by NEPA to at least evaluate the potential impacts of drawing down water from its source and transporting it through the pipeline.

BLM did not have the information it needed to conduct such an analysis, but it could have gathered that information.  It had the discretion to request additional information from Cadiz to facilitate its review of the right-of-way application.  *See* 43 C.F.R. §§ 2804.25(c), 2884.11(c).  When BLM did so, Cadiz provided only a vague response about potential future plans.  Cadiz2020-02417.  Cadiz also urged BLM to process its application quickly, Cadiz2020-02185, even though Cadiz claimed to have no plans for development at the time.  Cadiz2020-02396.  The result was a rushed process without adequate information, and BLM was unable to complete an appropriate analysis of environmental impacts to comply with NEPA.

## B.   BLM Did Not Comply With Section 106 of the NHPA Prior to the Approval of Right-of-Way Grants to Cadiz

In attempting to comply with section 106 of the NHPA, under the circumstances presented here, BLM failed to adequately evaluate potential impacts to historic properties from the grant of a right-of-way for a water pipeline.  BLM erred by defining the undertaking too narrowly and necessarily excluding from consideration aspects of the new activity approved, *e.g.*, potential effects associated with the transported water.  Because of that, BLM improperly concluded that the right-of-way grant was not the type of activity that had the potential to cause effects to historic properties.  *See* 36 C.F.R. § 800.3(a)(1).  BLM only reached that conclusion by focusing solely on whether there would be new

ground disturbance within the right-of-way itself, rather than considering the entirety of a new activity not previously considered. This initial determination, which allowed BLM to conclude its section 106 responsibilities without any consultation or consideration of effects to historic properties, cannot be squared with the regulations or the facts.

The NHPA requires federal agencies to consider the potential effects of the project on any historic properties listed on or eligible for the National Register of Historic Places and provide, where appropriate, the ACHP an opportunity to comment on the undertaking. 54 U.S.C. § 306108; *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of the Interior*, 608 F.3d 592, 607 (9th Cir. 2010). Section 106 requires an agency to first examine whether its action is an undertaking and is "a type of activity that has the potential to cause effects on historic properties." 36 C.F.R. § 800.3(a). An undertaking is defined as the activity in its entirety that requires agency approval to move forward, including those components of the activity that may be "under the direct or indirect jurisdiction" of an agency. 54 U.S.C. § 300320. If an agency determines there is an undertaking that is a type of activity with the potential to cause effect on historic properties, then it must complete the steps of the section 106 process (set forth in the ACHP regulations) through consultation with appropriate parties regarding the designation of the area of potential effects, identification and evaluation of historic properties within that area, determination of effects on those properties, and any means to avoid, minimize or mitigate any adverse effects. *See* 36 C.F.R. §§ 800.4-800.6.

Here, BLM did not go through the regulatory steps set forth in 36 C.F.R. §§ 800.4-800.6 because it concluded that it was not required to do so. BLM initially relied on Exemption B8 of the California PA, which exempts from further section 106 compliance the "[i]ssuance of permits, leases, and rights-of-way where no surface disturbance is authorized, that have no potential for adverse effects, and

that do not have the potential to affect access to or use of resources by American Indians." Cadiz2020-00951.  NALC submitted a formal objection to BLM's reliance on Exemption B8, however, on the basis that BLM had not evaluated Cadiz's water extraction project as directly associated with the right-of-way authorization.  Cadiz2020-00345.  Based on the objection, the California SHPO informed BLM that NALC's objection required BLM "to initiate consultation with the SHPO in order to determine how to proceed."  Cadiz2020-00183.

Instead of initiating consultation, BLM sent letters to both the California SHPO and NALC explaining that it was no longer relying on Exemption B8 and was instead relying on 36 C.F.R. § 800.3(a)(1).  Cadiz2020-00195; Cadiz2020-00193 (letter to NALC).  Referencing this provision, BLM evaluated the right-of-way as proposed, narrowly defined the undertaking as only a right-of-way allowing for the transport of water through an existing pipeline, and concluded that the right-of-way had "independent utility," *i.e.*, was not related to any other authorization for the use of public or private land and, specifically, was "not linked to the use of the groundwater under private lands held by Cadiz." *Id.*  Based on this independent utility finding, BLM determined that allowing the transport of water in the existing pipeline (the defined undertaking) "has no potential to cause an adverse effect to historic properties." *Id.*  Under the circumstances here, BLM's conclusion was legally and factually flawed.

