# STATE PROTOCOL AGREEMENT

## AMONG

## THE CALIFORNIA STATE DIRECTOR OF THE BUREAU OF LAND MANAGEMENT
## AND
## THE CALIFORNIA STATE HISTORIC PRESERVATION OFFICER
## AND
## THE NEVADA STATE HISTORIC PRESERVATION OFFICER

## REGARDING

## THE MANNER IN WHICH THE BUREAU OF LAND MANAGEMENT WILL MEET ITS RESPONSIBILITIES UNDER
## THE NATIONAL HISTORIC PRESERVATION ACT
## AND
## THE NATIONAL PROGRAMMATIC AGREEMENT AMONG THE BLM, THE ADVISORY COUNCIL ON HISTORIC PRESERVATION, AND THE NATIONAL CONFERENCE OF STATE HISTORIC PRESERVATION OFFICERS

Revised  2019

EXHIBIT 1

# Table of Contents

PREAMBLE ....................................................................................................................... 1
STIPULATIONS ................................................................................................................. 2
1.0 PURPOSE AND APPLICABILITY ................................................................................. 2
2.0 ROLES OF FEDERAL AND STATE AGENCY PERSONNEL ........................................ 4
3.0 PARTICIPATION OF INDIAN TRIBES.......................................................................... 7
4.0 PARTICIPATION OF OTHER PARTIES ........................................................................ 9
5.0 IDENTIFICATION OF HISTORIC PROPERTIES ......................................................... 10
6.0 EVALUATION OF HISTORIC PROPERTIES ............................................................... 13
7.0 FINDINGS OF EFFECT ON HISTORIC PROPERTIES ................................................ 15
8.0 SITUATIONS WARRANTING SHPO CONSULTATION .............................................. 16
9.0 POST REVIEW DISCOVERIES AND UNANTICIPATED EFFECTS ............................ 20
10.0 EMERGENCY SITUATIONS ..................................................................................... 20
11.0 IDENTIFICATION AND TREATMENT OF HUMAN REMAINS .................................. 21
12.0 COOPERATION AND ENHANCED COMMUNICATION............................................. 22
13.0 BLM TRAINING, DEVELOPMENT, AND STAFFING................................................. 24
14.0 ACCOUNTABILITY MEASURES ............................................................................... 26
15.0 PROGRAM DEVELOPMENT AND ACTIVITIES UNDER SECTION 110 .................... 28
16.0 REVISION, RESOLUTION OF OBJECTIONS, AND SUPPLEMENTAL PROCEDURES ............ 29
17.0 EXECUTION, EXTENSION, TERMINATION, AND EXPIRATION ............................... 32
18.0 OTHER PROCEDURES ............................................................................................ 33
19.1 AFFIRMATION.......................................................................................................... 33

# Appendices

A. Exempt Undertakings (expires with Protocol)
B. Historic Preservation Program for Public Lands in California and Northwestern Nevada (expires with Protocol)
C. Supplemental Procedures for Livestock Grazing Permit/Lease Renewals (expires with Protocol)
D. Supplemental Procedures for Fluid Minerals Leasing (expires 2/15/2021)
E. Supplemental Procedures for Sage Steppe Ecosystem Restoration (expires with Protocol)

# PART 2 Additional References

National Programmatic Agreement (2/9/2012)
36 CFR § 800 (8/ 5/2004)
Secretary of the Department of the Interior's Standards and Guidelines
SO 3317 Department of the Interior Policy on Consultation with Indian Tribes
EO 13007 Indian Sacred Sites (5/24/1996)
EO 13175 Consultation and Coordination With Indian Tribal Governments
Presidential Memo on Tribal Consultation (11/5/2009)
EO 13604 Improving Performance of Federal Permitting (3/22/2012)

# STATE PROTOCOL AGREEMENT

### AMONG

### THE CALIFORNIA STATE DIRECTOR OF THE BUREAU OF LAND MANAGEMENT
### AND
### THE CALIFORNIA STATE HISTORIC PRESERVATION OFFICER
### AND
### THE NEVADA STATE HISTORIC PRESERVATION OFFICER

### REGARDING

### THE MANNER IN WHICH THE BUREAU OF LAND MANAGEMENT WILL MEET ITS RESPONSIBILITIES UNDER
### THE NATIONAL HISTORIC PRESERVATION ACT
### AND
### THE NATIONAL PROGRAMMATIC AGREEMENT
### AMONG THE BLM, THE ADVISORY COUNCIL ON HISTORIC PRESERVATION, AND THE NATIONAL CONFERENCE OF STATE HISTORIC PRESERVATION OFFICERS

## PREAMBLE

The Bureau of Land Management (BLM) executed a national Programmatic Agreement (nPA), on February 9, 2012, (Part 2) with the Advisory Council on Historic Preservation (ACHP) and the National Council of State Historic Preservation Officers (NCSHPO).  The nPA governs the manner in which the BLM shall meet its responsibilities under the National Historic Preservation Act (NHPA) and directs each BLM State Director (SD) to develop a mutually agreed upon Protocol with each State Historic Preservation Officer (SHPO) in their respective jurisdictions. The nPA encourages BLM SDs and SHPOs to develop mutually agreed upon BLM-SHPO protocols regulating their relationship and how consultation will take place by establishing streamlined (as opposed to case-by-case) consultations. Since California BLM administers land in California and Nevada, this Protocol has been negotiated by the California SD of the BLM with the California SHPO (CASHPO) and the Nevada SHPO (NVSHPO).

# STIPULATIONS

## 1.0    PURPOSE AND APPLICABILITY

### 1.1 Purpose of this Protocol

The BLM and the SHPOs mutually agree that BLM California will meet its responsibilities under the NHPA through this Protocol as provided for in the nPA (Part 2), rather than by following the procedure set forth in 36 CFR § 800.3 through 800.7 for many undertakings. The BLM will integrate the manner in which it meets its historic preservation responsibilities as fully as possible with its other responsibilities for land-use planning and resource management.

The California BLM, consistent with its authorities and responsibilities under the Federal Land Policy and Management Act of 1976 (FLPMA), is charged with managing public lands located in the States of California and Nevada, in a manner that will "protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values," and "that will provide for outdoor recreation and human occupancy and use."

The Presidential Executive Order of March 2012 (Part2) requires the BLM to improve the performance of Federal permitting and review of infrastructure projects to achieve that objective, "our Federal permitting and review processes must provide a transparent, consistent, and predictable path for both project sponsors and affected communities."

Authorities for managing cultural resources exist under the National Environmental Policy Act (NEPA, Pub. L. 91-190), the Federal Lands Policy and Management Act (FLPMA, Pub. L. 91-579), the Archaeological Resources Protection Act (ARPA, 16 USC 470), the Native American Graves Protection and Repatriation Act (NAGPRA, 25 USC 3001), the Historic Sites Act of 1935 (Pub. L. 73-292), the Antiquities Act of 1906 (16 USC 431-433), the American Indian Religious Freedom Act (AIRFA, Pub. L. 95-341), The Religious Freedom Restoration Act of 1993 (RFRA), Pub. L. No. 103-141, 107 Stat. 1488 (November 16, 1993), Executive Order 13007 ("Sacred Sites", 61 FR 105), Executive Order 13175 (Consultation and Coordination with Indian Tribal Governments), the Department of the Interior Policy on Consultation with Indian Tribes (Secretarial Order 3317), Memorandum for the Heads of Executive Departments and Agencies on Tribal Consultation (75 FR 78709), and the National Historic Preservation Act of 1966 as amended (NHPA, Pub. L. 113-287).

In carrying out its responsibilities both under the nPA and statutory authorities, the Protocol guides the BLM's planning and decision making as it pertains to historic properties and historic preservation. The BLM employs a professional staff of Cultural Resource Specialists to advise the BLM's managers and to implement cultural resource policies consistent with these authorities throughout its lands in California and those it manages in Nevada.

## 1.2 Applicability of this Protocol

This revised State Protocol Agreement (Protocol) replaces the provisions of the Protocol Agreement between the California SD of the BLM and the California and the Nevada SHPOs, (revised on October 05, 2012) and will have full force and effect upon its execution when signed by all signatories. This Protocol will remain in effect until the California SD and the SHPOs execute a successor, terminate it, or it expires, whichever comes first. In the event of the termination of the nPA, the signatories to this Protocol shall promptly enter consultations to convert the Protocol into a statewide Programmatic Agreement pursuant to 36 CFR § 800.6 and § 800.14(b) (Part 2).

Public lands administered by the California BLM within California and northwestern Nevada and other public lands within California administered by the Arizona Field Offices of the BLM are included within the scope of applicability of this Protocol unless alternative agreements are reached subsequent to the adoption of this Protocol and are attached to this Protocol as Supplements approved by the BLM and the SHPOs.

With the exception of Tribal lands, this Protocol, subject to the limitations in this Protocol and threshold limitations specified in Stipulation 8.1, applies to all programs, funding initiatives, actions or decisions under the statutory or regulatory authority of the BLM that, regardless of land ownership, may affect historic properties unless the BLM, in formal consultation with the SHPOs, determines otherwise.

This Protocol is not applicable to certain kinds of projects that will instead be processed under the full procedures at 36 CFR § 800 or other alternative procedures developed under 36 CFR § 800.14.  At present most large scale renewable energy projects with appurtenant structures that would generate more than 20 megawatts of energy shall not be processed under the Protocol. This definition of large scale renewable energy projects is consistent with previous BLM Land Use Plans. For purposes of this Protocol, renewable energy includes solar, wind, and geothermal energy production and appurtenant transmission facilities. In addition to large scale renewable energy projects several other types of projects are excluded from the Protocol. These involve other major infrastructure projects designated by the BLM Washington Renewable Energy Office as having national interest, projects that have the potential for presenting procedural problems, cases with substantial public controversy related to historic preservation issues, cases where disputes among or about consulting parties which the ACHP may be invited to help resolve, and cases that are involved or are likely to be involved in litigation on the basis of Section 106 as per Appendix A of 36 CFR § 800.

## 1.3 Definitions Used in this Protocol

The terms used in this Protocol are defined within the body of the Protocol itself, in appended documents, and in 36 CFR 800.16 (a-z) (Part 2).

**1.4 Contents of this Protocol**

This Protocol is divided into two main sections that include the main body of the text and appendices. The text involves Stipulations 1.0-19.0. The appendices are also part of the Protocol and cover Exempt Undertakings, the Historic Preservation Program (HPP) for Public Lands in California and Northwestern Nevada, and Supplemental Procedures for specific activities on lands administered by the BLM.

This Protocol also provides additional references in Part 2 but these references are not part of the Protocol. The Part 2 references include national foundational documents regarding cultural resources policy and guidance. These are attached to the Protocol as a courtesy to provide a more comprehensive document regarding the BLM's overall approach to cultural resources policy in California and northwestern Nevada. All attachments in Part 2 are the latest text version available at the time this Protocol was executed. In the event that attachments in Part 2 are revised or updated, then later versions take precedent over the ones attached regardless of whether or not new version are attached to this Protocol. In the event that attachments in Part 2 or other National BLM policy are modified in the future to conflict with this Protocol, then the BLM shall notify the other signatories and the signatories shall consult to determine how the Protocol should be revised, if necessary, pursuant to Stipulation 13.1.

## 2.0   ROLES OF FEDERAL AND STATE AGENCY PERSONNEL

**2.1 The California BLM State Director (SD):**

A. The SD with the SHPOs shall establish the most efficient method to consult on the evaluation of cultural resources for National Register eligibility and for no-historic-properties-affected, no-adverse-effect, and adverse-effect determinations.

B. The SD shall enter into Programmatic Agreements with the SHPO when undertakings are of statewide interest, involve multiple states, or multiple Field Offices, along with the ACHP and other agencies for implementing Section 106 in specific circumstances not covered by this Protocol.

C. The SD shall contact, on a regular basis, Tribes affected by undertakings within his or her jurisdiction and develop Tribally specific procedures for Tribal consultation

D. The SD shall meet annually with the SHPO and may meet more frequently upon the request of any signatory.

E. The SD shall designate a Deputy Preservation Officer (DPO) to represent California on the Preservation Board, and to advise him or her, Assistant Directors, and District and Field Managers (FMs) in the development and implementation of the BLM's policies and procedures for NHPA implementation.

F. The SD shall use procedures described in § 800.4(b)(2) to meet the BLM's NHPA Section 106 responsibility for programs implemented through a phased decision making process beginning with land use planning designations that may affect large land areas. A phased compliance process requires that the BLM demonstrate that it has taken some steps to take into account the effect of the undertaking on potentially eligible sites in each phase, and that until a reasonable effort has been made to identify all potentially eligible sites, the bureau retains the ability to modify the project, if necessary, e.g.,

through no-surface-occupancy or other stipulations, or specific permit restrictions or covenants.

## 2.2 The BLM Field Manager (FM):

A. Shall concur in recommendations and determinations developed by their professional Cultural Resources Staff (CR Staff), including but not limited to, determinations of the Area of Potential Effects (APE), determinations of National Register eligibility, finding of effects.

B. Shall consult formally with the SHPO:
   a. in any situations that meet thresholds for SHPO review, as defined in this Protocol (Stipulation 8.1);
   b. when there is a finding of an adverse effect to a historic property;
   c. in the event of unresolved disagreement between the BLM CR Staff and the FM;

C. Shall specify and record the applicable National Register criteria used to determine the property's eligibility;

D. Shall, for the purposes of an undertaking, assume that all cultural resources are eligible without consulting the SHPO until such time that determinations are made;

E. Shall ensure that mandatory annual training for CR Staff and required training for new staff takes place including Protocol and Section 106 trainings(Stipulation 13.1);

F. Shall ensure the availability of cultural resources funding for preservation projects and the implementation of the Historic Preservation Plan (HPP);

G. Shall ensure the availability of funding for Tribal consultation for Section 106 projects consistent with 36 CFR § 800 (Part 2) and the Department of the Interior Policy (Part 2);

H. Shall execute Memoranda of Agreement (MOA) for adverse effects and Programmatic Agreements (PA) that are limited to their specific Field Offices;

I. Shall ensure that the documentation of cultural resources for an undertaking processed under this Protocol, is completed prior to  the execution of any NEPA decision document except in cases of phased identification provided for by § 800.4 (b)(2);

J. Shall represent the United States in government-to-government meetings with Tribes at the Field Office level and establish working relationships with Tribal officials comparable to their working relationships with State and local government officials;

K. Shall recognize that traditional Tribal practices and beliefs are an important, living part of our nation's heritage and seek to avoid, to the degree possible under existing law and regulation, their potential disruption as a consequence of a proposed BLM land use decision;

L. Shall protect from disclosure to the public, sacred sites, sensitive and confidential information about traditional Tribal practices and beliefs, and the locations with which they are associated, to the greatest degree possible under law and regulation;

M. Shall consider and consult with Tribes regarding whether a proposed undertaking may inhibit or destroy Tribal access to public lands for the purposes of religious use and other traditional uses, such as gathering natural resources, and, shall, consistent with Executive Order 13007 (Part 2), seek to accommodate access to and ceremonial use of sacred sites, as well as avoid unnecessary interference with or adverse effects to traditional religious and cultural properties;

N.  Shall consult with affected Tribes to identify and consider Tribal concerns related to the identification and management of historic properties in BLM land use planning and decision-making, and document all consultation efforts; and

O.  Shall ensure that information on Tribal religious and cultural issues receives good faith consideration during decision-making, and that, to the extent consistent with the law, BLM decisions do not substantially burden the pursuit of traditional religious and cultural practices.

### 2.3 The BLM Associate Field Manager (AFM):

Consistent with efficient program management and BLM policies to delegate to the lowest organizational level possible, BLM District or FMs may delegate the authority to operate under the Protocol to Associate FMs, provided the AFM has received the required training in use and application of this Protocol.

### 2.4 The BLM Field Office Cultural Resources Staff (CR Staff):

A.  Shall, without formal SHPO consultation, determine an undertaking's Area of Potential Effects (APE). Field Office CR Staff shall apply the definition of APE (36 CFR § 800.16(d)) and shall document the determination and the rationale used in reaching that determination.

B.  In defining the APE, shall consider potential direct, indirect, and cumulative effects to historic properties and their associated settings as applicable, regardless of land ownership. In cases where the APE is subject to question or in which there are multiple Federal Agencies with jurisdiction in regard to the undertaking jurisdictions, the Field Office shall seek input from the SHPO;

C.  Shall make a reasonable and good faith effort to identify historic properties that may be affected by an undertaking as described in 36 CFR § 800.4(b)(1);

D.  Shall determine National Register eligibility of historic properties and make findings of no historic properties affected and/or no adverse effect to historic properties, and apply exemptions (Appendix A). The CR Staff shall employ the Secretary of the Interior's Standards (Part 2) and 36 CFR § 800 in assessing effects.

E.  Shall maintain cultural resource records and transmits reports and records to data repositories appropriate for each State signatory to this Protocol;

F.  Shall maintain professional knowledge and ability

G.  Shall develop and implement Section 110 programs and projects according to the NHPA and consistent with priorities described in the nPA and the HPP;

H.  Shall advise and assist the FM by coordinating Tribal Consultation;

I.  Shall conduct and oversee inventories and develop Class II surveys  (Stipulation 5.5); and

J.  Shall ensure that archaeological contractors make a reasonable level of effort to identify, record, and evaluate historic properties and report problems to the DPO who is responsible for requiring the contractor to follow the conditions of the BLM California Cultural Resources Use Permit on behalf of the SD (Section 112(a)(1)(A) of the NHPA).

### 2.5 The BLM Deputy Preservation Officer (DPO):

A.  Shall oversee implementation of the Protocol by providing technical oversight;

B. Shall conduct field office reviews;
C. Shall conduct Protocol and other professional training;
D. Shall recommend certification, provisional certification, decertification, and recertification of Field Offices;
E. Shall review or develop Programmatic Agreements (PA) and Memoranda of Agreement (MOA); and
F. Shall submit the Annual Reports to the SHPOs and provide other information to the SHPOs concerning implementation of the Protocol when requested.
G. The DPO may also lead consultation with the SHPOs in specific cases; and
H. May also be called upon to assist the District or a Field Office in Tribal coordination.

## 2.6 The BLM State Data Steward (SDS):

A. The DPO may serve as the SDS for the BLMs cultural resources geodatabase or may appoint a Field Office CR Staff to serve in the position.
B. The SDS shall coordinate the BLM data submittal to, and data sharing with, the SHPOs and/or the designated entity or entities responsible for maintaining the  statewide inventory of historical resources on behalf of the SHPOs.
C. The SDS role shall emphasize compliance and consistency with the BLM Washington Office, Cultural Resources Data Sharing Program (CRDSP) data standards and those specified by the SHPOs, both of which help to fulfill data sharing and data synthesis goals of the nPA.

## 2.7 The State Historic Preservation Officers (SHPOs).

The SHPOs for California and Nevada have responsibilities under Section 101(b)(3) of the NHPA including to *"advise and assist as appropriate, Federal and State agencies and local governments in carrying out their historic preservation responsibilities,"* and to *"consult with the appropriate Federal agencies in accordance with the NHPA on Federal undertakings that may affect historic properties, and the content and sufficiency of any plans developed to protect, manage, or to reduce or mitigate harm to such properties."*

The Secretary of the Interior has approved a federally recognized Tribe's Preservation Program pursuant to Section 101(d)(2) of the NHPA, a Tribal Historic Preservation Officer (THPO) may perform SHPO functions with respect to Tribal lands. In a similar manner, this Protocol authorizes, within certain limits expressly defined in this Protocol, the BLM professional CR Staff to act without consulting with the SHPO on BLM managed lands.