When properly considered, the right-of-way grant for a water pipeline is the type of activity that has the potential to affect historic properties.  *See Save Our Heritage v. Federal Aviation Administration*, 269 F.3d 49, 63 (1st Cir. 2001); *see also Sisseton-Wahpeton Oyate of the Lake Traverse Reservation v. U.S. Army Corps of Eng'rs*, No. 3:11-CV-03026-RAL, 2016 WL 5478428, at *7 (D.S.D. Sept. 29, 2016), *aff'd sub nom. Sisseton-Wahpeton Oyate of Lake Traverse Reservation v. U.S. Army Corps of Eng'rs*, 888 F.3d 906 (8th Cir. 2018).  Whether

an activity is the type of activity that has the potential to affect historic properties is determined based on the "type and nature" of the undertaking, not case-specific issues. *See* Protection of Historic Properties, 65 Fed. Reg. 77,698, 77,703 (Dec. 12, 2000). Further, the definition of an undertaking includes activities that are "under the direct or indirect jurisdiction of a Federal agency," not just activities that are directly authorized by an agency. 54 U.S.C. § 300320. BLM defined the undertaking too narrowly to include only the transport of water through the segment of pipeline within the right-of-way. BLM's definition of the undertaking was based on the principle that the right-of-way had independent utility apart from Cadiz's plans to withdraw water on its private land, Cadiz2020-00195, but that conclusion is not supported by the record.

The concept of independent utility is borrowed from the NEPA case law. In general, where multiple actions are connected, the impacts of such actions must be analyzed in a single NEPA document. *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 893-94 (9th Cir. 2002). Where two actions "would have taken place with or without the other, each has 'independent utility' and the two are not considered connected actions." *Id.* (citation omitted); *see also Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1069 (9th Cir. 1995) (evaluating whether two actions were "interdependent . . . parts of [a] larger action"); *see Crutchfield v. U.S. Army Corps of Eng'rs*, 154 F. Supp. 2d 878, 905 (E.D. Va. 2001) (in the NHPA context, finding that two aspects of a project were part of the same undertaking and therefore needed to be evaluated together); *see also id.* at 889, 902 (discussing the independent utility standard).

BLM erred in concluding that the segment of the pipeline between Cadiz and Wheeler Ridge has independent utility—without water to transport through the pipeline, it has no utility at all. Indeed, Cadiz's statements to BLM make plain its plans to transport water from its holdings through the pipeline. In response to

BLM's initial request for information, Cadiz explained that it planned to use the existing pipeline to transport "approximately 30,000 AFY of water between Palmdale and Barstow and 25,000 AFY between Barstow and Cadiz."  Cadiz2020-02444.  When Cadiz later submitted its right-of-way application, Cadiz stated that it "owns 45,000 acres of land and water rights in eastern San Berna[r]dino County, California" and that the conversion of the oil and gas pipeline to a water pipeline would allow it to transport water to providers in certain communities.  Cadiz2020-02383; *see also* Cadiz2020-02384 (map showing a proposed "Cadiz Northern Pipeline," extending from Cadiz to Wheeler Ridge).  BLM's conclusion that the pipeline had its own independent utility—separate from Cadiz's plans to transport water from its holdings—cannot be squared with the record.  As a consequence, BLM erred by defining the undertaking too narrowly and thus concluding that Cadiz's right-of-way application was not the type of activity that had the potential to adversely affect historic properties.

### C.   BLM Lacked Sufficient Information to Determine Whether Cadiz's Use of the Rights-of-Way Complied With FLPMA

Plaintiffs also claim that BLM violated FLPMA by failing to: (1) prevent unnecessary or undue degradation of areas within the California Desert Conservation Area ("CDCA"), which includes the Mojave Trails National Monument; (2) include terms and conditions in the right-of-way grant that minimize damage to resources and protect Federal property and economic interests; and (3) ensure the ROW conforms to the applicable resource management plan.  *See* Compl. ¶¶ 190-200, *Native American Land Conservancy*, No. 5:21-cv-496, ECF No. 1; Compl. ¶¶ 64-74, *Center for Biological Diversity*, No. 2:21-cv-2507, ECF No. 1.  It is unclear whether BLM's approval of the statute violated FLPMA for the reasons alleged by Plaintiffs because BLM conducted no analysis of the potential impacts of water drawdowns on the Mojave Trails