# 3.0   PARTICIPATION OF INDIAN TRIBES

## 3.1 Government-to-government consultation

The special legal status of Federally recognized Tribal governments requires that the BLM's official interactions with them, including consultation, will be carried out in accordance with government-to-government procedures and policy established in the Department of the Interior Policy on Consultation with Indian Tribes (Part 2) and all other appropriate authorities. While the BLM may initiate consultation under multiple authorities at one time, this Protocol

governs compliance with the NHPA and in no way supersedes the BLM's other treaty, trust, and consultation responsibilities to Tribes under any other requirement.

During routine and government-to-government Tribal consultation, the BLM shall seek to:
  A. Identify geographic areas, types of historic properties, and undertakings of concern to Tribes;
  B. Identify Tribal confidentiality issues;
  C. Answer questions about this Protocol;
  D. Provide a Point of Contact for the State Office and each District and Field Office;
  E. Develop a process for providing information and schedules of pending actions, including land exchanges, permits, and approvals on a regular basis;
  F. Offer Tribes the opportunity to establish a formal agreement for conducting the consultation required under the NHPA Section 106.

## 3.2 Project Specific Consultation

The BLM shall coordinate and consult with Indian Tribes on individual undertakings in the context of an ongoing government-to-government relationship sustained through periodic meetings, as agreed upon between the Tribe and the BLM FM. These ongoing government-to-government consultations shall be supplemented by information sharing procedures described in Stipulation 12.1 and undertaking-specific consultation to ensure Tribes have the opportunity to participate pursuant to the statutory and regulatory directives in Sections 101(d)(6) and 110(a)(2)(E) of the NHPA and 36 CFR § 800.2(c)(2). Consultations with Tribal communities for undertakings under this Protocol and any of its Supplements will be conducted so that these Tribes may:
  A. Identify their concerns about historic properties, including those of traditional religious and cultural significance to them;
  B. Advise the BLM on the identification and evaluation of historic properties;
  C. Articulate their views on the potential effects of an undertaking; and
  D. On a government-to-government basis, consistent with the Department of the Interior's Tribal consultation policy (Part 2), consult with the BLM.

## 3.3 BLM and Tribal Officials

The appropriate BLM officials to consult on a government-to-government basis are those individuals who are knowledgeable about the matters at hand, are authorized to speak for the BLM, and those who exercise delegated authority in the disposition and implementation of a BLM action. BLM officials will identify appropriate Tribal consulting parties who are elected or appointed Tribal leaders or officials designated in writing by a Tribe to represent the Tribe in government-to-government consultations early in the planning process and to provide the Tribes a meaningful opportunity to participate in consultation.

## 3.4 Tribal Historic Preservation Officers (THPOs)

In accordance with Section 101(d)(6) of the National Historic Preservation Act, some Indian tribes with a THPO may choose to designate the THPO as their tribal representative to assist BLM in identifying tribally significant cultural resources or historic properties potentially

affected by a proposed Federal undertaking on non-tribal lands. For undertakings on BLM lands, FM shall consult with the THPO in lieu of an Indian tribe only when they have been designated by the Indian tribe as the tribal representative for purposes of Section 106 to assist in identifying and evaluating properties of religious and cultural importance to the tribe. THPO consultation does not substitute for consultation with SHPO.

### 3.5 Information Sharing

The BLM supports and encourages the reciprocal sharing of sensitive cultural information with Federally recognized Tribes, Tribal communities and individual members during planning for specific undertakings as allowed for under applicable statute and regulation. The BLM shall solicit such input through the public participation opportunities afforded by the BLM's land use planning and NEPA review processes, government-to-government consultation, and in the development of BLM/Tribal protocol agreements. The BLM shall take into account any confidentiality concerns raised by Tribes and Tribal traditional practitioners during the identification process particularly those regarding sacred sites (Part 2).

### 3.6 Dispute Resolution

The BLM FM shall seek the concurrence of any Tribe that has made known to them that they attach religious and cultural significance to an historic property that is subject to Section 106 review by the SHPO. If the Tribe disagrees with the BLM findings, it may, within a 30-day review period, specify the reasons for disagreeing with the finding and request the ACHP to review and object to the findings pursuant to 36 CFR § 800.5(c)(2)(iii).

### 3.7 Non-Federally Recognized Tribal Entities

Although non-Federally recognized Tribes, Indian communities, and individual Tribal members cannot consult with the BLM on a government-to-government basis, they shall be encouraged to raise issues and express concerns during public scoping for specific undertakings. The BLM shall take into account any confidentiality concerns raised by non-Federally recognized Tribes and Tribal traditional practitioners during the identification process.

## 4.0    PARTICIPATION OF OTHER PARTIES

### 4.1 Consulting Parties

Consulting parties can include representatives of local governments, applicants, and certain individuals and organizations with a demonstrated interest in the undertaking due to  the nature of their legal or economic relation to the undertaking or affected properties or their concern with the undertaking's effects on historic properties (36 CFR § 800.2(c)(3-5)) such as non-Federally recognized Indian Tribes that have unique knowledge and expertise. In consultation with the SHPO/THPO, the BLM shall identify consulting parties and invite them to participate in consultation. The BLM shall also use its agency procedures as contained in this Protocol (Stipulation 12.1) and BLM NEPA procedures as additional opportunities to identify potential consulting parties and the BLM shall consider all written requests of individuals and organizations to participate as consulting parties (§  800.3(f)).

## 4.2 The Public

The views of the public are essential to informed Federal decision-making, and the BLM shall seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties. The BLM must also provide the public with information about an undertaking and seek public comment and input (36 CFR § 800.2(d)). Pursuant to 36 CFR § 800.2(d)(3), the BLM shall use its agency procedures as contained in this Protocol (Stipulation 12.1) and BLM NEPA procedures to involve the public.

## 5.0     IDENTIFICATION OF HISTORIC PROPERTIES

As required by the NHPA Section 106 process and the nPA, the BLM FM—with the assistance of qualified professional CR Staff (Stipulation 13.4) and in consultation with the SHPO implements this Protocol, and with Tribes and consulting parties—identifies, evaluates, and assesses effects of the BLM's proposed actions on historic properties.

## 5.1 Exempt Undertakings

The definitions and procedures for application of Exemptions are found in Appendix A. Class A undertakings are those that the Field Office CR Staff and SHPOs find are generally exempted from further review or consultation. In addition, Field Office CR Staff may determine that any specific undertaking subsumed under the list of Class B undertakings qualifies as an exempt undertaking. Documentation regarding an undertaking's exemption from review under this Protocol shall be retained and entered into an electronic database. The list of exemptions may be revised in consultation with the SHPOs/THPOs to add, delete, or modify specific exemptions (see Appendix A).

However, the following exceptions apply:

A.  Any Field Office may elect to review a normally exempted, specific undertaking under the terms of this Protocol or 36 CFR § 800.

B.  Should an objection by the public arise to a Class B exempt undertaking prior to implementation, the Field Office shall consult with the objecting party and the SHPO for not more than 30 calendar days following receipt to resolve the objection. If the objection is resolved within this timeframe, the parties shall proceed in accordance with the terms of that resolution. If the objection cannot be resolved within this time frame, and the Field Office and the SHPO have not agreed to extend the consultation period, the Field Office shall submit the disputed exemption for review by the SHPO either under this Protocol or under 36 CFR § 800.

C.  Any party to this Protocol may propose that Appendix A be modified by removal or revision of exempted undertakings or by addition of a previously non-exempted class of undertakings. Such proposals for modification of Appendix A shall  be  considered pursuant to the provisions for revisions of this Protocol at Stipulation 16.3. Appendix A may be revised as a component of the Protocol revision or may be revised at any time upon written agreement of the parties to this Protocol.

## 5.2 Establish the Area of Potential Effects (APE)

The BLM shall apply the definition of APE (36 CFR 800.16[d]) to each undertaking and shall include a description of the APE in the undertaking's Section 106 report. In defining the APE, the BLM shall consider potential direct, indirect, and cumulative effects to historic properties and their associated settings as applicable, regardless of land ownership. The BLM is not required to determine the APE in consultation with the SHPO in those cases when the BLM is using the review procedures outlined in this Protocol. However, in cases where the APE is subject to question, or multiple federal jurisdictions are involved, or a Traditional Cultural Property has been identified, the BLM shall seek the opinion of the SHPO (Stipulation 8.1).

## 5.3 Identification of Historic Properties

Unless otherwise agreed upon in consultation with the SHPO, the BLM shall ensure that planning and project specific surveys and other efforts to identify historic properties are conducted in accordance with the appropriate professional standards as defined in the Secretary's Standards and Guidelines (Part 2), and to the extent prudent and feasible with the California Office of Historic Preservation guidelines applicable to Federal agencies (available from the California Office of Historic Preservation).

## 5.4 Class III Inventory

The BLM will routinely conduct a Class III intensive field survey to identify historic properties on BLM administered lands or other lands that comprise BLM's direct APE for an undertaking. A Class III Survey is consistent with the Secretary of the Interior's Standards and Guidelines for Archaeology and Historic Preservation (Part 2). The intent of a Class III inventory is to locate and record all historic properties. Class III inventories conform to the prevailing professional survey standards for the geographic region, provided that the regional standards meet or exceed the Secretary's Standards and Guidelines. Because Class III survey is designed to produce a total inventory of the cultural properties observable within the target area, once it has been completed no further survey work should be needed in the target area as long as the current standards are met. Areas with a high probability of buried cultural materials or known cultural materials may require additional investigation and are analyzed on a case-by-case basis. Depending on the proposed action and the types of cultural resources present in the project area, additional inventory efforts  may include, but are not limited  to, sub-surface survey, professional monitoring, and/or data recovery excavations.

## 5.5 Class II Inventory

Class II inventories are statistically based sample surveys designed to aid in characterizing the probable density, diversity, and distribution of cultural properties in the area, to develop and test predictive models, and to answer appropriate research questions. Within individual sample units, survey aims, methods, and intensity are the same as those applied in Class III survey. In all cases where the CR Staff of the BLM determines that less than a Class III survey is appropriate for an undertaking, a written justification and research design or strategy shall be prepared.  When Class II surveys are deemed appropriate, Field Office CR staff shall seek the

views of the SHPO Staff concerning the justification and research design/strategy for the reduced level of inventory. The SHPO may concur with the proposed approach or may determine that formal consultation shall be initiated (Stipulation 8.1).

Records of Class II surveys shall be retained in appropriate files and reported to the SHPOs in the Annual Report. Class II surveys may be conducted in several phases, using different sampling strategies, to improve statistical reliability.

## 5.6 Class I Inventory

Class I inventories are limited to landscape level planning and are very rarely sufficient for the purposes of Section 106 compliance for specific undertakings. Class I inventories are completed with the use of existing data from cultural resource inventory files maintained by both the BLM and the SHPOs. Class I inventories serve to identify known properties and are used to determine if more intensive inventory of specific areas is appropriate. This determination is made in consultation with the SHPO and often results in the completion of Class II or Class III inventories.

## 5.7 Prior Identification

No additional identification efforts are required if the APE is entirely within areas that have been previously inventoried; and BLM CR Staff have determined that the previous identification efforts meet standards set forth in this Protocol. Such a finding must be documented for the undertaking. When assessing and certifying the adequacy of previous inventory work (i.e., reports and documentation), BLM CR Staff should consider the following measures:

    A.  when the inventory was done;
    B.  who did the inventory;
    C.  whether there are any previously identified problems with similar inventories;
    D.  what parties were consulted and how;
    E.  whether methodology accounted for prehistoric resources, properties of traditional religious and cultural significance,  and historic resources;
    F.  changes in environmental conditions (e.g., burn areas where the potential exists for new exposure of resources; erosion, landslides, flood events or other actions which may cause the exposure; or natural destruction of sites);
    G.  and adequacy of previous documentation.

The determination and the justification for determining that a prior survey was adequate to identify historic properties shall be reported in the Annual Report to the SHPOs.

## 5.8 Alternative Identification Procedures

Where Supplements to this Protocol apply to a particular undertaking and also address alternative identification procedures, those alternative methodological procedures  shall be followed.

### 5.9 Ethnographic Overviews

An Ethnographic Overview is recommended, depending upon the availability of funding, for large scale projects processed under the Protocol with the goal of identifying resources traditionally valued by culturally affiliated Tribes or other ethnic groups on a landscape level. An Ethnographic Overview examines existing information about resources traditionally valued by these groups. The information is gathered primarily from archives, publications, and interviews with Tribal members or other constituents, and may include trips to specific sites to supply missing data and may identify the need for further research. These overviews should be undertaken prior to the undertaking when appropriate and possible, to facilitate identification, rather than as a mitigation measure. Ethnographic studies are an integral part of the identification process and do not usually constitute mitigation for adverse effects of an undertaking.

### 5.10 Working with Traditional Cultural Properties (TCPs) and Sacred Sites

If a TCP or Sacred Site is suspected to be present in an APE, then this is a threshold condition requiring consultation with the SHPO (Stipulation 6.5 and Stipulation 8.1) and with interested and concerned Tribes regarding what further identification efforts should be performed to ascertain the status of the resource. Any additional identification efforts will take into consideration guidance provided in Bulletin 38, other BLM and national policy, and shall be responsive to the concerns of living communities, but will be commensurate with the scope and magnitude of the undertaking triggering the investigation.

## 6.0    EVALUATION OF HISTORIC PROPERTIES

The BLM's nPA allows more efficient (as opposed to case-by-case) consultation on the evaluation of cultural resources for National Register eligibility when the SHPOs and the BLM agree on the approach. That agreement, as expressed in this Protocol, allows the BLM to determine certain types of properties ineligible without seeking SHPO agreement on each resource determination. However, any BLM FM or CR Staff may contact the SHPO or DPO concerning ineligibility determinations when assistance or additional perspectives related to the decision would be helpful. In the case of this Protocol, the BLMs authority to determine that individual archaeological properties or built environment resources do not meet the eligibility criteria in 36 CFR § 60.4, is limited to the following procedures.

### 6.1 Avoidance and Assumption of Eligibility

Where resources are identified but will be avoided by moving the project or by implementing protection measures, then, the BLM may treat cultural resources as eligible for inclusion in the National Register without formally evaluating or consulting with the SHPO for the purposes of that individual undertaking at that time. If the undertaking changes in any manner, a re-initiation of consultation as outlined under this Protocol should be undertaken. Avoidance treatments that rely on protection measures to preserve assumed eligible properties must ensure that all direct and indirect effects do not alter the characteristics of the property that would make it eligible and must ensure the qualifying characteristics of the integrity of the property are not diminished. Assuming a property as eligible and avoiding it neither precludes nor prejudices formal evaluation of the resource in the future.

## 6.2 Determinations of National Register Eligibility

When determining if there are historic properties within the APE, the BLM will apply the criteria for evaluation found in 36 CFR § 60.4 and National Register Bulletin 15 to all cultural resources that may be affected, including TCPs and properties of religious and cultural significance. As appropriate, BLM will invite interested parties to consult. The BLM also acknowledges that Indian Tribes possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them in accordance with 36 CFR § 800.4(c)(1).

All resources, including archaeological sites, shall be evaluated under all four National Register Criteria. The BLM Field Office CR Staff with jurisdiction over the resource shall review and approve all research designs for NRHP eligibility evaluations and may approve without consulting with SHPO a research design including 4 cubic meters or less volume of archaeological test excavation provided no more than 5 percent of the overall site area is affected. For test excavations involving more than 4 cubic meters or affecting more than 5 percent of the overall site area, the BLM Field Office CR Staff with jurisdiction over the resource shall informally consult with the SHPO to determine whether review and consultation is required.

## 6.3 Ineligible Properties

The BLM may determine archaeological or built environment resources are ineligible without the involvement of the SHPO, provided such determinations are fully documented in the same manner as eligible resources (Stipulation 6.6). Determinations of ineligibility must be made by qualified CR staff that meet professional qualifications standards described in Stipulation 13.4. Availability of this expertise to determine properties ineligible is a condition of certification for each Field Office. Any Field Office placed in provisional certification status (Stipulation 8.5) must submit all eligibility determinations to the DPO for approval prior to formally submitting to the SHPO for concurrence.

## 6.4 Eligible Properties

If the BLM determines that archaeological or built environment resources in the APE meet one or more of the National Register Criteria, the BLM must consult with the SHPO. This threshold condition that triggers SHPO review (Stipulation 8.1) requires a consensus be reached between the BLM and the SHPO. In order for SHPO to confirm that a resource proposed by the BLM is a historic property and make a consensus determination requires the following consultation conditions be met for each resource:

A. The BLM shall submit adequate documentation on appropriate Department of Parks and Recreation (DPR) or Intermountain Antiquities Computer System (IMACS) forms for each resource describing which National Register Criteria make each resource an eligible property;

B. The BLM shall provide sufficient written context and justification to support each determination but it need not be a full-scale evaluation report; and

C. SHPO has 15 working days after receipt of sufficient documentation to object to the BLM's decision in writing.

**6.5 Consultation with SHPO on TCPs**

If, through the course of consultation with Tribes and other identification efforts, the BLM identifies that a TCP is or may be present in the APE, the BLM shall consult with the SHPO regarding additional identification efforts (Stipulation 5.10). The BLM shall also seek SHPO concurrence on the eligibility of a TCP, pursuant to nPA Component 6.b(10).

**6.6 Documentation Standards for Evaluations**

The BLM shall document all evaluations, including applicable National Register criteria, and disclose those evaluations in the cultural resources geodatabase implemented by the BLM in 2013 and report the evaluations in the Annual Report to the SHPOs. The SHPOs may elect to review any evaluation as an element of its oversight role in this Protocol. All determinations, including determinations of ineligibility, will be documented, providing justification, detailing BLM's determination, resources consulted in making the determination, and included in the site record and report.

**6.7  Disputes with Tribes, Consulting Parties, or the Public**

Should an objection by a Tribe or the public arise to a determination of eligibility, the Field Office shall consult with the objecting party and the SHPO for not more than 30 calendar days, following receipt of the dispute in writing, to resolve the objection. If the objection is resolved within this timeframe, the parties shall proceed in accordance with the terms of that resolution. If the objection cannot be resolved within a 30 day time frame, and the Field Office and the SHPO have not agreed to extend the consultation period, the Field Office shall submit the disputed determination for review by the SHPO either under this Protocol or under 36 CFR § 800.4(c)(2).

**6.8 Disputes with the SHPO**

If the BLM and the SHPO cannot concur on eligibility of a cultural resource, and agreement cannot be reached within 30 days, then the BLM shall submit the dispute to Federal Preservation Officer (FPO) in the BLM Washington Office who shall request a formal determination of eligibility from the Keeper of the National Register of Historic Places (Keeper), pursuant to 36 CFR § Part 63 regulations on eligibility for inclusion in the National Register of Historic Places.  The Keeper's determination shall be final.