National Monument or other federal lands.  Because BLM proceeded to take action without conducting such an analysis, its decision to nevertheless grant a right-of-way was arbitrary and capricious and should be overturned.  *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstance, is to remand to the agency for additional investigation or explanation.") (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

## II.   The Court Should Vacate BLM's Decision Granting Rights-of-Way to Cadiz

BLM's decision to grant rights-of-way to Cadiz should be vacated. "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (citation omitted). Further, in considering whether to leave a decision in place, a court should consider "the extent to which either vacating or leaving the decision in place would risk environmental harm." *Nat'l Family Farm Coal. v. U.S. Envtl. Prot. Agency*, 960 F.3d 1120, 1144-45 (9th Cir. 2020).  Here, these factors weigh in favor of a remand with vacatur.

First, the legal errors are serious.  In looking at the seriousness of the error, the court considers the likelihood that the agency will come to the same decision upon remand and whether the errors were "mere technical or procedural formalities." *Klamath–Siskiyou Wildlands Ctr. v. Nat'l Oceanic and Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1244-45 (N.D. Cal. 2015).  Here, BLM granted a new right-of-way for a water pipeline to Cadiz without evaluating the potential impacts of water drawdowns on the environment—indeed, without asking where the water would come from at all.  In doing so, BLM acted contrary to NEPA and

section 106 of the NHPA.  This is not a case where BLM conducted an appropriate level of analysis, in which the court might find some technical legal errors.  Instead, BLM failed to prepare the required analyses altogether.  Further, given that BLM never analyzed the potential impacts of drawing down water on the Mojave Trails National Monument or other federal lands, there is a serious question as to whether BLM would reach the same decision to grant the right-of-way on remand.  In such cases, a remand with vacatur is appropriate.  *See Nat'l Family Farm Coal.*, 960 F.3d at 1145 (vacating rule where the agency's analysis contained fundamental flaws).

Second, although vacatur of the right-of-way decision may be disruptive from Cadiz's perspective, this factor does not favor remand without vacatur. In evaluating this factor, the Court should consider whether vacatur would "cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error."  *Klamath–Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1246 (citation omitted).  Cadiz has not indicated any imminent plans to transport water through the pipeline, and, in fact, has indicated that it has no immediate plans to do so.  Cadiz2020-02396.  Thus, there are no immediate plans for the transportation of water that would be disrupted by the vacatur of the right-of-way.  As far as potential monetary harms to Cadiz, BLM would return all rental fees paid by Cadiz.  To the extent that Cadiz may claim monetary harm based on its contract with EPNG, in purchasing that contract, Cadiz undertook the risk that its right-of-way might subsequently be deemed legally invalid.  Having pressed BLM to make a decision within an artificial time frame governed by its contractual relationship with EPNG, Cadiz is in no position now to argue that it was harmed by a decision making process that took shortcuts in order to comply with the company's wishes.

Finally, the Court should consider the potential harm to the environment of leaving the right-of-way in place pending the remand.  *See Nat'l Family Farm*

*Coal.*, 960 F.3d at 1144-45.  Although BLM must approve any further ground disturbing activity within the right-of-way, if no ground disturbance is necessary, then Cadiz may transport water through the pipeline without approval from BLM.  Cadiz2020-00005.  Such transport will involve the drawdown of water from wherever it is sourced and cause potential impacts to the environment and historic properties that have not been analyzed under NEPA and the NHPA.  Given that the extent of such impacts are currently unknown and may be significant, this weighs in favor of vacating BLM's right-of-way grants.  *See Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*, 806 F.3d 520, 532-33 (9th Cir. 2015) (vacating rule where leaving the rule in place would have risked environmental harm).

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for voluntary remand and vacate BLM's decision granting rights-of-way to Cadiz.

DATED:  December 3, 2021          Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

*/s/ Luther L. Hajek*
Luther L. Hajek
Trial Attorney (CO Bar No. 44303)
U.S. Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Tel | (303) 844-1376
Fax | (303) 844-1350
Email:  Luke.Hajek@usdoj.gov

*Attorneys for Defendants*