# 7.0     FINDINGS OF EFFECT ON HISTORIC PROPERTIES

The FM, upon determining that National Register-listed or eligible historic properties may be affected by an undertaking, shall determine to what extent those properties may be affected, giving consideration to the views of the Tribes, the interested public, and any consulting parties pursuant to Stipulations 3.0, 4.0, and 12.1.

### 7.1 No Historic Properties Present and No Historic Properties Affected

If the FM finds that either no properties are present or the undertaking will not affect those characteristics of the property that qualify it for listing in the National Register, the FM will document this finding, proceed with the undertaking, and provide documentation of "no historic property affected" to the SHPOs in the Annual Report (Stipulation 14.3).

### 7.2 No Adverse Effect

If the FM finds that the effect would not be adverse or the undertaking would be modified to avoid adverse effects, per 36 CFR § 800.5(b), and does not meet the threshold for case-by-case review in this Protocol (Stipulation 8.1) or the threshold for ACHP notification (nPA Component 5), the FM will document this finding, proceed with the undertaking, and report it to the SHPOs according to this Protocol.

### 7.3 Adverse Effect

If the FM finds that the undertaking may affect those characteristics of the property that qualify it for listing in the National Register, the FM will apply the Criteria of Adverse Effect, in consultation with SHPO (Stipulation 8.1), Tribes, and other consulting parties, to determine whether the proposed undertaking may alter, directly or indirectly, those characteristics in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association (36 CFR § 800.5(a)(1)) and will document this finding.

If the FM decides to proceed with an undertaking that will cause adverse effects, he or she shall make every reasonable and good faith effort to avoid or minimize adverse effects and/or to mitigate such effects through consultation with the SHPO, Tribes, and other consulting parties through the process found at 36 CFR 800.6.

### 8.0   SITUATIONS WARRANTING SHPO CONSULTATION

### 8.1 Thresholds for SHPO Review

The BLM shall initiate formal consultation with the SHPO in the following situations to determine whether or not to follow the procedures set forth in 36 CFR § 800 instead of continuing under the Protocol. In these threshold circumstances, the BLM and the SHPO may agree to continue proceeding under the Protocol if both parties agree that the details of a specific undertaking merit staying under the Protocol or if the BLM and SHPO agree to specific conditions that allow the review to stay under the Protocol.

Unless BLM and the SHPO both agree that the undertaking can continue under the Protocol, these actions shall require formal consultation:

A. **Adverse Effect.** When undertakings may have an adverse effect as defined by 36 CFR § 800.5(a)(1) on a property eligible or listed in the National Register of Historic Properties;
B. **When a National Historic Landmark (NHL) is Affected.** When the BLM proposes an adverse effect to a NHL.

C. **When a TCP and/or a Sacred Site is Affected**.  When the BLM proposes an adverse effect to an identified TCP or a sacred site.

D. **The BLM Acts as Lead Agency.** When the BLM acts either as lead agency for small scale, routine undertakings on behalf of other Federal agencies or in cooperation with other Federal agencies, or for undertakings that may have effects beyond the boundaries of the State and which involve other SHPOs. In such cases, the BLM will either consult with the respective SHPOs and agencies regarding an appropriate compliance process and proceed accordingly,  or comply with 36 CFR § 800. Consultation with the SHPO is required when more than one federal agency is involved and no lead agency has been agreed upon. The BLM will comply with 36 CFR § 800 on any complex, non-routine undertaking.

E. **The BLM Proposes Less than a Class III Survey.** When the BLM proposes to complete less than a BLM Class III survey of the affected (selected) lands and when informal consultation with the SHPO Staff yields a consensus agreement to proceed with formal consultation;

F. **The BLM Proposes a Transfer, Lease, or Sale of Public Lands.** When an undertaking involves a transfer, lease, or sale of public lands out of Federal ownership or control and historic properties in the APE are proposed to be protected by legally enforceable restrictions or conditions to ensure long-term preservation;

G. **The BLM Proposes a Transfer of Land to the State.**  When the BLM proposes to transfer lands to the States of California or Nevada absent an agreement document governing the undertaking;

H. **Professional Expertise is Unavailable.** When professional CR Staff  expertise necessary to implement this Protocol is unavailable to a Field Office;

I. **Land Use Plans and Amendments.** When land  use plans and amendments are initiated;

J. **Unresolved Disagreements.** When unresolved disagreements or disputes concerning professional findings exist between the CR Staff and FMs;

K. **Supplemental Procedure Non-participation.** When a Field Office declines to participate in any Supplemental procedure of this Protocol (Appendices) which would normally govern the undertaking or class of undertaking, and when the undertaking cannot be covered under this Protocol;

L. **BLM Policy Conflicts with 36 CFR § 800.** When BLM policy conflicts with the procedures established in 36 CFR § 800;

M. **Data Recovery.** When Data Recovery or other treatments to mitigate adverse effect are proposed by the BLM;

N. **Supplemental Procedure Requires Consultation.** When Supplemental procedures (Appendices) appended to this Protocol require such consultations;

O. **Unanticipated Adverse Effects**. When unanticipated, potentially adverse effects occur after surveys and findings of eligibility are consulted upon and completed;

P. **Objection by the Tribe(s) or the Public.**  When a written objection by the Tribe(s) or the public is made to a Class B exempt undertaking (Appendix D) ; and/or

Q. **A Prior Determination Is Vacated or Property is Removed from the National Register**. When the BLM proposes to vacate a prior determination of eligibility or proposes to remove a historic property from the National Register (36 CFR § 60.15).

In instances where the involvement of the SHPO occurs after steps have been taken under the Protocol pursuant to 36 CFR § 800.2 through 800.5, the BLM shall not be required to reconsider previous findings or determinations unless those findings or determinations are the subject of unresolved disputes or disagreements and there have been no significant changes in the landscape since the findings or determinations were made.

## 8.2 SHPO Involvement in the BLM Cultural Resource Program

To encourage broad participation by the SHPOs in the BLM Historic Preservation Program, the following involvement opportunities are extended to the SHPOs:

A. **Planning Efforts.** At the earliest stage of the planning process, each District or FM responsible for preparing a land use plan, significant amendments to a plan, or revisions at the regional or local level shall ensure that an invitation is sent to the SHPO to participate in the planning effort, including seeking the SHPO's comment on proposed resource Use Allocations (see next section). The SHPO, may elect, in writing not to participate in specific planning efforts at any time in the process. The BLM shall consider the views of the SHPO on specific planning efforts when those views are expressed in writing. All draft and final land use plans shall be submitted to the SHPO for review and comment unless the SHPO declined to participate in writing. Completion of the consultation process for planning will be indicated by either the SHPO's written notification to not participate or by the BLM's written response to the SHPO's comments on the draft land use or cultural resource project plans. No decision documents for planning shall be issued prior to completion of the consultation. An agreement document specific to the planning effort may be requested by either party.

B. **Use Allocations.** The BLM may invite the SHPO to comment on proposed Use Allocations of evaluated cultural resources. The BLM may allocate cultural resources in a Resource Management Plan area, whether already recorded or projected to occur on the basis of existing data synthesis. The SHPO may also elect to review any unevaluated allocations since BLM Use Allocations pertain to cultural resources rather than areas of land. Resources can be designated to one or more uses according to their nature and relative preservation value: (Scientific Use, Conservation for Future Use, Traditional Use, Public Use, Experimental Use or Discharge from Management).

C. **Field Tours.** The BLM Field Offices may invite the SHPO/SHPO Staff to participate in field tours relating to land use planning efforts or specific undertakings whenever cultural resources may be affected. SHPO may participate at its discretion.

D. **General Coordination:** The SHPO Staff and the BLM CR Staff are encouraged to communicate on general concerns or issues related to specific undertakings. Informal consultation shall be documented by the BLM Field Office staff. Formal consultation outside the scope of this Protocol shall be conducted between the SHPOs and the BLM

FMs in consultation with the DPO. Documentation shall be retained in appropriate files under the control of the BLM Field Office CR Staff.

### 8.3 Internal BLM Program Review

Either SHPO may request a review of any Field Office at any time by making a written request to the SD. The BLM will review a minimum of three (3) Field Offices per year. The DPO will convene a review committee within sixty (60) days of the request. The BLM shall invite the SHPO's participation in internal Field Office program reviews and shall provide reports of reviews, exclusive of findings and recommendations specific to personnel matters.

### 8.4 Certification

The SHPOs and ACHP may recommend review of a Field Office's certification. The DPO shall periodically consider the certification status of each Field Office during the year and consult with the District and FMs to resolve problems informally when possible.

The Preservation Board, in consultation with the SHPOs and the ACHP, has authority to review the certification of each BLM Office and make recommendations to the SD regarding certification of individual offices' ability to operate under this Protocol based upon the following:

A. Managers and specialists have completed required training;
B. Professional capability to carry out these policies and procedures is available to each line manager within the State through each Field Office's immediate staff or through other means.

### 8.5 Provisional Certification

The DPO or either SHPO may recommend that the SD place a Field Office on a provisional status based on findings from any of the reviews specified at Stipulation 8.3. Provisional status may extend from one to two years, although the term of the provisional status shall be a matter of agreement among the parties to this Protocol and shall reflect the complexity of the deficiencies identified. While on provisional status, a Field Office will have the opportunity to correct deficiencies that have been identified and documented during review of Field Office practices under the Protocol. Upon expiration of the provisional status term, the parties to this Protocol shall convene to determine whether identified deficiencies have been satisfactorily corrected. Should the parties determine that such deficiencies remain uncorrected, or should new deficiencies be identified that the parties deem significant, the decertification process shall be initiated as described below.

### 8.6 Decertification

The Preservation Board may choose to review a Field Office's certification status.  The FM, the DPO, the SHPO, or the ACHP may request that the Preservation Board initiate such a review, in which case the Preservation Board will respond under the terms of Component Eight of the nPA. If a Field Office is found not to have maintained the basis for its certification (e.g. the professional capability needed to carry out these policies and procedures is no longer available, or the office is not in conformance with this Protocol or BLM internal guidance) and the Office

Manager has not voluntarily suspended participation under this Protocol, the Preservation Board will recommend that the SD decertify the Field Office.

A. A Field Office may ask the SD to review the Preservation Board's decertification recommendation, in which case the Director will request the ACHP's participation in the review.
B. The Preservation Board will notify the SHPOs and the ACHP if the status of a certified office changes. In consultation with the appropriate SHPO(s), the DPO will prepare a Plan of Action to address the identified deficiencies.
C. When a Field Office is decertified, the responsible manager shall follow the procedures of 36 CFR § 800 to comply with Section 106.

### 8.7 Recertification

The BLM shall consult with the SHPO(s) on the results of the Plan of Action developed under Stipulation 8.6B so that the SHPO(s) may review the basis for recommending recertification. If a decertified Field Office is found to have restored the basis for certification, the Preservation Board will recommend that the SD recertify the office.

## 9.0    POST REVIEW DISCOVERIES  AND UNANTICIPATED EFFECTS

A post-review discovery is defined as the identification of previously unknown historic property within the context of BLM activities other than planned archaeological excavations.

The BLM, in consultation with the SHPOs, Tribes and consulting parties, will seek to develop a monitoring and discovery plan for projects pursuant to 36 CFR § 800.13(a)(1) as appropriate for individual undertakings in consideration of these types of sites.

A. If the BLM determines that the implementation of a project or an Historic Properties Treatment Plan (HPTP) will affect a previously unidentified property that may be eligible for the National Register, or will affect a known historic property in an unanticipated manner, and a monitoring and discovery plan has not been finalized, the BLM, in coordination with the SHPO, will address the discovery or unanticipated effect by following the procedures at 36 CFR § 800.13(b)(3) when a process has not yet been agreed upon pursuant to 36 CFR § 800.13(a)(1).
B. The BLM at its discretion may assume any discovered property to be eligible for inclusion in the National Register. The BLM's compliance with this stipulation  shall satisfy the requirements of 36 CFR § 800.13(a)(1).

## 10.0   EMERGENCY SITUATIONS

When the BLM finds it necessary to implement an undertaking in a manner that would preclude the use of this Protocol as in the case of an Emergency declared by the President, a Tribal government, or the Governor of a State, the BLM shall comply with the provisions of 36 CFR § 800.12 and 36 CFR § 78 for such undertakings. The BLM and its mutual aid partners will

implement to the extent prudent and feasible any measures that could avoid or minimize harm to historic properties and shall implement post-emergency rehabilitation measures and evaluations for properties which may have been damaged by agency activities during the emergency. The BLM may assume the eligibility of a cultural resource or group of resources for inclusion on the NRHP without consultation with the SHPO where proposed rehabilitation and stabilization measures are unlikely to affect prospective NRHP values and measures are needed to prevent further resource damage or destruction. The BLM shall document properties discovered or affected by the emergency undertaking or post-emergency rehabilitation and shall submit a report to the SHPO.

## 11.0   IDENTIFICATION AND TREATMENT OF HUMAN REMAINS

The Native American Graves Protection and Repatriation Act (NAGPRA) as outlined at 43 CFR § 10, the Archaeological Resources Protection Act (ARPA) at 43 CFR § 7, and State laws govern the treatment of human remains, associated and non-associated funerary objects, sacred objects, or objects of cultural patrimony (NAGPRA items). BLM FMs in consultation with affected Tribes shall coordinate these and other responsibilities under NAGPRA (43 CFR § 10) with those under the NHPA, as described in the laws, and shall follow all applicable State laws.

In consultation with the SHPO and federally recognized affiliated Tribes, the BLM shall select the option of leaving native human remains in place under Federal control or collection with repatriation under NAGPRA. BLM policy regarding human remains, associated funerary objects, and sacred objects discovered during land use allows BLM FMs to allow burial sites and cultural items on public lands to remain undisturbed whenever possible resulting in a "no historic properties affected" finding.

Where there is a reasonable probability of encountering undetected native human remains and/or NAGPRA items during a proposed land use, the FM shall consult with federally recognized Tribes prior to project authorization. The goal of the consultation is to provide the FM with a general understanding of the Tribes' concerns regarding the treatment of previously unknown human remains that might be discovered. If discovery is likely, a Treatment Plan should be developed for the treatment of such properties, including consultation requirements and compliance with other laws, such as NAGPRA and applicable state laws prior to initiating or authorizing the undertaking.

If previously unknown native human remains are discovered during the implementation of an undertaking considered under the terms of this Protocol or during an exempted activity covered under the Exemptions (Appendix A) and the human remains cannot be protected, the BLM shall address the discovery in accordance with the provisions of NAGPRA and coordinate that process with 36 CFR § 800.13 as needed until such time that supplemental procedures are finalized and appended to this Protocol as a Supplement in the manner specified in Stipulation 16.1.

If such remains or items are discovered off federal lands within California, for projects authorized by the BLM, the provisions of the California Native American Graves Protection and Repatriation Act (California Health and Safety Code 8010-8030, and California Public Resources Code 5097.98-99) or the Nevada Protection of Indian Burial Sites statutes (Nevada Revised Statutes 383.150-190) shall be followed.

## 12.0 COOPERATION AND ENHANCED COMMUNICATION

This section establishes how the BLM will develop cooperation and enhanced communication with the ACHP, SHPOs, Indian Tribes  potentially affected by BLM undertakings, consulting parties, and the public.

### 12.1 Information on the BLM California Web

The BLM Field Offices will ensure that the NEPA information on each Field Office web site maintains a current list of pending undertakings by listing active Environmental Impact Statements (EIS), Environmental Assessments (EA), Categorical Exclusions (CE), and Determinations of NEPA Adequacy (DNAs). At a minimum the pending undertakings information will be updated when the review is initiated and again when it is completed. Information will include a basic project location and description of either the proposed finding of effect, (no historic properties affected, no adverse effect to historic properties, or adverse effect to historic properties) or the proposed use of an exemption under the Protocol if that is the case.

Before the project review is completed the information regarding the proposed finding of effect or proposed use of an exemption under this Protocol will be available on the web for at least 7 days for CEs and DNAs. For EAs the information will be available for a minimum of 15 days and usually for 30 days. EISs will be available as per Council of Environmental Quality (CEQ) regulations and BLM policy for a minimum of 45 days.

The State Office will ensure that the following information is available on the California BLM web site within 60 days of execution of this Protocol and will widely publicize this availability:

    A.  An explanation of the current list of pending undertakings available on BLM E-Planning.
    B.  A list of BLM California CR Staff and BLM Tribal contacts;
    C.  A map of California showing BLM District and Field Office boundaries;
    D.  A copy of the Annual BLM Report to the SHPOs;
    E.  A link to the BLM 8100 Series Cultural Resources Manuals; and
    F.  A link to BLM Manual 1780: Tribal Consultation

### 12.2 ACHP, NCSHPO, and the Preservation Board

The SHPOs or the BLM SD may ask the NCSHPO, the BLM Preservation Board, and/or the ACHP to assist at any stage in revising this Protocol. The Preservation Board and the ACHP will be kept

informed of the progress of Protocol review and revision, and the BLM State Office will provide the ACHP an opportunity to review and comment on the revised Protocol before execution.

### 12.3 Data Sharing and Reporting

This Protocol provides for data sharing, including information resource management development, support and security at a minimum annual transmittal of all site forms and project reports for all Section 106 and Section 110 activities.

The BLM maintains a Cultural Resources Geodatabase in a Geographic Information System (GIS) program in accordance with Section 112(2) of the NHPA. The geodatabase shall be updated, as data are available, with newly recorded and re-recorded resource and investigation data. Initiatives shall be undertaken to input cultural resource data as funding allows.

The BLM and the SHPOs shall jointly work to implement the electronic submission of records for tracking agency actions, using the documentation and submittal standards that may be specified in a supplemental agreement. The BLM and the SHPOs will work together to insure the program meets the BLM and the SHPOs needs for data sharing and access as allowed for under applicable policy and law.

Initiatives shall be undertaken to develop agreements whereby the BLM will work to input and share Cultural Resource data developed by the agency pursuant to Section 106 and Section 110 of the NHPA with the Cultural and Historic Resources Information System (CHRIS) and Nevada Cultural Resource Information System (NVCRIS). Depending on the exact nature of data sharing agreements and the participation of other agencies, these may be appended to this Protocol as a supplement amendment process described in Stipulation 16.3 or may be made up stand-alone agreements.

### 12.4 Documentation of Findings

All Cultural Resources investigations associated with implementing this Protocol regardless of findings shall be documented to standards described in BLM guidelines and/or standards stipulated in written guidance from the SHPOs, or those found in supplemental agreements. The BLM CR Staff shall document all determinations, findings, and recommendations made under this Protocol including, but not limited to, delineating the APE, determining National Register eligibility, applying exemptions, findings of effect, and other findings and determinations. Documented determinations, findings, and recommendations shall be retained as described as responsibilities under the Protocol of the BLM Field Office CR Staff (Stipulation 2.4).

### 12.5 Records Management

The BLM shall maintain complete, current, and permanent records for cultural resources activities, including but not limited to, survey areas, findings, determinations, reports, historic property records, archaeological site records, and correspondence to fully document fulfillment of its responsibilities under this Protocol, and other laws, regulations, and policies. Records management shall conform to BLM and government standards.   Records pertaining to

undertakings shall be retained in files, under the control of Field Office CR Staff, which shall document inventory efforts, research designs, peer reviews, assessments of effect and impacts, and use of exemptions. Records shall include, but shall not be limited to, site records, monitoring and condition reports, effect findings, determinations of eligibility, images, use allocations, and cross references to other files or archived documents which contain information pertaining to the individual property.

In California all site records will use DPR forms and will be submitted to the appropriate Information Center of California Historical Resources Information System. In Nevada all site records will use the IMACS forms and will be submitted to Nevada Cultural Resource Information System (NVCRIS). The procedures governing the manner in which such documentation is submitted to the SHPO and the manner in which such documentation is incorporated into permanent repositories shall be made explicit in agreements among the BLM and the SHPOs after the execution of this Protocol. Such agreements may be administratively appended to this Protocol through the process described in Stipulation 16.3.

### 12.6 Non-sensitive Cultural Resources Compliance Documents

Findings, determinations, and recommendations and other non-confidential information may be disclosed to the public.  However, the SD has determined, under the authority of Section 304 of NHPA and consistent with Section 9 of ARPA, that public disclosure of the location and character of cultural resources may put the resources at risk. Sensitive cultural resource information under the control of the BLM, regardless of ownership of the resource, shall not be disclosed to the general public and such information shall not be stored in documents open to the general public. This determination notwithstanding, the BLM may sufficiently characterize cultural resources in writing for the purposes of required analyses under NEPA.

## 13.0   BLM TRAINING, DEVELOPMENT, AND STAFFING

### 13.1 Training

Training and development are key elements in maintaining the effectiveness of the Protocol. FMs and others who may act in the role of FMs within the scope of this Protocol shall receive Protocol training within 90 days of their report date as specified in the nPA and annually thereafter. The SHPOs shall be offered the opportunity to comment on scope and content of training and may actively participate in training sessions. In cooperation with the SHPOs, the BLM may identify partners to assist in developing training programs.

After successfully completing the introductory training, each FM, and others who may act in the role of FMs within the scope of this Protocol, shall sign a signature sheet stating they understand and agree to follow all provisions of the Protocol for which they are responsible. Signature sheets shall be retained by the DPO with copies forwarded to the SHPOs as they become available.

BLM CR Staff, and other Staff as appropriate, shall receive training in the use and implementation of the Protocol, including the procedural requirements of 36 CFR § 800 which are to be implemented in instances when the Protocol does not apply. The DPO shall identify the need for specialized cultural resource management training. The BLM's CR Staff shall meet annually, usually in conjunction with the Society for California Archaeology meetings, to participate in workshops, training, exchange information, and to discuss issues concerning the Cultural Resources Program. The SHPOs and the ACHP shall be offered the opportunity to participate in this annual meeting and assist the BLM in on-going training of Line Officers and the CR Staff in the implementation of the Protocol. The SHPOs will also be offered the opportunity to comment on the scope and content of training.

The DPO will schedule initial training for BLM staff at the Annual Meeting. All CR Staff and non-permanent CR Staff with Protocol roles and responsibilities that do not attend the annual training shall receive a minimum of 8 hours of training.  This training will be similar in content to the annual training and focus on a comprehensive review of the Protocol, how it relates to Section 106, and the current nPA, including roles and responsibilities, documentation, reporting, consultation, evaluation, and best practices.

## 13.2 Development

BLM FMs, in consultation with the DPO, shall review, as part of the Employee Performance and Appraisal Plan (EPAP), their CR Staff to ensure that current professional standards in the discipline can be met and maintained, and that training needs are identified. Training received shall be reported as a component of annual reporting (Stipulation 14.3). Appropriate training subjects will include but not be limited to, the Protocol, NHPA Section 106, Tribal Consultation, Oral History, Agreement Document Writing, Field Methods, and specialized trainings such as Osteology, Ceramic Identification, Lithics, and Rock Art Recordation.

A minimum of 4 hours of training for the BLM FMs shall be focused on a review  of  the Protocol's basic components and the Manager's roles and responsibilities. The DPO may recommend that other Field Office staff also participate in such training. New Field Managers shall receive the minimum training within ninety (90) days of reporting to a Field Office. Participation by Field Offices in any future Protocol training, and CR Staff's completion of any required culture resource management training shall be key considerations for continuing certification of individual Field Offices.

## 13.3 Professional Societies and Annual Meetings

The BLM recognizes that staying current in relevant professional literature and participation of Cultural Resource Staff in professional societies and annual meetings (e.g., Society for California Archaeology, Society for American Archaeology, Society for Historical Archaeology, California Council for the Promotion of History, Society of Architectural Historians) is integral to staying abreast of developments and advances in the discipline, for enhancing professional knowledge and skills, and for providing opportunities for leadership and service to the profession.

### 13.4 Staffing Commitment

The BLM is committed to employing a professional CR Staff. In hiring new, full time professional staff, the BLM will follow Section 112(a)(1)(B) of the NHPA and select candidates that meet the *Secretary of the Interior's Professional Qualifications Standards* or the education and experience standards called for by the U.S. Office of Personnel Management. FMs shall ensure the availability of cultural resources expertise at the Field Office level. Field Offices that do not have the services of a BLM Cultural Resources professional, either on staff or through arrangement with another BLM administrative unit, shall consult with the SHPO on all undertakings.

BLM's student training programs may be used to recruit new staff to assist the full time Cultural Resource Staff in the Field Office but the trainees shall not perform professional duties without appropriate direct oversight by qualified professional CR Staff.

### 13.5 Professional Staff

The DPO, in consultation with supervising line managers and CR Staff, will document each District and Field Office's professional staffing capabilities in their annual report to the SHPOs. Documentation will include any recommended limitations on the nature and extent of authorized functions. Where a FM's immediate staff does not possess the necessary qualifications to perform specialized preservation functions (e.g., historical architecture, historical landscape architecture, ethnography), the FM will seek specialized expertise from outside the immediate staff.

### 13.6 Professional Capability

The DPO may request that the Preservation Board assist the FM and the CR Staff in assessing the manager's needs for special skills not presently available on the immediate staff, and the CR Staff's opportunities for professional development and career enhancement through training, details, part-time graduate education, and other means. The BLM may request the assistance of the SHPOs in such cases or may obtain the necessary expertise through contracts, BLM personnel from other units, or arrangements with other agencies.

### 13.7 Non-Professional Cultural Resources Personnel

The BLM may employ CR Staff who do not meet the Secretary of the Interior's standards for professional CR Staff (student interns working towards a degree). In such instances, individuals who do not meet these standards shall work under the direct technical supervision of BLM professional CR Staff and may not substitute for professional CR Staff in making findings, determinations, or recommendations regarding the identification and evaluation procedures set out in this Protocol or in 36 CFR § 800.

## 14.0   ACCOUNTABILITY MEASURES

### 14.1 Meetings

The SHPOs and the SD, with their respective staffs shall meet annually, to review the BLM's implementation of the Protocol, annual reports of activities, and other pertinent issues. The

ACHP may be invited to participate in order to facilitate the ACHP's general oversight of the Section 106 process. At the annual meeting, the SHPOs and the BLM shall exchange information relevant to achieving the goals and objectives set forth in this Protocol. At any time the SHPO or the SD may convene a meeting to discuss issues. This Protocol encourages SHPO Staff and BLM CR Staff, to meet and to consult informally and frequently in order to maintain appropriate communication, to seek informal opinions and advice, and share information and knowledge.

## 14.2 Communicating by Reporting

The BLM SD will prepare an Annual Report to the SHPOs outlining the preservation activities conducted under the nPA and the Protocol. The Annual Report will be consistent with the BLM's annual Washington Office reporting requirements, and will include supplemental information agreed upon by the BLM and the SHPOs. The Annual Report will be made available to the public via the BLM California web site, and BLM will notify the ACHP of its availability via email.

## 14.3 The BLM Annual Report to the SHPOs

The BLM Field Offices shall, by November 7th of each year, provide to the DPO for collating and reporting to the SHPOs by December 1st, a list of prior fiscal year undertakings including determinations of eligibility made, and a short narrative summarizing Section 106 work and Section 110 accomplishments:

A. List undertakings which made use of one or more of the Supplements to this Protocol and indicate which Supplement(s) was utilized;
B. List and track the number and types of exemptions applied;
C. List the number of acres surveyed by level and distinguish between Section 106 and Section 110 work;
D. List the number of cultural resources recorded or recordations updated and distinguish between Section 106 and Section 110 work;
E. List emergency actions, inadvertent discoveries, and unanticipated effects that occurred during the fiscal year;
F. List the number of National Register evaluations made for Section 106 actions; and
G. List the number and type of findings of effect made under the Protocol.
H. A list of staff who received Protocol training, a list of those who did not receive Protocol training and a planned schedule to train those people based on the data gathered from the narrative submitted by each Field Office;
I. All data gathered on undertakings for which the DPO provided assistance, a list of Field Offices which were subject to or will be subject to a program review;
J. A list of any Field Office suspended from use of the Protocol for any reason, any change of staffing in both CR Staff and managers and a list of legal actions involving cultural resources; and

K.  Additional data may be requested by either SHPO until October 1 of the Federal fiscal year that is being reported upon.

## 14.4 BLM Public Reports

The DPO shall prepare responses for the signature of the BLM National Director or SD regarding public inquiries about the BLM's exercise of its authorities and responsibilities under the nPA and the State Protocol, such as the identification, evaluation, and management of resources. Responses will include establishing the facts of the situation and, where needed, recommendations to the BLM National Director or SD for corrections or revisions in a practice or procedure.

## 15.0   PROGRAM DEVELOPMENT AND ACTIVITIES UNDER SECTION 110

### 15.1 Preservation Planning

In return for the procedural flexibility that this Protocol provides in meeting 36 CFR § 800 responsibilities, the BLM commits to fulfill the responsibilities enumerated in Section 110 of the NHPA. The Historic Preservation Program (HPP) in (Appendix B) guides the BLM in achieving measurable progress toward compliance with Section 110 as described here:

A.  Programs of evaluation and National Register nomination;
B.  Monitoring for historic property condition and ARPA;
C.  Stabilization and preservation of resources;
D.  Inventory and documentation of known but unrecorded properties;
E.  Data synthesis and research targeting topical and geographic priorities to more fully develop proactive landscape scale management of cultural resources;
F.  Strategies to improve the quality of existing GIS data and to reduce the backlog of un-synthesized site location and report information; and
G.  Interpretation and public education involvement in historic preservation through site stewardship programs and other outreach activities.

### 15.2 Curation

The BLM will ensure to the greatest extent possible that curation and disposition of all archaeological and historical materials and data from Federal lands conform to 36 CFR 79 and the Secretary of the Interior's Standards for Archaeological Documentation:

A. Archaeological specimens and records are part of the documentary record of an archeological site. They must be curated for future use in research, interpretation, preservation, and resource management activities. Curation of important archaeological specimens and records should be provided for in the development of any archaeological program or project.

B. Archaeological specimens and records that should be curated are those that embody the information important to history and prehistory. They include artifacts and their associated documents, photographs, maps, and field notes; materials of an environmental nature such as bones, shells, soil and sediment samples, wood, seeds, pollen, and their associated records; and the products and associated records of laboratory procedures such as thin sections, and sediment fractions that result from the analysis of archeological data.

C. Satisfactory curation occurs when:

   i. Curation facilities have adequate space, facilities, and professional personnel;
   ii. Archaeological specimens are maintained so that their information values are not lost through deterioration, and records are maintained to an archival standard;
   iii. Curated collections are accessible to qualified researchers within a reasonable time of having been requested; and
   iv. Collections are available for interpretive purposes, subject to reasonable security precautions.
   v. Management of non-Federal archaeological materials and data will be consistent with applicable law and professional curation requirements as negotiated with non-Federal landowners or managers. Non-museum collections may be maintained at Field Offices, but only under appropriate curatorial conditions and with appropriate documentation.

## 16.0 REVISION, RESOLUTION OF OBJECTIONS, AND SUPPLEMENTAL PROCEDURES

### 16.1 Revision

This Protocol is intended to be responsive to changing circumstances. Therefore, the BLM or the SHPO may propose revision of this Protocol, whereupon the parties shall consult to consider the proposed Revision. "Revision" as used herein refers to the process of review and rewriting (including extension) of all or portions of the Protocol, including the addition, deletion, or modification of exempt undertakings. Revisions shall only become effective upon written concurrence of the signatories. Changes that would affect the opportunity for public participation or Tribal consultation will be subject to public notice and Tribal consultation. A revision will go into effect when signed by all the signatories.

**16.2 Procedures for Resolving Objections**

Should any signatory to this Protocol object to any matter related to its implementation, the signatories will meet to attempt to resolve the objection.

### A. Between the BLM and the SHPO

The BLM or the SHPO may object to an action proposed or taken by the other pursuant to this Protocol. The objecting party shall notify the other party in writing of the objection. Within seven (7) calendar days following receipt of notification, the parties shall begin consultations for thirty (30) calendar days to resolve the objection. If the objection is resolved within this time frame, the signatories shall proceed in accordance with the terms of that resolution. The BLM's responsibilities to carry out all other actions subject to the terms of this Protocol that are not the subject of the dispute remain unchanged.

    i.   Forward all documentation relevant to the dispute, including the BLM's proposed resolution, to the signatories. The signatories shall provide the BLM with their response to the BLM's proposed resolution of the objection within thirty (30) days of receiving adequate documentation. Prior to reaching a final decision on the dispute, the BLM shall prepare a written response that takes into account any timely advice or comments regarding the dispute from the signatories, and provide them with a copy of this written response. The BLM will then proceed according to its final decision.

    ii.   If the signatories do not provide their advice regarding the dispute within the thirty (30) day time period, the BLM may make a final decision on the dispute and proceed accordingly. Prior to reaching such a final decision, the BLM shall prepare a written response that takes into account any timely comments regarding the dispute from the signatories to the Protocol, and provide them with a copy of such written response.

    iii.   If the objection is not resolved within this time frame, and the parties have not agreed to extend the consultation period, the DPO shall refer the objection to the Preservation Board, which will provide the SD with its recommendations. If the SD accepts the Preservation Board's recommendations, the SD shall promptly notify the SHPO of such acceptance, provide a copy of the Preservation Board's recommendations, and afford the SHPO thirty (30) calendar days following receipt of the notification to comment on the recommendations. If the SHPO concurs with the Preservation Board's recommendations within this time frame, the SD and the SHPO shall proceed in accordance with the Preservation Board's recommendations and the objection shall thereby be resolved.

    iv.   If either the BLM SD or the SHPO rejects the Preservation Board's recommendations after consideration not to exceed thirty (30) days, the SD shall promptly notify the Preservation Board in writing of the rejection, and immediately thereafter submit the objection, including copies of all pertinent documentation, to the ACHP for comment in accordance with Component Five of the nPA. Within thirty (30) calendar days following receipt of any ACHP

comments, the SD shall make a final decision regarding resolution of the objection and in writing notify the Preservation Board, the SHPO and the ACHP of that decision. The objection shall thereupon be resolved. In reaching a final decision regarding the objection, the SD shall take into account any comments received from the Preservation Board, the SHPO, and the ACHP pursuant to this stipulation.

**B. Between the BLM, the Public, the Tribes, Indian groups, or Individuals**

If a member of the public or a Federally recognized Indian Tribe or other American Indian group, family or individual objects at any time to the manner in which this Protocol is being implemented in a specific case, the BLM shall consult with the objecting party for a period not to exceed forty-five (45) days and, if the objecting party requests, with the SHPO, to resolve the objection.

If the objecting party and the BLM resolve the objection within forty-five (45) days, the BLM shall proceed in accordance with the terms of that resolution. If the objection cannot be resolved, the DPO shall refer the objection to the Preservation Board, which will provide the SD and the objecting party with its recommendations for resolving the objection. If the SD and the objecting party accept the Preservation Board's recommendations, the SD shall proceed in accordance with these recommendations and the objection shall thereby be resolved.

**C. Between the BLM SD and/or SHPO and the Preservation Board**

If either the SD, SHPO, or the objecting party rejects the Preservation Board's recommendations for resolving the objection, the SD shall refer the objection to the ACHP in accordance with Component 5 of the nPA. Any objection filed pursuant to this paragraph shall not prevent the BLM from proceeding with project planning; however, project implementation shall be deferred until the objection is resolved pursuant to the terms of this stipulation.

  i.   The BLM shall forward all documentation relevant to the dispute, including the BLM's proposed resolution, to the Preservation Board, the ACHP, and the SHPO. The ACHP shall provide the BLM with their response to the BLM's proposed resolution of the objection within thirty (30) days of receiving adequate documentation. Prior to reaching a final decision on the dispute, the BLM shall prepare a written response that takes into account any timely advice or comments regarding the dispute from the parties, and provide them with a copy of this written response. The BLM shall then proceed according to its final decision.

  ii.  If the signatories do not provide their advice regarding the dispute within the thirty (30) day time period, the BLM may make a final decision on the dispute and proceed accordingly. Prior to reaching such a final decision, the BLM shall prepare a written response that takes into account any

timely comments regarding the dispute from the signatories to the agreement, and provide them with a copy of such written response.

## 16.3 Supplemental Procedures

In keeping with the intended responsive nature of this Protocol, the BLM or either SHPO may propose a Supplement to this Protocol at any time, whereupon the signatories shall consult to consider such an amendment. The BLM shall add supplemental procedures for specific BLM programs or projects when all signatories to the Protocol wish those procedures to be made explicit.

### A.  Adoption of Supplements

When new supplemental procedures are proposed that may change the participation and current consultation process for parties other than the BLM or the SHPOs, then the BLM shall consult with Consulting Parties, Tribes, and the ACHP on the development of the proposed Supplement. The process culminates in the issuance of a Protocol Supplement, administratively appended to the Protocol after signature by the signatories.  Protocol Supplements shall be housed as Appendices to this Protocol.

### B.  Termination of Supplements

The BLM or SHPO may terminate a Supplement. The signatory proposing termination shall, in writing, notify the other signatories of the intent to terminate a Supplement and explain the reasons for proposing the termination. Within seven (7) calendar days following receipt of such notification, the parties shall begin to consult for up to thirty (30) days to seek alternatives to termination. Should such consultation result in agreement on an alternative to termination, the signatories shall proceed in accordance with the terms of that agreement. Should such consultation fail, the signatory proposing termination may terminate the Supplement by providing the other signatories with written notice of such termination. Termination hereunder shall render the Supplement without further force or effect.

### C.  Expiration of Supplements

Supplements expire on the individual expiration date of each Supplement or on the date of this Protocol if no date is specified in the supplement.

## 17.0   EXECUTION, EXTENSION, TERMINATION, AND EXPIRATION

## 17.1 Execution

The signatories to this Protocol agree that the execution of this Protocol implements the nPA dated February 9th, 2012 and shall not be adopted for such until reasonable and adequate consultation with the public, Federally recognized Indian Tribes, Tribal Historic Preservation Officers and affiliated non-federally recognized Indian groups occurs to the satisfaction of all signatories.

### 17.2 Extension

This Protocol and the BLM's activities under this Protocol shall be reviewed by the SHPOs on or about the fourth (4th) anniversary of its execution. The purpose of such a review shall be to determine whether the terms of this agreement have been satisfactorily implemented and whether the signatories can agree to extend this Protocol. An extension of the Protocol is a revision as defined in Stipulation 16.1 and an extension is executed by the procedures described in that stipulation.

### 17.3 Termination

Any signatory may terminate this Protocol.  The party proposing termination shall notify the other signatories in writing of their intent to terminate and explain the reasons for proposing termination. Within seven calendar days following receipt of such notification, the parties shall consult for up to 60 working days to seek alternatives to termination. Should such consultation result in agreement on an alternative to termination, the parties shall proceed in accordance with the terms  of that agreement.     Should such consultation fail,  the party  proposing termination may terminate this Protocol by providing the other party with written notice of such termination.  Until a new agreement is executed, all signatories shall follow procedures outlined in 36 CFR § 800 including those found at 36 CFR § 800.4 for making determinations of eligibility for the National Register.

### 17.4 Expiration

At midnight of the fifth (5th) anniversary of the date of its execution, this Protocol shall automatically expire and have no further force or effect, unless it is extended pursuant to Stipulation 17.2 in the manner specified in Stipulation 16.1. Should the Protocol not be extended and should no successor agreement document be in place at the time of automatic expiration, the BLM shall comply with 36 CFR § 800.

## 18.0   OTHER PROCEDURES

The BLM shall follow policies of the nPA (Part 2) along with the Secretary's Standards and Guidelines (Part 2) and/or those promulgated by the SHPOs. The BLM, in consultation with the SHPOs, may develop other guidance as necessary and shall consider incorporating such guidance as Supplemental procedures to this Protocol.

## 19.0   AFFIRMATION

The signatures below represent the affirmation of the BLM and the SHPOs of California and Nevada agreeing that the execution of this Protocol implements the nPA dated February, 2012 (the national Programmatic Agreement among the BLM, the ACHP, and the NCSHPO regarding the manner in which the BLM will meet its responsibilities under Section 106 and serves as partial satisfaction of the BLM's obligations under Sections 110(f) and 111(a) of the NHPA) and has not been adopted for such until reasonable and adequate consultation with the public, Federally recognized Indian Tribes, Tribal Historic Preservation Officers and affiliated non-federally recognized Indian groups occurred to the satisfaction of all signatories.

This Protocol shall become fully executed when signed by all signatories and transmitted to the BLM Field Offices managing lands in California and Nevada. This Protocol may be signed in counterparts and each signature will be effective and binding as if the signatories had signed the same document.  Within three (3) months of execution, the BLM agrees to provide training acceptable to the SHPOs covering the terms and stipulations provided in this Protocol to both BLM FMs and CR Staff.

With my signature, I do hereby agree and have the authority to execute this Protocol and shall implement its stipulations until amended, replaced, terminated or expired.


**STATE DIRECTOR, BUREAU OF LAND MANAGEMENT, CALIFORNIA**

_____   Date  5 / 7 / 19
Joe Stout

With my signature, I do hereby agree and have the authority to execute this Protocol and shall implement its stipulations until amended, replaced, terminated or expired.

**STATE HISTORIC PRESERVATION OFFICER, C A L I F O R N I A**

_____     Date_____

Julianne Polanco

Back of Signature page 2

With my signature, I do hereby agree and have the authority to execute this Protocol and shall implement its stipulations until amended, replaced, terminated or expired.

STATE HISTORIC PRESERVATION OFFICER, NEVADA

Date May 7, 2019

Rebecca L. Palmer

# APPENDIX A
# EXEMPT UNDERTAKINGS
## May 2019

**INTRODUCTION**

Undertakings listed in this Appendix to the Protocol may be exempt (categorically excluded) from further review or consultation under the terms of this Protocol at Stipulation 5.1. The listed classes of undertakings are subdivided into Class A and Class B activities, which vary by the degree of review required. This review shall be conducted by the Field Office Cultural Resources Staff that meet the professional requirements of Protocol Stipulation 13.4.

**Class A Activities**

Class A activities are generally exempt but may require a records check to determine whether the activity may affect a known historic property or an unevaluated cultural resource. Cultural Resources Staff shall determine whether a records check is appropriate and shall conduct that check prior to exempting the activity. A Field Office may elect to provide further and more robust review, including field inventory, by Field Office Cultural Resource Staff if that Staff determines that a specific exempt undertaking may affect a cultural resource which is significant, documented, known but not recorded, or unevaluated.

Class A activities, <u>submitted for further review</u>, shall be documented and reported in annual reports. Class A exemptions which are not submitted for further review shall be documented in project case files in order to demonstrate compliance with Section 106 of NHPA using an appropriate exemption tracking form.

# Class A Activity List

**A1**: Ground disturbing activities which involve no more than two (2) square meters of cumulative surface disturbance and no more than one (1) square meter of contiguous disturbance in any given one (1) acre location.  This does not apply to ground disturbing activities within the site boundaries of a known unevaluated, eligible, or listed National Register cultural resource.

**A2**: Routine maintenance of existing facilities, including minor routine and preventative maintenance of the BLM facilities which do not disturb additional ground surface area or historic properties at the facility including the facility itself.

**A3**: Rendering formal classification of Federal lands in the United States pursuant to 43 CFR 2400 (Formal Land Classification Procedures).

**A4**: Removal of log jams and debris dams using hand labor or small mechanical devices.

**A5**: Special land use designations which do not authorize surface disturbance including ACECs, Wilderness Study Areas, environmental education areas, and Natural Areas.

**A6**: Alteration of structures which are known to be less than 45 years old in their entirety.

**A7**: Removing modern materials and trash scatters less than 45 years old and not associated with a larger eligible or unevaluated cultural entity.  Abandoned vehicles and modern trash dumps are included in this class.

**A8**: Withdrawal continuations or extensions which would only establish a specific time period and where there would be essentially no change in use and/or no new uses would be permitted and continuation would not lead to environmental degradation.

**A9**: Withdrawal terminations, modifications or revocations that, because of overlying withdrawals or statutory provisions, involve merely a record clearing procedure.

**A10**: Withdrawal terminations, modifications, or revocations and cancellations of classification and opening orders where the land would be opened to discretionary land laws and where future actions would be subject to review under the terms of this protocol.

**A11**: Withdrawal terminations, modifications or revocations and opening orders that the Secretary of the Interior is under a specific statutory directive to execute, and where future actions would be subject to review under the terms of this protocol.

**A12**: Transfer of use authorization from one Federal agency to another when an action such as a boundary adjustment necessitates changing a right-of-way from one federal agency to another (e.g., Forest Service Special Land Use Permit to a BLM Title V Right-of-Way).

**A13**: Rights-of-way for overhead line (no pole or tower on BLM land) crossing over a corner of public land.

**A14**: Right-of-way which would add or remove another radio transmitter to an existing communication site that is neither an historic property nor located on or within the proximate area (10 m) of an historic property.

**A15:** Apiary sites adjacent to a designated road or route of travel and which do not involve ground disturbance.

**A16:** Acquisition of lands and easements.

**A17:** Transferring lands or interest in lands to other Federal agencies where future management will be subject to the Section 106 process.

**A18:** Cadastral survey.

**A19:** Designating areas closed to vehicles or areas limited to travel only on existing roads and trails where such designation does not require or involve Plans or Plan amendments and where access to traditional or sacred sites by Native Americans is not an issue.

**A20:** Installation of routine signs or markers on shoulders of existing roads and markers adjacent to existing roads, or placing recreational, special designation or information signs, or visitor registers, unless within known historic properties. Disturbance cannot exceed the restrictions set forth in Exemption A1.

**A21**: Operations in, and reclamation of, materials in existing borrow sites when the activity is entirely within the disturbed area.

**A22**: Administratively determining that land is mineral in character. Log but not necessary to report to SHPO.

**A23**: Continued development of borrow sources which have previously removed all Holocene and Pleistocene sediments and will not extend into any area which contains Holocene and Pleistocene sediments.

**A24**: Dispersed non-commercial recreation activities such as rock collecting, Christmas tree cutting, pine nut gathering, and personal use fuel wood collecting where it is unlikely to impact Cultural Resources.

**A25**: Issuance of special recreation permits:

**a.** River use permits where camping and put-in/take-out sites are established facilities where previous Section 106 consultation has been completed.

**b.** Long.-term visitor use permits in established Long Term Visitor Areas for which previous Section 106 consultation has been completed.

**c.** Other recreation use permits which do not have a ground disturbing component.

**A26**: Placement of recreational, special designation or information signs, visitor registers, portable kiosks and portable sanitation devices.

**A27**: Modification of existing fences, gates, grills, or screens to provide improved wildlife ingress and egress where such modification does not affect the integrity of potentially historic adits, stopes, or shafts.

## Class B Activities

Class B activities may be exempt, depending on a finding by professional Field Office Cultural Resources Staff. The screening of potentially exempt Class B activities shall consider the nature of the proposed activity, adequacy of prior inventory, adequacy of documentation of historic properties and inventory efforts, information or knowledge of potentially affected Cultural Resources which were unknown at the time of the original inventory, and the nature or scope of any prior Section 106 review.

If the Field Office Cultural Resources Staff determines that an undertaking may be treated as exempt, then that undertaking shall be considered exempt under this Protocol and no further review or consultation would be required. If Field Office Cultural Resources Staff determines that an undertaking has an effect, may have an effect, or will continue an on-going effect, the undertaking shall not be exempt and shall be subject to the provisions of this Protocol or 36 CFR 800, as appropriate.

Class B reviews shall be documented on an appropriate exemption tracking form and reported in annual reports.

## Class B Activity List

**B1**: Repair or stabilization of historic properties using in-kind workmanship and materials consistent with Secretary of the Interior's Standards for the Treatment of Historic Properties and that do not have an effect upon the values that make the properties significant.

**B2**: Emergency repair or stabilization of historic properties using methods consistent with Secretary of the Interior's Standards for the Treatment of Historic Properties and that do not have an effect upon the values that make the properties significant.

**B3**: Resource management actions which do not utilize motorized vehicles or create new surface disturbance and that do not have the potential to affect access to or use of resources by American Indians.

**B4**: Hazards abatement, including elimination of toxic waste sites, filling, barricading, or screening of abandoned mine shafts, adits, and stopes where such features are <u>not</u> historic or contributing properties.

**B5**: Removal of, recent (less than 45 years old) structures and materials not associated with older remains which may qualify for listing in the National Register and where no historic properties will be affected.

**B6**: Limited archaeological testing and/or artifact collection during field identification, evaluation, and recording activities, so that the significance or research potential of a cultural property may be better understood but not substantially diminished. Limited testing, in association with a research design, is defined as affecting no more than four (4) cubic meters or less volume of an archaeological deposit or affecting less than 5% of the overall site area. For test excavations involving more than 4 cubic meters or affecting more than 5 percent of the overall site area, the BLM shall informally consult with SHPO to determine whether review and consultation is required.

**B7**: Prescribed burns which will have no effect on historic properties, which do not disturb structures, or affect petroglyphs/pictographs, or require disturbance of the ground surface (cutting line, dozer work, fire breaks, fire retardant drops, helipads, etc.), or adversely affect access or use by California and Nevada Indians to harvest or gather traditionally used plant materials.

**B8**: Issuance of permits, leases, and rights-of-way where no surface or resource disturbance is authorized, that have no potential for adverse effects, and that do not have the potential to affect access to or use of resources by American Indians.

**B9**: Designation of existing transportation and utility corridors under Section 503 of FLPMA when current BLM information indicates that such corridors have a low probability of containing or being in proximity to historic properties.

**B10**: Activities at designated communication sites that do not affect historic properties and where Section 106 consultation has been previously completed.

**B11**: Approval of minor modifications to or minor variances from activities described in an approved mineral exploration plan that does not affect historic properties.

**B12**: Approval of minor modifications to or minor variances from activities described in an approved underground or surface mining plan of operations that does not affect historic properties for which previous Section 106 consultation has been completed.

**B13**: Seismic operations on maintained roads or trails, and those involving no use of explosives, grading, or other land modifications, and resulting in no appreciable disturbance or compaction of vegetation, soils, or desert pavement by vehicle movement or other means.

**B14**: The removal of oil well stand pipes where there is no evidence of historic or archaeological remains.

**B15**: Approval of an Application for a Permit to Drill (APD) or applications for rights-of-way for ancillary facilities within an established, utilized or developing oil and gas field for which Section 106 consultation has been completed or that does not involve historic properties.

**B16**: Issuance of special recreation permits where permitted use is consistent with planning decisions or OHV designations for which previous Section 106 consultation has been completed, and where there will be no new surface disturbance.

**B17**: Placement or removal of monitoring equipment (e.g., stream gauges) which does not disturb potentially sensitive ground surface or historic properties or other Cultural Resources.

**B18**: Maintenance of non-historic roads that does not widen or otherwise extend surface disturbance, unless previously unevaluated archaeological features are exposed.

**B19**: Renewals or reassignment of land use authorization where the action conveys no additional rights beyond those granted in the original authorization and where Section 106 consultation has been previously completed.

**B20**: Upgrading or adding new lines (power or telephone) to existing pole(s) when there is no change in pole configuration or number, and when the lines are not historic properties and no other Cultural Resources issues are known.

### Inadvertent Discoveries during Implementation of an Exempted Undertaking

In the event of inadvertent discovery of Cultural Resources during implementation of an undertaking which has been exempted under Appendix A, the following procedure shall be undertaken. Field Office Cultural Resources Staff and the Field Manager shall be immediately notified by personnel responsible for implementation of the exempted undertaking. All work shall cease at the site of discovery and all other work which may damage the cultural resource shall also cease. The Field Office Cultural Resource Staff shall make an assessment of the situation and, in consultation with the Field Manager, may prescribe the emergency implementation of appropriate physical and administrative conservation measures. Physical protection measures may include indirect measures (signing, fencing/gating, patrol/surveillance, erosion control [off-site], and fire control [off-site]) and direct measures (stabilization, erosion control [on-site], fire control [on-site], detailed recording,).   Administrative

conservation measures include withdrawal, closure to public and off highway vehicles, special designations, land acquisitions, recreation and public purposes act, easements, and public information and education.  The Field Office Cultural Resource Staff shall notify the SHPO within 48 hours in order to develop an agreement on the appropriate course of action, and such agreement shall reflect the intent of 36 CFR § 800.13.  The agreement shall be memorialized in writing and documented in project files. The Field Office Cultural Resource Staff shall document implementation of the agreed-upon steps and shall report the discovery event and the manner of its resolution in the annual accomplishment reporting required under this Protocol.

**Addition, Deletion or Modification of Exemptions**

This list of exemptions may be changed through addition, deletion, or modification of exemptions as described in Stipulation 16.1 of the Protocol.  When the list of exemptions is modified a new Appendix A shall be appended with its effective date entered on the face of the Appendix. Upon issuance, all prior versions of Appendix A shall be superseded and shall have no further force or effect. When a specific exemption is deleted, its deletion shall be shown by striking through its text and, similarly, when terms in a specific exemption are modified, the modified terms shall be denoted by strikethrough and notification of the changes shall be provided to all FM by the DPO reflecting the revision and implementation date.

**APPENDIX B**

**BLM California**
**Statewide Strategic Historic Preservation Program**

### 1. Introduction:

The Bureau of Land Management (BLM) oversees nearly 15 million surface acres and 47 million acres of subsurface mineral estate across the state of California (CA), as well as 1.6 million surface acres in northwestern Nevada. These lands, which stretch from desert to rocky coast, from rangeland to high mountain peak, encompass an incredible diversity of natural and cultural resources. As of 2018, the BLM is responsible for overseeing the management of more than 40,000 recorded prehistoric and historic archaeological resources across the state. The BLM is dedicated to ensuring the continued protection, public access, and enjoyment of these resources by the American public as part of its multiple use mission. The Statewide Strategic Historic Preservation Plan presented here is intended to assist the BLM CA Cultural Program to more effectively meet these objectives over the next five years (2019 - 2024).

*Background*

This plan was developed in partial fulfillment of the obligation under the 2019 reauthorization of the State Protocol between BLM, California State Historic Preservation Officer (SHPO) and the Nevada SHPO to develop and implement a Historic Preservation Program to promote the values expressed in Section 110 of National Historic Preservation Act of 1966 (as amended) (NHPA). In doing so, it also meets the requirement set forth by the BLM's FY2018 Program Target Allocation (PTA) to prepare a five-year statewide strategic plan to guide future resource initiatives supported by Cultural Heritage funds (Subactivity L1050).

Subactivity L1050 funding is intended to support the proactive management of cultural resources and tribal relations as is required by Section 110 of the NHPA. Section 110 directs federal agencies to develop a program to inventory, evaluate, and manage historic properties. It is intended to ensure that historic preservation is fully integrated into the ongoing programs of all federal agencies. This is distinct from Section 106 of the NHPA, which requires federal agencies to take into account the effects of their undertakings on historic properties. Within the BLM, funding for Section 106 review and compliance activities is supposed to come from the program or proponent driving the land-use action. Subactivity L1050 are not designed to fund project-level review, assessment, evaluation and mitigation required for compliance with Section 106 of the NHPA

Presently, project-level Section 106 review and compliance dominates the workload of BLM CA Cultural Program staff. This is consistent both with national trends in cultural resource management, as well as with the direction given to the BLM under the Federal Land Policy and Management Act of 1976 (FLPMA) to manage public lands for multiple uses. Nevertheless, the CA BLM remains obligated to its responsibilities to protect cultural resources under Section 110 of the NHPA. Proactive management and

protection activities may include inventory, testing, documentation, tribal consultations, structural stabilization or rehabilitation of sites, and outreach and education for public and scientific benefits. Such activities are a crucial aspect of the CA BLM mission and must be prioritized consistent with the Department of Interior's Strategic Goal to "Protect the nation's natural, cultural, and heritage resources".

In practice, the actual coordination of the CA BLM Section 106 workload and Section 110 obligations is an intricate balancing act of resources, staff time, and funding. However, tools like the State Protocol Agreement (PA) among the BLM, California State Historic Preservation Officer (SHPO) and the Nevada SHPO provide direct relief in coordinating compliance and proactive actions. The State PA, as provided for in part 2 of the BLM National Programmatic Agreement (nPA), streamlines the procedures set forth in 36 CFR § 800.3 through 800.7 for many undertakings. In exchange for the savings in time and money that the Protocol confers, the BLM commits to fulfill its obligations under Section 110.

This plan was developed to provide guidelines for how to better match cultural resource protection and management goals with the funding available for Section 110 activities. The purpose of this plan is to provide a framework for planning and implementing historic preservation projects, evaluating program efficacy, and directing L1050 funds in accordance with national, state, and local priorities. It is designed not only to be applicable at the State, District, and local (Field Office) level, but also to leverage the interests, skills, and knowledge of the CA BLM Cultural Program Staff.

2. **Management Summary**

*California Cultural Resource Context*

The cultural resources found on public lands in California and northern Nevada are as varied as the dramatic landscapes within which they are located. Indigenous populations are known to have occupied and used what is now public land as long ago as 12,000 years (the end of the Pleistocene era). Although the nature of these uses changed after contact with Euro-American settlers, sojourners, and explorers, many of these traditional Native American lifeways continue into today.

The archaeological remains that were left on public lands are highly varied: intricate rock paintings and carvings, giant geoglyphs, fish traps along the extinct shoreline of Lake Cahuilla, coastal shell middens at the foot of the King Range, and cleared rock rings on the Modoc plateau.

European contact gradually displaced native people in the period spanning 1540 to 1850 bringing disease, conquest, and destruction of native resources. Beginning in 1882, reservations for tribes and family groups were established by Executive Order. By 1900, California's native population was reduced to about twenty-thousand people. Today, there are 109 Federally-recognized tribes and approximately 90 unrecognized tribes and groups with which BLM coordinates regularly in California and Nevada.

The Spanish began settling the deserts in the 1600s. The DeAnza expedition crossed the desert in 1776, eventually arriving at San Francisco Bay. Along the way, they crossed the public lands now administered by several CA BLM Field Offices. The discovery of gold in the Mother Lode in 1849 brought a flood of prospectors and settlers to California. Many stayed to develop the State, contributing to agriculture and other industries. The advent of the railroad toward the end of the 19th century and the subsequent homestead laws further opened markets and fostered settlement in the more areas of California and Nevada. Major military development, especially during World War II and the Cold War, brought rapid expansion in industrial development. The rapid urbanization of the state and the influx of newcomers have increased pressures for recreation on public lands.

In 1978, a study of the California Desert Conservation District (cited in USDI BLM 2003:4) showed that 36 percent of the desert's archaeological sites had been damaged by natural forces and the activities of people, and predicted a continuing loss of sites to occur at the rate of one percent yearly. Since then, public education, law enforcement, and volunteer programs have helped to reduce the rate at which this damage occurs; however, damage to and destruction of archaeological sites across the state of California continues at a rapid pace.

*Existing Preservation Efforts and Successes*

In spite of a heavy Section 106 workload, the CA BLM Cultural Program has made remarkable inroads into cultural resource research, preservation, and protection in California since the last issuance of the State Protocol in 2014. This section provides a snapshot of the extensive list of historic preservation projects and outreach activities that the BLM Cultural Resources Program has accomplished most recently. A common theme underlying all of these successes is the invaluable role that external partnerships play in achieving the BLM's preservation goals. These partners include other federal agencies, tribal governments and other Native American organizations, State and local governments, universities, and advocacy groups, as well as dedicated individuals. Their contributions make the work of historic preservation achievable and mutually beneficial.

Between 2014 and 2018, more than 10,000 acres of BLM land were proactively inventoried. These areas were selected for inventory based on a variety of factors including a high sensitivity for archaeological resources, threat from natural or human degradation of the landscape, and regional planning initiatives. In order to complete these surveys, BLM Cultural Resources staff leveraged existing partnerships with a variety of community groups, conservation based programs, local universities, and individual volunteers. The additional personnel and resources provided through these partnership enable the BLM to cover more area and use fewer L1050 dollars to meet their proposed annual inventory goals.

A great example of the kinds of benefits that these BLM-partner relationship provide is demonstrated in the work conducted by volunteers and BLM staff of the Eagle Lake

(CA), Applegate (CA), and Carson City (NV) Field Offices. In 2015, the BLM hosted its second annual Archaeology Volunteer Week. A dozen volunteers of all ages and from all walks of life worked with seven BLM archaeologists to record Belfast, a well-known site and part of the Willow Creek Petroglyph District. Volunteers were taught about area prehistory and history, archaeological survey techniques, and archaeological site etiquette and laws. Working together, the group recorded 180 individual petroglyph panels by the end of the week. Similar events in subsequent years have resulted in additional site recording, excavation, and evaluation.

Among the greatest contributors to historic preservation efforts on BLM land are tribal governments and organizations. The BLM consults, coordinates, and cooperates with 109 tribal governments in managing those resources of particular concern to Native Americans. In addition, the BLM has formed specialized partnerships with several tribal governments and organizations to advance specific programs and objectives. In 2017, for example, the Bishop Field Office, in collaboration with the Inyo National Forest and UCLA Departments of Anthropology, partnered with the Bishop Paiute Tribe to offer a training course to tribal members interested in participating in project and archaeological site monitoring. Twenty tribal enrollees successfully completed the training which covered regulatory context, artifact identification, safety, authority, and project logistics. Such trainings are provide a platform to develop meaningful relationships and open dialogue between tribal members and land managing agencies.

Another program areas that has benefitted from strong partnerships is site monitoring. The BLM remains an active partner of the California Archaeological Site Stewardship Program (CASSP). CASSP provides a pathway for interested members of the public to be trained as site stewards able to assist field offices in site monitoring efforts. Each year since 2014, the CA BLM has hosted at least one, two-day CASSP volunteer training, and several intensive workshops dedicated to recording historic structures and rock art panels. Once they have gone through the training, CASSP members work with BLM archaeologists to develop a plan to monitor individual archaeological sites as frequently as once a month to check on site condition and alert the BLM to any damage or destruction.

Despite such efforts, it is the unfortunate reality that many archaeological sites and structures eventually succumb to damages from natural or human causes. In such instances, the BLM again relies heavily on partners to donate time, resources, and additional funding to stabilize and protect these sites. One such site is the Cleveland Mill at Birch Creek. Located within the Bishop Field Office, the Cleveland Mill site dates to the early 1870s, and was used continuously until 1980. While it has undergone many alterations, the mill retains enough of its initial character to be eligible for listing on the National Register of Historic Places (NRHP). During site cleanup and documentation, it was discovered that two structural foundation walls and the entire south side of the structure had failed. Since then, the BLM has worked to stabilize the structure and rebuild using in-kind materials. The vast majority of this work has been accomplished

using skilled volunteer labor, Student Conservation Association members, and archaeological interns. These efforts are expected to culminate in an NRHP nomination and public interpretation displays.

While much energy has gone towards the protection, stabilization, and evaluation of individual structures within the past five years, the CA BLM has also committed to taking a more regional approach to historic preservation. Such efforts are integral not only to developing regional planning models that are more responsive to historic preservation and resource management needs, but also to developing a better understanding of the statewide distribution and condition of specific cultural resource types. A notable outcome of these efforts, was the publication of *Mining in the Southern California Deserts: A Historic Context Statement and Research Design* in 2017 (Swope and Gregory 2017). The document thoroughly details the history and development of hard rock mining in the southern California deserts from 1848 to approximately 1960, thereby providing context for future Section 106 and Section 110 work at hard-rock mining sites.

In addition to regional contexts, the CA BLM has put significant effort towards developing regional scale predictive models using geographical information systems. Although these models have thus far been primarily used in support of Section 106 review and compliance activities, they serve an important function in proactive inventory and site identification efforts. In northern California, predictive models were developed to assist in the survey of nearly 14,000 acres of sage steppe environment. A total of 245 new sites were discovered using this model. Additional refinements based on known resources and environmental factors are being made to the model to improve its efficacy for future site identification efforts. One particularly promising application of the model is to locate rock art panels which may be weathered to the point that in field survey efforts alone might not be sufficient for identification.

This is precisely the kind of proactive work that L1050 funds are intended for. As evidenced by the anecdotes above, the CA BLM Cultural Resources staff has found numerous ways to support meaningful historic preservation projects and activities across the state. This plan is designed in support of furthering these successes over the next five years.

### 3. Vision Statement

This plan was developed using information, ideas, and experiences informally gathered from CA BLM Cultural Resources Staff and Management. It reflects a collective desire to improve and expand the CA BLM's capacity to understand and protect the cultural resources on public lands throughout California and northern Nevada. This is especially poignant given the rapid rate of development and economic growth across California, as well as the external threat posed to resources by natural events like wildfire and coastal erosion. From the ideas, concerns, and desires expressed by CA BLM staff the following three key objectives were developed:

1. Promote research at a regional level;
2. Improve resource resilience; and
3. Build trust between the BLM and the American public.

These key objectives, described in more detail below, present a general vision of what the CA BLM Cultural Program will aspire to over the next five years.

### 1. *Promote Research at a Regional Level*

BLM managed lands in California account for nearly 15 percent of the state's total land area. These lands represent a wide range of ecosystems and provide the backdrop for a variety of recreational and critical economic uses. Planning for and managing these areas requires a careful understanding of and appreciation for the myriad ways that natural and cultural resources interact within a given landscape.

Over the past five years, the CA BLM has engaged in several regional scale planning efforts aimed at streamlining major land use decisions. The largest of these include regional scale planning for utility scale renewable energy in and the West Mojave (WEMO) Travel Management Plan. The identification and management of cultural resources figured prominently in both plans. Broad scale overviews, context statements, research designs, and predictive models created with geographical information systems were among the tools used to account for and analyze impacts to cultural resources. Such tools are not only of use for these planning efforts, but will continue to provide the necessary background information and data for future planning decisions that occur in the area. Furthermore, they provide a much needed baseline for site monitoring and developing regional research objectives.

**Over the next five years, the BLM can contribute to and improve existing regional contexts, sensitivity models, and research designs, and initiate the development of these tools for regions not yet scrutinized at this level.**

### 2. *Improve Resource Resilience*

Among the greatest threats posed to cultural resources in California and northwestern Nevada are those caused by natural disasters. In the past five years, more than 5 million acres of land have burned across California including large swaths of BLM managed lands. Cultural resources in fire prone areas are at risk of being damaged by heat, flames, and smoke if they are not entirely destroyed. Significant efforts have gone into protecting resources from advancing fires, but the speed and size of many of California's most recent fires can make this all but impossible.

On the California coast, surface level cultural resources are increasingly being battered by strong offshore storms that slowly chip away at the coastline. These same storms

and strong currents, are actively eroding cliffs and dunes exposing buried archaeological deposits to the elements.

Looking ahead, extreme wildfire events and rapid coastal erosion are only likely to increase in severity and frequency. The same is true of other natural disasters like landslides and flooding. The management of cultural resources under these conditions presents a significant challenge to the BLM Cultural Resource Program as they can happen quickly, without notice, and because the degree of damage to resources can be extreme. It is for this reason that proactive work to protect and record resources in their original context is so important.

**Over the next five years, the BLM can improve the resilience of cultural resources to damage by natural disasters through proactive inventory, regular monitoring resources, and working with partner groups to develop rapid response programs to more efficiently address impacts to resources during disaster scenarios.**

### 3. Build Trust between the BLM and the American Public

A core component of the CA BLM Cultural Resource Program is the notion that the past belongs to everyone. Many of the partnerships that the BLM has created over the past few decades have been formed in recognition of this fact and much great preservation work has been accomplished as a result. And yet, there are several segments of the American population who are currently either underrepresented in the BLM's partnership network or who remain chronically unengaged with historic preservation efforts. For example, although urban populations, low-income communities, and communities of color make up a significant portion of the population of California and northwestern Nevada, their voices remain largely absent from much of the historic preservation work that occurs on BLM lands. Reaching out to and connecting with these groups and others presents new opportunities to strengthen the BLM's historic preservation program, as well as to foster a sense of stewardship amongst the American public.

Other opportunities to grow the BLM's heritage preservation program lie in education, outreach, and information sharing. There remain many misconceptions amongst the American populace about what historic preservation is and what it is not. This confusion can lend itself to apathy or even frustration when efforts to protect local archaeological sites and historic structures are employed. This can be detrimental to both the resource and to the publics' relationship with the BLM. Spending more energy on educating local communities, businesses, recreational groups, and others about the value of our nation's many heritage resources is one way that the BLM can increase public engagement with historic preservation efforts.

**Over the next five years, the BLM can engage with new and more diverse segments of the population, develop educational programs aimed at engaging the general public in historic preservation efforts, and actively involve the people who live on, work on, and love BLM land in growing its historic preservation program.**

### 4. Strategic Plan Components

This section sets the overall goals and defines the range of activities by which progress towards implementing a successful Heritage Preservation Program will be made and measured. Proactive resource management activities can be roughly grouped into seven focal areas:

- inventory and documentation of all resources;
- management of archaeological sites;
- management of historic structures;
- resource monitoring;
- National Register nominations and statewide contexts;
- museum collection management; and
- outreach and public education.

Where applicable, the current Program Elements (PE) eligible for Subactivity L1050 funding are referenced (see Appendix A for additional details). PE are the units of accomplishment used to gauge the performance of the BLM workforce.

### a. Inventory and Documentation of all types of heritage resources

<u>Activities:</u>

Accurate heritage resource inventory data are essential to the effective management of cultural resources and support land-use decisions. We need to know what we have in order to better protect the resources.

Inventories are most often completed using current standards and best practices for Class III intensive pedestrian survey, site recordation, and report preparation. However, in some circumstances, for example when access to an area is cost or time prohibitive, Class II sample inventories, remote sensing, or reconnaissance survey may be effective for planning purposes. Pursuant to the State Protocol, SHPO must be consulted in any instance where less than a Class III inventory is proposed.

Specific activities associated with this focal area include the survey and inventory of archaeological sites, historic structures, cultural landscapes, and traditional resources; data-recovery, detailed recordation, mapping and photography, and site evaluations.

Relevant Program Elements:

BC = Acres of Heritage Resources Inventoried

FD = Heritage Resources Intensively Recorded, Evaluated, and Studied

CA BLM Goals:

The CA BLM places a high priority on the inventory and documentation of cultural resources in areas where risks to the long-term preservation of heritage resources and values are high due to environmental concerns (e.g., coastal areas exposed to erosion, and forested areas at risk of wildfire activity). Possible avenues for achieving this goal include hosting university field schools, promoting individual research projects by both professionals and students, and internal BLM studies. Recent advances in geographic information systems, UAS (unmanned aircraft systems [drones]), and photogrammetric modeling have significant applicability for both Class III and Class II inventories and should be utilized to the greatest extent possible in completing annual priority workload.

**b. Management of Archaeological Sites, Sacred Sites, and Traditional Cultural Properties**

Activities:

There are an estimated 30,000 recorded archaeological sites located on BLM managed lands in California and northwestern Nevada. The BLM, in consultation with any local tribal governments and organizations who ascribe significance to the resources or the landscape in which they are located, is committed to protecting and preserving these sites.

Activities aimed at the management of archaeological sites, sacred sites, and traditional cultural properties might include oral history studies, ethnographic studies, cultural landscape studies, regional overviews, regional research designs, historic context studies, and the creation and maintenance of geospatial data files.

In some instances, data recovery efforts and artifact analysis studies may also be appropriate as a means of site management. Excavation and/ or collection by any group (e.g., university field school, internal BLM project) should be considered only for those sites where the benefits of the data retrieved outweighs the benefit of preserving the resource intact and where the BLM or its partner have the capacity and funding to complete the project, including report preparation and curation of the artifacts, samples, and associated records. For all data recovery work, coordination and consultation with local tribal governments and organizations, as well as other interested parties must be prioritized.

Activities aimed at protecting archaeological sites, sacred sites, and traditional cultural properties include stabilization of resources using appropriate or in-kind materials, installation of fences and gates, installation of interpretive or anti-looting signs, remediation of vandalism, erosion control, back-filling, or other restoration measures, as well as the development of monitoring programs for particularly sensitive sites or those that have been determined eligible or listed on the NRHP. The documentation of rock art, intensive site mapping, and completion of damage assessments may also be included.

Equally as important as on-the-ground preservation efforts are outreach and education activities. These might include working with tribal governments and organizations to develop tribal monitoring programs, education programs for local and tribal youth, and hosting or otherwise funding regional tribal forums and programs aimed at broadening perspectives on traditional ecological knowledge, the survivance of traditional cultural practices, or the role that federal land managing agencies play in supporting the preservation of archaeological sites and sites of tribal cultural and religious significance.

<u>Relevant Program Elements</u>:

FD = Heritage Resources Intensively Recorded, Evaluated, and Studied

AJ = Consultations with Indian Tribes and Alaska Native Corporations

HF = Resource Protection and Stabilization

<u>CA BLM Goals</u>:

Priority projects are those which expand regional resource knowledge and prevent or remediate undue damage to resources from both cultural and natural causes. The BLM has made significant advances in the past five years towards the identification, documentation, and preservation of rock art sites across the state, for example within the Willow Creek Petroglyph District. Such efforts are essential for combatting the desecration of these sites. Other avenues for potential future projects are obsidian hydration studies of artifacts uncovered on BLM lands, ethnographic and oral history studies catered towards land use patterns and human-environment interactions, and the development of regional contexts for feature types such as bedrock mortars and slicks. Where possible BLM staff should work to edit and improve existing geospatial data and databases and develop new regional site models. BLM cultural resources staff should also work to strengthen existing partnerships and seek new partnerships with tribal governments and organizations in support of a mutual exchange of information about best management practices for archaeological sites and sacred areas.

### c.  Management of Historic Structures

Activities:

Historic structures are often among the most visible reminders of the past on BLM lands. For this reason, they offer an easy opportunity to engage with and teach the public about historic preservation and cultural resource management.

BLM actions directed towards the protection and preservation of historic structures are focused on conserving the integrity, character, and material of the structure's fabric. This area is well-suited to intra-agency partnerships with engineering and recreational program staff.

Activities aimed at historic structure management might include documentation, regional scale research aimed at developing contexts for specific historic activities or industries, and photogrammetric or isometric modeling.

On-the-ground protection activities include stabilization, reconstruction using in-kind materials, detailed documentation efforts using HABS/HAER method, installation of fences and gates, remediation of vandalism, and regular site clean-up.

Efforts to engage the public might include installation of interpretive or anti-looting signs, developing annual interpretive events/ walks, creating educational materials for use in elementary school classrooms, hosting annual work-days to make minor improvements to structure conditions or surroundings, and hiring or otherwise showcasing the efforts of local skilled craftspersons.

Relevant Program Elements:

KO = Historic Structures Managed

HF= Resource Protection and Stabilization

CA BLM Goals:

Priority projects are those which focus on protecting those sites already listed on or eligible the NRHP, especially those with potential for interpretation or public education. Using the Historic Mining Context developed for Southern California as a template, BLM cultural resources staff should develop additional historic contexts for mining in both central and northern California. Other industries well suited to such studies in California are ranching, agriculture, and, in the desert region, military activities. On the coast, priority projects should include the rehabilitation, maintenance, and interpretation of light house structures. Efforts should be made to use volunteers as much as possible in the stabilization and rehabilitation of structures to encourage stewardship within local communities and to teach citizens about the importance of preserving historic structures.

### d. Monitoring all types of heritage resources

Activities:

Monitoring the condition of heritage resources is fundamental to the success of the CA BLM Cultural Resources Program. Measuring trends in condition of heritage resources increases protection and upkeep of properties where the BLM has invested in site restoration, stabilization, and/or interpretation.

Monitoring activities include site visits with the completion of monitoring forms, updating condition documents, and the development of database management strategies to track and synthesize monitoring reports. In order to be effective, monitoring must be systematic, coordinated, scheduled, and strategic. Different approaches to monitoring may include: 1) site watch/ site steward programs; 2) monitoring by BLM staff; 3) local volunteer groups; 4) contracted work; or 5) in systematic, detailed high resolution aerial views, such as those made available by drones.

Relevant Program Elements:

MY = Heritage Resources Monitored

KO = Historic Structure Management

CA BLM Goals:

Although the BLM remains committed to monitoring a wide variety of resources, priority over the next five years should be given to resources in those areas that have been damaged by natural disasters, those which are known to be threatened by environmental concerns, and those which have overlapping research and management interests. The BLM will continue to support site stewardship and monitoring programs like CASSP and work with other partners to support new site watch programs and training curricula. BLM staff has been working on developing digital monitoring forms using ESRI ArcGIS online software. The applicability of this system should be field tested and additional functionality for site stewardship programs developed. When appropriate, other technologies such as drones should be incorporated into monitoring programs. Sites eligible or listed on the NRHP should be monitored regularly, as well.

### e. National Register Nominations and Regional Context Statements

Activities:

The nomination of cultural resources to the NRHP is a critical means of capturing not only their significance to American heritage, but also for demonstrating the BLM's commitment to their long-term management.

Activities associated with this focal area include documentation related to NR nominations, and tribal consultation associated with NR nominations but not associated with project specific Sec 106 work, and the development of statewide context statements and/ or multiple property nominations in support of ongoing landscape and resource identification and documentation efforts and for future planning purposes.

Oral history studies, ethnographic studies, cultural landscape studies, regional overviews, regional research designs, historic context studies, and the creation and maintenance of geospatial data files are all activities associated with both NR nominations and the development of statewide contexts.

Relevant Program Elements:

FD = Heritage Resources Intensively Recorded, Evaluated, and Studied

CA BLM Goals:

The CA BLM currently has several NR nominations under development. The completion of these nominations are prioritized over the initiation of new nominations. Where statewide and regional contexts have been or are being developed for certain categories of resources, prioritization is to apply these contexts towards existing and new NR nominations. The development of multi-property nominations may be considered for those areas and types of resources which are subject to frequent or upcoming major land use decisions. For all activities associated with NR nominations and statewide contexts, BLM staff are encouraged to implement new data management strategies to maintain accurate and functional geospatial data.

### f.  Management of Museum Collections

Activities:

The work of managing museum collections is fundamentally a special case of personal property management for which the BLM State Director is the "Accountable Officer." In practice, ensuring the curation of BLM museum collections is a shared responsibility between the state office and field office Cultural Resources Program staff. In California, BLM collections are curated in partner facilities through active curation agreements.

Activities associated with the management of museum collections include maintaining active curation agreements with museum facilities where BLM collections are stored, updating inventories, documenting the accession or withdrawal of BLM collections, checking on curation facility conditions, and, if applicable, developing educational materials based on museum collections and encouraging professional research and analysis of collections.

Relevant Program Elements:

BD = Managing Museum Collections

CA BLM Goals:

There is currently no position for a statewide CA BLM Museum Collections Manager. For this reason, priority is placed on the Cultural Resources staff to maintain and monitor the status of museum collections within the jurisdiction of their field offices. BLM staff are encouraged to review and renew or update as needed existing curation agreement documents or financial assistance documents in support of ongoing work at external facilities.

### g.  Outreach and Education

Activities:

As has been demonstrated throughout this document, maintaining regular and meaningful contact with the public, whether direct or indirect, is an essential part of the CA BLM Cultural Resources Program.

Talks, lectures, and training seminars for non-professional audiences; interpretive walks, apps, signage, and websites; volunteer excavations and inventories, annual outdoor education weeks, and volunteer driven historic preservation projects are all types of activities included in this category. As the scope of historic preservation changes and new technologies and outlets for social interaction and information sharing are developed, the range of activities that might be included within this category will inevitably grow.

Relevant Program Elements:

AE = Heritage Education and Outreach

CA BLM Goals:

In accordance with the vision statement presented above, while continuing to strengthen its existing network of partnerships, the CA BLM will prioritize those outreach and education efforts aimed at engaging new and more diverse populations, and those which seek to encourage preservation and stewardship among local stakeholders. BLM staff should seek out new ways to incorporate technology into their existing interpretation models, and partner with other groups geared towards promoting preservation at a national scale. As applicable, BLM staff are encouraged to participate in events outside of their normal cultural resource management duties to engage with other publics working, living, and recreating on BLM lands and encourage broad based public lands stewardship efforts, as this is fundamental to upholding the multiple use mission.

### 4. Implementation

*Roles and Responsibilities*

The successful implementation of this Statewide Strategic Historic Preservation Program depends on the close collaboration and coordination of Cultural Resources Staff and management across organizational levels within the CA BLM.

Under this plan District and Field Office Cultural Resources Staff will be principally responsible the planning, execution, and reporting of the type of historic preservation projects and activities set forth in this document. The District and Field Office Managers and Associate or Assistant Managers play an integral role in project prioritization and oversight, as well as in supporting the professional development of Cultural Resources Staff. Field Office Cultural Resources Staff and Managers are also responsible for ensuring that all historic preservation projects and activities comply with all other relevant regulations and laws (e.g., NEPA, ARPA, NAGPRA), and when necessary, completing Section 106 consultation with SHPO.

At the State Office level, the Deputy Preservation Officer/ State Archaeologist is responsible for Program oversight, advice and counsel, preparation of the PTA and AWP for the Cultural Program, and assignment of one-time funding through the PTA to projects of merit or to projects that meet specific criteria. Pursuant to Section 2.1 of the State Protocol, the State Director is responsible for working with the SHPOs to ensure that that the most efficient methods for meeting the needs of Section 106 compliance are met. Underlying this specific responsibility is the expectation that the time and cost savings proffered by the streamlining measures of the State Protocol to the Field Office Cultural Resources Staff will be put towards advancing the proactive historic preservation projects and activities outlined herein.

*Flexibility*

To the greatest extent possible, the implementation of the goals and priorities of this plan will be matched to the priority directives of both the Washington Office and the California State Office. That said, priority directives are subject to change from year to year and reflect a broad range of project-driven management activities. As a result, this plan is designed for flexible application rather than rigid adherence. This flexibility allows Cultural Resources Staff to not only develop projects best suited to current resource needs, but also broader strategies for long term archaeological, architectural, and tribal resource management. This flexibility also allows Field Office Cultural Resources Staff to better leverage their own unique skill sets and interests, and take advantage of and external partnerships and funding opportunities.

*Funding*

The implementation of this program will be funded primarily through annual Subactivity L1050 Cultural Resource Program funds. As stated above, L1050 funds are to be directed towards proactive cultural resource management projects. These activities may

include inventory, testing, tribal consultations and record searches; physical protection and stabilization or rehabilitation of sites and features; maintaining and managing digital and analog data; ensuring proper collections management; and outreach, education, and partnerships. Although such activities are often also required for Section 106 compliance, L1050 funds are to be directed towards Section 110 compliance only.

In addition to annual L1050 funds, Cultural Resources Staff may submit requests through the Budget Proposal Submission Share Point Site (BPSS) for one-time project funding. At the direction of WO-240, no less than 15 percent of the State's annual L1050 funding should be put towards these projects. States should fund their highest priority projects as they are initially ranked.

In the past, these one-time funds have been applied to a variety of proactive heritage preservation projects including site monitoring, inventory, and structure stabilization. These funds have be further supplemented by additional means such as in-kind donation of materials, skills and labor, volunteer hours, and grants, donations acquired through external partnerships. Cultural Resources Staff are encouraged to explore these and other avenues when developing historic preservation project plans. Such actions not only help to meet the key objectives outlined in this plan, but also provide an additional means through which to engage the American public in the protection and management of cultural resources on public lands. Citizen support is integral to ensuring the success and durability of this plan.

*Professional Development*

A well-trained and professionally current cultural resource staff is one of the building blocks of this plan. Developments in the methods and techniques of cultural resources management continue as new technologies become available and as expertise in the field advances. It is incumbent on BLM Cultural Resources Program Staff to keep abreast of such changes, including new techniques, technological advances in GIS tools, efficient records management databases, project tracking systems and tools, consultation methods and ethics, and developments in historic preservation law, regulation, and case law.

Providing for the continued education of BLM cultural resource staff is fundamental to the success of this plan. The Individual Development Plan (IDP) is the planning vehicle for ensuring that regular, annual professional development training is provided for each cultural resource professional. Specific training included in each IDP should be negotiated between the resource professional and their supervisor. The training ideally should reflect both the interests of the professional and the types of expertise and skills that support the Field Office's preservation priorities.

*Reporting Accomplishments for Training and Historic Preservation*

Accomplishment of activities discussed in this plan will be described in both the Annual Cultural Heritage Report to the BLM Washington Office (posted on the Cultural Heritage SharePoint site), and the Annual Reports to the California SHPO. States, Districts, and Field Offices will also track workload targets and actuals.

Although IDP's are personnel documents subject to a measure of privacy, the actual participation in annual training is a reviewable component of the cultural resource program. Annual progress in professional development of Field Office cultural resources staff is a requirement of this plan.

**APPENDIX A**

**Classification of Activity Types**

Subactivity L1050 activities include inventory, testing, tribal consultations and record searches for determining what resources are present and their condition; physical protection, stabilization or rehabilitation of sites and features; ensuring that site and inventory information is properly maintained, including upgrading to digital formats; ensuring proper collections management; as well as, outreach, education, signage, and partnerships for public and scientific benefits. The following activities are eligible for funds under Subactivity L1050 when *not* performed as part of NHPA Section 106 compliance:

**Table 1**

| Program Element | PE CODE |
|---|---|
| Heritage Education and Outreach | AE |
| Consultations with Indian Tribes and Alaska Native Corporations * | AJ |
| Inventory and Documentation | BC |
| Managing Museum Collections | BD |
| Prepare Wilderness/WSR/NSHT/Cultural/ Paleontological Activity Plans * | DC |
| Issuance of Cultural Use Permits * | FB |
| Heritage Resources Intensively Recorded, Evaluated, and Studied | FD |
| Protection and Stabilization | HF |
| Historic Structure Management | KO |
| Monitor Designated National Scenic and Historic Trails * | LA |
| Heritage Resources Monitored | MY |
| * Less Common Section 110 or State Office Functions | |

# SUPPLEMENTAL PROCEDURES
# FOR FLUID MINERALS LEASING

### A CULTURAL RESOURCES AMENDMENT
### TO THE STATE PROTOCOL AGREEMENT


### BETWEEN


### CALIFORNIA BUREAU OF LAND MANAGEMENT
### AND
### THE CALIFORNIA STATE HISTORIC PRESERVATION OFFICER
### AND
### THE NEVADA STATE HISTORIC PRESERVATION OFFICER


Section 106 of the National Historic Preservation Act (NHPA) requires agencies to make a reasonable and good faith effort to identify historic properties that may be affected by an agency's undertakings and take those effects into account in making decisions. Leasing actions are undertakings for the purpose of NHPA. For the purposes of this document, Fluid Minerals leasing activities include both oil and gas and geothermal development. These undertakings include environmental analysis and decision making for landscape level proposals for the leasing of lands. These supplemental procedures specifically address the appropriate identification efforts for Section 106 compliance under NHPA at the leasing stage. Site-specific land disturbing activities, which may be associated with these undertakings, would be identified and addressed in environmental documentation and decision making at a later date.

These supplemental procedures are an amendment to the State Protocol dated February 10, 2014.

This amendment deviates from the Protocol in Section 8.1, Thresholds for SHPO Review, which states, *"Where BLM proposes to complete less than a BLM Class III survey of the affected (selected) lands and when informal consultation with SHPO staff yields consensus agreement to proceed with formal consultation"* by allowing for a Class I record search and Tribal consultation to be considered adequate inventory and identification methodology for the purposes of Fluid Minerals decisions at the leasing stage. BLM shall require a Class III survey of all leased lands when surface occupancy is requested.  In addition, BLM will make every reasonable effort to avoid effects to historic properties identified as a result of these surveys. The Class I record search and tribal consultation at the time of leasing are proposed to identify any potential adverse effects to historic properties which should be considered during the earliest phases of planning. This amendment would allow for this deviation from the protocol

as long as Protocol direction, the BLM 8100 Series Manual guidelines (Protocol Appendix B), and the following specific stipulations are followed:

I. Inventory Methodology

At the leasing stage the appropriate level of inventory is a Class I record search and consultation with Tribes, on a government-to-government basis, and with tribal communities and traditional practitioners. Completion of the Class I record search and consultation with Tribes and tribal communities allows for the identification of historic properties that, due to their size, spacing, and/or sensitivity, cannot be adequately considered or protected following issuance of a lease.

A Class I record search for the purposes of this amendment will include reviewing all pertinent existing documentation to assess the presence of significant historic properties.

II. Tribal and Interested Party Consultation

Field Offices will be responsible for contacting and consulting with Tribes, tribal communities and traditional practitioners, and other interested parties as outlined in 36 CFR 800 and the BLM 8120 Series Manual guidelines. This will also meet the BLM's government-to-government responsibilities for consultation. As this consultation will be conducted on a landscape level scale, it is imperative to provide information and maps that are easily understood by tribal members in the consultation process.

III. Findings and Effects

    A. Where no significant historic properties or properties of significance to the Tribes, tribal communities, or other interested parties are identified, then "No Adverse Effect" shall be the appropriate determination for the undertaking. It should be noted that as the development of the lease progresses and specific ground disturbing actions are identified, there may be a potential for effect; however, historic properties can typically be avoided as ground disturbing activities are identified and considered under the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA) as follows:

        (1)    *No historic properties affected.* If the agency official finds that either there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them as defined in § 800.16(i), the agency official shall provide documentation of this finding, as set forth in

2

§ 800.11(d), and II.B. of the Protocol to the SHPO/THPO. The agency official shall notify all consulting parties, including Indian tribes and Native Hawaiian organizations, and make the documentation available for public inspection prior to approving the undertaking.

(2)   *Criteria of adverse effect.* An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association as set forth in § 800.5(a)(l) reaching a threshold for SHPO review as set forth in VI.A of the Protocol.  Consideration shall be given to all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the National Register. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative.  In the event of a finding of adverse effect, consultation will be conducted using 36 CFR Part 800.

(3)   *Finding of no adverse effect.* The agency official, in consultation with the SHPO/THPO, may propose a finding of no adverse effect when the undertaking's effects do not meet the criteria of paragraph (2) of this section or the undertaking is modified or conditions are imposed, such as the subsequent review of plans for rehabilitation by the SHPO/THPO to ensure consistency with the Secretary's Standards for the Treatment of Historic Properties (36 CFR part 68) and applicable guidelines, to avoid adverse effects as set forth in § 800.5(b).

B. Where a search of the Class I records or Tribal consultation identifies significant historic properties or properties of cultural significance to Tribes and traditional practitioners (such as Traditional Cultural Properties), which may be affected by this landscape level proposal, consultation with the SHPO under 36 CFR 800 will be required.

C. All documentation and determinations associated with these undertakings shall be completed and considered within the timeframe of the NEPA process for the undertaking and prior to any decision point for lease issuance. Initiation of Section106 consultation will begin no later than the initiation of the NEPA process.

3

IV. Reporting

    A.  Each participating Field Office shall report annually to the SHPO and the State Office, a summary of activities carried out under this amendment to the Protocol during the previous fiscal year. The reporting shall be included in the Protocol Annual Report.

    B.  Annual reports shall summarize activities carried out under this amendment. These reports are not meant to be compilations of the individual project reports prepared for leasing projects; they are meant to be programmatic summaries of data and significant findings.

V. Revision and Termination

The parties to this Amendment shall review the terms of this Amendment during scheduled reviews of the Statewide Protocol Agreement in order to determine whether continuation, revision, or termination is appropriate. Any party may propose revisions or terminate this Amendment by providing 90 days notice of the intent to terminate; all parties to this Amendment shall enter active negotiations to avoid termination.

This Amendment shall expire and have no further force or effect at midnight of the fifth (5th) anniversary of the Amendment's date of execution unless a continuation for a specific period is mutually agreed between all parties.

4

STATE DIRECTOR, BUREAU OF LAND MANAGEMENT, CALIFORNIA

Jerome E. Perez                                    Date: 2/4/14.


STATE HISTORIC PRESERVATION OFFICER, STATE OF CALIFORNIA

Julianne Polanco                                   Date: 10 Feb 2016


STATE HISTORIC PRESERVATION OFFICER, STATE OF NEVADA

For   Rebecca L. Palmer                            Date: 2 11 16


5

# SUPPLEMENTAL PROCEDURES FOR
# LIVESTOCK GRAZING PERMIT/LEASE RENEWALS

A CULTURAL RESOURCES AMENDMENT
TO
THE STATE PROTOCOL AGREEMENT

BETWEEN

CALIFORNIA BUREAU OF LAND MANAGEMENT
AND
THE CALIFORNIA STATE HISTORIC PRESERVATION OFFICER

The purpose of this amendment is to address the National Historic Preservation Act (NHPA) Section 106 compliance procedures for processing approximately 400 grazing permit/lease (hereafter "permit") renewals scheduled for 2004 through 2008.  This amendment shall cover grazing permit renewals for livestock as defined in 43 CFR 4100.0-5 as "….domestic livestock – cattle, sheep, horses, burros, and goats."  The following procedures will allow for renewal of the permits while maintaining compliance with the NHPA.  Alternative approaches to this amendment may be developed by individual Field Offices, but such approaches shall fall under the Section 106 regulations of the NHPA (36 CFR Part 800) and shall require individual Field Office consultation with the SHPO.

These supplemental procedures are an amendment to the State Protocol dated April 6, 1998, which is scheduled for termination on October 25, 2004.  These supplemental procedures will remain in effect when that Protocol is terminated and will become an amendment to a successor Protocol document.

 This amendment deviates from the Protocol in *Section VI.  Thresholds for SHPO Review*, which states,  "*BLM shall complete the inventory, evaluation and assessment of effects and document all findings, including negative inventories and no effect determinations, in BLM files before proceeding with project implementation.*"  This amendment would allow for renewal of an existing grazing permit prior to completing all NHPA compliance needs as long as Protocol direction, the BLM 8100 Series Manual guidelines (Protocol Amendment F), and the following specific stipulations are followed:

I. Planning

Grazing permit renewals of any acreage size shall be scheduled for cultural resource compliance coverage over the next ten years.  Such long term management includes scheduling for inventory, evaluation, treatment, and monitoring, as appropriate.  Schedules for inventories of all renewals to be covered by this amendment shall be delineated by each participating Field

1

Office and submitted to the SHPO and the State Office at the first annual reporting cycle for FY 2004.

This amendment shall only apply to the reissuance of grazing permit authorizations and existing range improvements. All new proposed undertakings for range improvements shall follow the established procedures within the Protocol or 36 CFR 800, the implementing regulations for Section 106 of NHPA.

II. Inventory Methodology

To address the impacts of grazing on cultural resources, a Class II sampling or reconnaissance survey strategy shall be devised by the cultural resource specialist in consultation with range staff which focuses inventory efforts on areas where livestock are likely to concentrate within areas of high sensitivity for cultural resource site locations. Congregation areas where it has been shown that the greatest levels of impact are likely to occur are generally around springs, water courses, meadows, and range improvement areas such as troughs and salting areas.

All existing range improvements within areas of high sensitivity for the location of cultural resource sites shall be inventoried. However, due to the fact that cattle trailing occurs along fence lines and the area of impact is limited to a one meter wide swath and impacts to cultural resources are generally restricted to this corridor, existing linear improvements will not be inventoried except in areas of high sensitivity for the location of cultural resource sites.

Salting areas may change from season to season making locating these areas problematic. Salting locations will be assessed by the cultural resource specialist in consultation with range staff and the permitee. The permitee will be asked to provide a map designating salting areas and these locations will be inventoried if they occur in areas where the probability for the occurrence of cultural resources is high. All livestock loading and unloading areas and corral areas will also be inventoried within areas of high sensitivity for the location of cultural resources.

A Class I records search will also be conducted for each allotment to ascertain previously recorded site locations and areas of prior survey coverage which can be accepted as meeting current standards. Sites located within livestock congregation areas will be visited to evaluate grazing impacts.

All areas identified for inventory in the survey strategy shall be covered intensely. All unrecorded site locations will be recorded and a report of findings for each allotment will be completed. These investigations shall only address public lands administered by BLM. Private, state and county in-holdings will not be evaluated.

III. Tribal and Interested Party Consultation

Field Offices will be responsible for contacting and consulting with Tribes and interested parties as outlined in 36 CFR 800 and the 8120 manual guidelines. This will also meet BLM government-to-government responsibilities for consultation.

IV. Evaluation

Determinations of eligibility to the National Register of Historic Places shall only be undertaken on sites or properties where it can be reasonably ascertained or it is ambiguous that range activities will continue to impact sites and further consultation with SHPO could be required.

V.  Effect

A.  Range undertakings where historic properties are not affected may be implemented under the Protocol without prior consultation with SHPO.  These undertakings shall be documented in the Protocol Annual Report.

B.  Range undertakings where historic properties are identified within APEs, and where historic values are likely to be affected or diminished by project activities, require consultation with SHPO, and ACHP if necessary, on a case-by-case basis, pursuant to 36 CFR 800.5-6.

VI. Treatment

Standard Protective Measures can include but are not limited to:

A.  Fencing or exclosure of livestock from the cultural resource sufficient to ensure long-term protection, according to the following specifications:

1.  the area within the exclosure must be inventoried to locate and record all cultural resources; and

2.  the exclosure (i.e.) fence must not divide a cultural resource so that a portion is outside of the fence; and

3.  the cultural resource specialist will determine the appropriate buffer to be provided between the cultural resource and its exclosing fence.

B.  Relocation of livestock management facilities / improvements at a distance from cultural resources sufficient to ensure their protection from concentrated grazing use.

C.  Removal of natural attractants of livestock to a cultural resource when such removal, in the judgment of the cultural resource specialist, will create no disturbance to the cultural resource (e.g. removing vegetation that is providing shade).

D.  Removal of the area(s) containing cultural resources from the allotment.

E.  Livestock herding away from cultural resource sites.

F.  Use salting and/or dust bags or dippers placement as a tool to move concentrations of cattle away from cultural sites.

G.  Locating sheep bedding grounds away from known cultural resource sites.

H.  Other protective measures established in consultation with and accepted by SHPO.

The Standard Protective Measures defined above may be used to halt or minimize on-going damage to cultural resources.  If the standard protection measures can be effectively applied, then no evaluation or further consultation with SHPO on effects will be necessary. The adopted Standard Protective Measures shall be added to grazing permit "Terms and Conditions" as appropriate for each grazing permit issued or reissued as fully processed permits (completed NEPA analysis, consultation, and decision).   The "Terms and Conditions" for each permit may be modified by the addition, deletion, or revision of Standard Protective Measures as described in Section VII of these Supplemental Procedures.

VII. Monitoring

A. Field Offices shall adopt the following monitoring guidelines:

1.  monitoring shall be conducted yearly and documented to ensure that prescribed treatment measures are effective; and

2.  when damaging effects to cultural resources from grazing activities are ambiguous or indeterminate, Field Offices shall conduct monitoring, as necessary, to determine if degrading effects are resulting from grazing activities and if they are continuing to affect the characteristics that may make properties eligible to the NRHP or if they are otherwise adversely affecting the values of cultural resources.

B.  When monitoring has yielded sufficient data to make effect determinations, the following apply:

1.  When no additional degrading damage will likely occur because standard treatment measures are adequate to prevent further damage from rangeland management activities, SHPO consultation on a case-by-case basis is unnecessary.

2.  When no additional degrading damage will likely occur, even without implementation of standard treatment measures, then no further treatment

consideration of those resources is necessary, even if past grazing impacts to the ground surface are evident.

3. When additional degrading damage will likely occur, mitigation of adverse effects shall be addressed on a case-by-case basis, pursuant to 36 CFR 800.5-6.

When monitoring results or case-by-case consultation result in a determination concerning addition or deletion of Special Treatment Measure(s) for a specific allotment, then that Measure(s) will be added to, or deleted from, the Terms and Conditions of the fully processed permit for that allotment.

VIII.  Disagreements

When a Field Office Cultural Heritage staff and Field Office Manager fail to agree on inventory, evaluation, monitoring, and application of Special Treatment Measures, then the Field Office Manager shall initiate consultation with the SHPO.

IX. Reporting and Amending

A.  Each participating Field Office shall report annually to the SHPO and the State Office, a summary of activities carried out under this amendment to the Protocol during the previous fiscal year.  The reporting shall be included in the Protocol Annual Report.

B.  Annual reports shall summarize activities carried out under this amendment. These reports are not meant to be compilations of the individual project reports prepared for the range projects; they are meant to be programmatic summaries of data and significant findings.

C.  Annual reporting shall include at least three major sections:

1.  schedules and status of accomplishments in meeting schedules for cultural resource activities in relation to the range management program as identified in Stipulation I; and

2.  results, as annual summaries of accomplishment and significant findings resulting from rangeland management cultural resource activities; and

3.  appendices to the report that would include project, coverage and cultural resource location maps and tabular summaries of total number of cultural resources located, new cultural resources located, cultural resources evaluated, types of treatment measures employed at each location, and cultural resources monitored.

D. Annual reports may contain recommendations for new or revised treatment measures.

E. Either party to this amendment may initiate a process to negotiate new or revised treatment measures or to revise the schedule of inventories. When such a process is initiated, the parties to this amendment shall negotiate new or revised treatment measures or schedule of inventories and such revisions or additions shall be issued as Attachments to these Supplemental Procedures.


STATE DIRECTOR, BUREAU OF LAND MANAGEMENT, CALIFORNIA

By Mike Pool                                   Date: 8/17/04


STATE HISTORIC PRESERVATION OFFICER, CALIFORNIA

By Milford Wayne Donaldson                     Date: 8/18/2004

# SUPPLEMENTAL PROCEDURES FOR
# SAGE STEPPE ECOSYSTEM RESTORATION

A CULTURAL RESOURCES AMENDMENT
TO
THE STATE PROTOCOL AGREEMENT

AMONG

CALIFORNIA BUREAU OF LAND MANAGEMENT
AND
THE CALIFORNIA STATE HISTORIC PRESERVATION OFFICER
AND
THE NEVADA STATE HISTORIC PRESERVATION OFFICER

The California Bureau of Land Management (BLM) and the U.S. Forest Service intend to restore the sage steppe ecosystem in northeastern California and northwestern Nevada. These supplemental procedures provide the process and means through which the BLM shall comply with Section 106 of the National Historic Preservation Act (NHPA) as sage steppe ecosystem restoration is implemented in the Alturas, Eagle Lake, and Surprise Field Offices (Northeastern Field Offices).

The strategy of the Sage Steppe Ecosystem Restoration Program (SSER) is generational in temporal scope, extending across 30 years, and landscape in geographic scale, covering over 1.1 million acres of public lands under BLM administration. The scale of the program is segmented into three 10 year blocks with increasing acreages treated in each successive block.

The vegetation treatment and restoration methods envisioned by the BLM have the potential to affect cultural resources and thus are undertakings for the purposes of compliance with the NHPA. The NHPA requires agencies to make a reasonable and good faith effort to identify historic properties that may be affected by an agency's undertakings and to take those effects into account in making decisions. The substantial scope of the Sage Steppe Ecosystem Restoration Program on public lands has led BLM to develop these supplemental procedures for compliance with Section 106 of the NHPA.

The purposes of these supplemental procedures are to provide a thoughtful alternative to complete archaeological survey in advance of restoration activities; to reduce archaeological survey costs; to address data gaps in archaeological information; to develop, test, and refine geographic models of archaeological sensitivity; to gain and refine understanding of the impacts and effects of restoration activities including use of mechanized equipment; and to develop and refine Standard Resource Protection Measures (SRPM). The developed models and SRPM will lead to greater reduced costs as they are refined and implemented with expectations of the greatest cost savings as increasing acreages are treated.

These supplemental procedures are an amendment to the Statewide Protocol Agreement (Protocol) dated October 15, 2007. These procedures deviate from the Protocol in *Section V.D.* and in Section *VI. Thresholds for SHPO Review,* which states *"Where BLM proposes to complete less than a BLM Class III survey of the affected (selected) lands and when informal*

*consultation with SHPO staff yields consensus agreement to proceed with formal consultation*"
by allowing for less than a Class III survey. For the purposes of these Supplemental
Procedures the term "SHPO" shall refer to the State Historic Preservation Offices of California
and of Nevada.

It is the intention of BLM that adoption of these supplemental procedures will lead ultimately
to an approach to landscape level inventory that can be applied to other classes of large scale
undertakings.

I. Tribal and other Native American Consultation

In order to fulfill BLM government-to-government consultation responsibilities and to comply
with 36 CFR 800 procedures, Field Offices shall be responsible for contacting and consulting
with Tribes, tribal communities and traditional practitioners, and other interested parties as
outlined in BLM 8120 Series Manual guidelines (Protocol Appendix B)    Tribal consultation
initiated during preparation of the Environmental Impact Statement for the SSER Strategy shall
continue throughout implementation of the Strategy and these supplemental procedures.

II. Program Level Requirements and Procedures

BLM support of all elements and phases of these supplemental procedures, whether they apply
to a programmatic level or to individual projects, is required for successful implementation. It
is the responsibility of each Field Office manager to ensure that adequate funding and time are
provided for cultural resources staff and others to complete the work prescribed in these
supplemental procedures. Although these supplemental procedures are intended to encourage
cooperation and coordination among the Northeastern Field Offices, should an individual Field
Office fail to implement all conditions of this amendment, then that Field Office shall operate
under the regular provisions of the Protocol (Section VI.K) and not under the terms of these
supplemental procedures.

Cultural resources shall be taken into account from the earliest stages of project planning.
Cultural Resource Staff shall have a key role in all stages of project development and
implementation. Coordination among the cultural resources staff of the Northeastern Field
Offices, particularly at all stages of the SSER program planning and implementation, shall
occur to ensure the success of this program.

A core feature of this amendment is the compilation, testing, and refinement of a site sensitivity
model. The purposes of such a model are to predict sensitivity of landforms so that appropriate
inventory strategies can be designed.    Cultural resources staff from the Northeastern Field
Offices shall compile existing site sensitivity models, refine those models, and develop and test
a  comprehensive regional model to be used in the planning and implementation stages of
SSER activities.    However, projects may be implemented prior to completion of the
compilation, testing, and refinement of a site sensitivity model provided that the other
provisions of Stipulation II are met.

In collaboration with a BLM multi resource interdisciplinary team, the Cultural Resource Staff shall assist in a focusing of the geographic scope of the site sensitivity model by precisely identifying the limits of stands of western juniper and incorporating these data into a GIS data set.

In consultation with SHPO and the interdisciplinary team, the Cultural Resource Staff from the Northeastern Field Offices shall develop a body of Standard Resource Protection Measures (SRPM) for use in Sage Steppe Ecosystem Restoration project implementation. These measures will be developed by compiling appropriate existing SRPMs, constructing new measures to address specific projects and impact types, and modifying them as appropriate during the term of these supplemental procedures.

The core organizing principle of these supplemental procedures is adaptive management which encourages the modification of the model of site sensitivity, changes to SRPMs, and adjustments of stipulations for level of inventory over the lifespan of this endeavor.

III. Developing and Maintaining a Database

This Amendment is intended to further knowledge of the distribution of archaeological sites across types of environmental associations, to foster the development of information concerning impacts and effects of vegetation treatments on archaeological sites, and to encourage communication and sharing of information among multiple parties, many of whom are external to the Bureau of Land Management. For those reasons, these Supplemental Procedures require the establishment and ongoing maintenance of an electronic database. The database will be in the form of a shared drive that will be maintained and utilized by the Northeastern Field Offices.

The scope of that database shall include, but not be limited to, such cultural resource documents as overviews, studies, and sensitivity models; spreadsheets or other compilations of results and findings from the monitoring program and schedules; reports of accomplishments made under the covering of these Supplemental Procedures; and modifications of SRPMs and stipulations for level of inventory.

The contents of this database shall be made available to the SHPO and to federally recognized tribes by a means which shall be developed subsequent to the adoption of these Supplemental Procedures. This database is a compilation of information for the purpose of facilitating communication and completing the terms of this amendment. As such, it is separate from existing spatial databases maintained either by the SHPO or by BLM.

IV. Specifying and Implementing Inventory

Cultural Resources Staff shall specify the level of inventory based on the treatment methodology and/or sensitivity model and best professional judgment. Specific levels of inventory are stipulated in this Section and these levels of inventory would become effective upon the execution of these Supplemental Procedures. However, it is the purpose of these Supplemental Procedures that advances in understanding of impacts and effects of vegetation

3

treatments and continued refinement of the sensitivity model shall provide an opportunity to adjust the level of inventory.

A sensitivity model shall be developed by the Northeastern Field Offices for northeast California and northwest Nevada within the first year of implementation of these Supplemental Procedures. The model will be provided to the SHPOs for review and comment. The model will also outline a strategy for testing the assumptions presented and how the strategy will be implemented and refined. In applying sensitivity to inventory strategies for the first year, professional judgment by the Field Archaeologists shall be utilized in developing the survey strategy; consultation with SHPOs will be required prior to application per requirements of our Protocol.

Stipulated levels of inventory by area sensitivity that shall be applied at the outset of these Supplemental Procedures are:

1. Literature review and Tribal consultation for all sage steppe restoration projects, regardless of type of treatment.
2. Class III surveys in high and moderate sensitivity areas when mechanized vehicular equipment is to be used. Mechanized equipment includes crawler track and rubber tired equipment.
3. Class III inventory in low sensitivity areas in which have been identified as testing areas for the purpose of evaluating predictions of the sensitivity model.
4. Class II inventory in low sensitivity areas which have not been identified as testing areas for the purpose of evaluation predictions of the sensitivity model.

Areas which have been previously inventoried and meet current professional standards for inventory may require no further inventory.

If prescribed fire is utilized as a treatment for SSER, then the inventory methodology identified in the Supplemental Procedures for Prescribed Fire (Protocol Appendix E) may be utilized.

Inventory methods may be refined depending on the type of treatment utilized for SSER, i.e. mechanized vehicular equipment, hand treatment, over the snow or frozen ground treatments and as previously mentioned, prescribed fire.

Lack of consensus between the Field Office Manager and Cultural Resource Staff regarding level of inventory stipulations shall be resolved according to the process set out in Section VI.I of the Protocol.

V. Evaluations

Formal determinations of eligibility to the National Register of Historic Places shall only be undertaken on sites or properties where it can be reasonably ascertained or it is uncertain that project activities will impact sites and that further consultation with SHPO could be required.

VI. Standard Resource Protection Measures

Cultural Resources Staff shall specify the application of SRPMs for individual sites which would be impacted by vegetation treatment measures. Specific SRPMs are stipulated in this Section and these SRPMs would become effective upon the execution of these Supplemental Procedures:

1. Flag-and-avoid with buffering, edge feathering / gradual reduction of standing juniper, and felled juniper as livestock barriers.
2. Lop-and-scatter with constraints on heavy fuel loads left on archaeological sites.
3. Mechanical treatment on archaeological sites with prescriptions and active monitoring by Cultural Resource Staff or other professional archaeologist.
4. Areas left untreated where high densities of archaeological sites have been identified.
5. Hand treatment on archaeological sites in areas of heavy juniper fuel load where the hand treatment will not impact archaeological data associated with the site.

However, it is the purpose of these Supplemental Procedures that advances in understanding of impacts and effects of vegetation treatments and continued refinement of the sensitivity model shall provide an opportunity to modify SRPMs and add additional SRPMs in consultation with SHPO. The SRPM defined above may be utilized as a condition for project implementation to avoid impacts to cultural resources. If the SRPM can be effectively applied, then no evaluation or further consultation with SHPO on effects will be necessary; if SRPMs cannot be applied or are not effective, then evaluations for eligibilities to NRHP and effects shall be required. The adopted SRPM shall be documented in contracts for implementation of projects. These SRPMs are implemented not only to protect cultural resources from project implementation but also to provide for best management of the cultural resources.

VII. Monitoring

These Supplemental Procedures are intended to facilitate adaptive management. Thoughtful and careful monitoring is the primary information source for making adjustments to inventory levels, SRPMs, and other aspects of management of cultural resources during sage steppe restoration projects. The monitoring program associated with this Amendment is critical at the earliest stages of implementation of this program as it will validate or assist in refining the applicability of survey strategies initiated and the application and refinement of SRPMs. Monitoring is critical to the cost that could be saved as the SSER progresses.

Monitoring has two fundamental purposes. These are:

1. Testing the predictions of the sensitivity model against findings from Class III surveys
2. Assessing the success of applications of the SRPMs to archaeological sites.

The monitoring program is intended to be incorporated into the normal program of work for compliance with these Supplemental Procedures. Provision of adequate funding and time

5

for conducting planned monitoring activities is the responsibility of each Field Office Manager.

VII. Reporting

A. Each participating Field Office shall report annually a summary of activities, including monitoring, carried out under this amendment to the Protocol during the previous fiscal year to the SHPO and the State Office. The reporting will either take place annually and be referenced in the Protocol Annual Report or it may be done through incorporation into the Protocol Annual Report.

B. Annual reports shall summarize activities carried out under this amendment. These reports are not meant to be compilations of the individual project reports prepared for sage steppe restoration projects; they are meant to be programmatic summaries of data and important findings.

V. Revision and Termination

The parties to this Amendment shall review the terms of this Amendment during scheduled reviews of the Statewide Protocol Agreement in order to determine whether continuation, revision, or termination is appropriate. Any party may propose revisions or terminate this Amendment by providing 90 days notice of the intent to terminate; all parties to this Amendment shall enter active negotiations to avoid termination. Revision may include changes and additions to the SRPMs and to levels of inventory by sensitivity or project type.

This Amendment shall expire and have no further force or effect at midnight of the tenth anniversary of the Amendment's date of execution unless continuation for a specific period is mutually agreed between all parties.

STATE DIRECTOR, BUREAU OF LAND MANAGEMENT, CALIFORNIA

By Mike Pool                                                   Date: DEC 10, 2008

STATE HISTORIC PRESERVATION OFFICER, CALIFORNIA

By Milford Wayne Donaldson, FAIA                      Date:   23 DEC 2008

STATE HISTORIC PRESERVATION OFFICER, NEVADA

By Ronald M. James                                            Date: 21 January 2009

7

I concur

FIELD MANAGER, ALTURAS FIELD OFFICE

By Timothy Burke                                        Date: 12/16/08

I concur

FIELD MANAGER, EAGLE LAKE FIELD OFFICE

By Dayne Barron                                    Date: 12/19/02

I concur

FIELD MANAGER, SURPRISE FIELD OFFICE

By Shane DeForest                                     Date: 12-15-08